ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
      – and –
SAMUEL H. RUDMAN
MARY K. BLASY (211262)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREG SAWICKI, Individually and on Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>  vs.<br><br>STITCH FIX, INC., KATRINA LAKE, PAUL YEE and MIKE C. SMITH,<br><br>                  Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

**INTRODUCTION**

Plaintiff Greg Sawicki ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned counsel, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's counsel, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Stitch Fix, Inc. ("Stitch Fix" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**SUMMARY OF THE ACTION**

1. This is a securities fraud class action on behalf of all purchasers of Stitch Fix common stock between June 8, 2018 and October 1, 2018, inclusive (the "Class Period") seeking remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2. Defendant Stitch Fix is an online retail fashion subscription service. Stitch Fix purchases clothing, shoes and accessories from name-brand manufacturers and designs more in-house that it has manufactured. Stitch Fix personnel then select and deliver curated boxes of items to "clients" to try on, buy what they like, and return the rest. While some or all of the items can be returned free of charge, clients are incentivized to accept the entire selection through a 25% price discount that is only applied if the client accepts the entire shipment.

3. This business model exposes Stitch Fix to a substantial risk of being forced to write off unsaleable inventory, a risk magnified by how quickly fashion trends change. Stitch Fix mitigates this risk by accumulating large troves of data about its clients' sizes, style preferences and purchasing habits, and runs that data through complex algorithms to match client preferences.

4. For subscription businesses like Stitch Fix, the most important business metric to investors is the number and growth rate of its "active clients," which Stitch Fix defines as a client who has responded to shipments at least once during the preceding 12-month period. In connection with its efforts to market its November 2017 initial public stock offering, Stitch Fix emphasized that

its active client base had grown dramatically from 867,000 at August 1, 2015, to 1,674,000 at July 30, 2016, to 2,194,000 at July 29, 2017, representing year-over-year growth rates of 93.1% and 31.1%, respectively. Stitch Fix focused investors on the growth of its active clients, stating that "the number of active clients [was] a *key indicator of [its] growth and the overall health of [its] business*."

5.      Stitch Fix's dramatic active client growth during 2017 and 2018, which served as a proxy for its revenue and profit growth during those same periods, was in large part the result of its prolific television advertising campaign. Though Stitch Fix was founded in 2011, it did not launch its first television advertising campaigns until 2017.

6.      Throughout the Class Period, Stitch Fix made materially false and misleading statements about the strength of its active client growth and its continued investment in television advertising and its impact on the Company's financial prospects, setting high investor growth expectations far beyond what the Company was actually then experiencing. In particular, Stitch Fix materially misrepresented the strength of its sales growth prospects by concealing that its active client growth rate had plummeted from 8% in the third quarter of 2018 ("3Q18") to 2% in the fourth quarter of 2018 ("4Q18") and claiming, among other things, that its strong 3Q18 results demonstrated the *continued positive momentum* of its business cycle while failing to disclose that the historical rates of growth reported in the Company's financial statements and reports to investors had actually slowed dramatically. In truth, Stitch Fix's active client growth rate had plummeted by the time it reported its 3Q18 financial results on June 7, 2018 – already *a third* of the way through 4Q18, which would end on July 28, 2018. Stitch Fix also misstated its commitment to its television advertising campaign, concealing that the Company had already determined it would cease running television advertising for 10 of the 13 weeks in 4Q18, further negatively impacting new client additions.

7.      Specifically, when Stitch Fix reported its financial results on June 7, 2018, the Company reported *30%* year-over-year active client growth for 3Q18, and its Chief Executive Officer, Katrina Lake, stated that the Company "'*continue[d] to balance growth* and profitability, [as] demonstrated by [its] *ability to consistently deliver top-line growth*,'" and that its strong 3Q18

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    - 2 -

"'results demonstrate[d] *continued positive momentum* for Stitch Fix.'" Stitch Fix's shareholder letter issued the same day confirmed that, as to ongoing advertising efforts, including its television campaigns, it would "continue to make strategic and measured marketing investments designed to achieve near-term payback." And in its quarterly report on Form 10-Q filed with the SEC that same day, Stitch Fix expressly stated that it then "*expect[ed] to increase [its] spending on*" *its television advertising campaigns*. The market was elated and the price of Stitch Fix common stock surged more than $5 per share on June 8, 2018, trading as high as $25.38 per share in intraday trading on unusually high volume of more than 12.6 million shares traded.

8. On June 19, 2018, CNBC published an article discussing the Company's 3Q18 earnings, titled "Trader: this company could be the Netflix of apparel." The article emphasized the Company's reported 30% year-over-year subscriber growth:

> **Trader: this company could be the "Netflix of apparel"**
>
> - Josh Brown, Ritholtz Wealth Management CEO, bought Stitch Fix.
>
> - It "might be the answer" to apparel companies that have had trouble building their online businesses, he said on Monday's "Halftime Report."
>
> \*   \*   \*
>
> *Brown also likes the fundamentals of the company. He noted that it is "growing its user base by an outstanding number" and that it's also showing accelerating revenue*. . . .
>
> Stitch Fix went public on November 17, 2017, and shares are up 81% since through Monday's close. *The company most recently reported quarterly results on June 7 that topped analyst estimates for both earnings and revenue, and the number of subscribers grew 30% in Q3 compared to a year earlier. The stock has soared 33% since the company announced results*.

As the market continued to digest the impact of the Company's reported 3Q18 growth and the continuing momentum that it purported to represent, the Company's share price increased to a Class Period high of $51.19 per share on September 17, 2018.

9. Then on October 1, 2018, after the close of trading, Stitch Fix reported its 4Q18 financial results, which fell short of projected active client growth expectations, disclosing that the Company had signed up far fewer than expected new active clients during 4Q18, which had ended more than two months earlier, on July 28, 2018. The Company shocked the market by disclosing

1  that Stitch Fix's active client count was virtually flat, coming in at 2.7 million.  Indeed, its active
2  client growth had plummeted by **70%** quarter-over-quarter, falling from 180,000 new additions in
3  3Q18 to just 54,000 in 4Q18 – lower than any prior reported quarterly growth since it had first
4  launched its television advertising campaigns in 2017 – and well below the 120,000 active clients
5  added during 4Q17.

6  10.  On Tuesday, October 2, 2018, the price of Stitch Fix stock declined $15.69 per share
7  – *more than 35%* – on unusually high volume of more than 39.9 million shares traded, or *more than*
8  *9.5 times* the average daily volume over the preceding ten trading days.  By the close of trading that
9  day, more than $600 million in market capitalization had simply vanished.

## JURISDICTION AND VENUE

11.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

12.  Venue is proper in this District pursuant to §27 of the Exchange Act, as Stitch Fix is headquartered in this District and many of the false and misleading statements alleged herein were disseminated from this District.

13.  In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

14.  Plaintiff Greg Sawicki purchased Stitch Fix common stock during the Class Period, as set forth in the accompanying certification incorporated by reference herein, and has been damaged thereby.

15.  Defendant Stitch Fix is a San Francisco, California-based online purveyor of clothing and accessories.  Stitch Fix common stock is listed and trades on the NASDAQ, an active market, under the ticker symbol "SFIX."  As of September 27, 2018, the Company had more than 38.5 million shares of common stock issued and outstanding.

16. Defendant Katrina Lake ("Lake") is, and was at all relevant times, the founder, Chief Executive Officer ("CEO") and a director of Stitch Fix.

17. Defendant Paul Yee ("Yee") is, and was at all relevant times, the Chief Financial Officer of Stitch Fix.

18. Defendant Mike C. Smith ("Smith") is, and was at all relevant times, the Chief Operating Officer of Stitch Fix.

19. Defendants Lake, Yee and Smith are sometimes referred to herein as the "Individual Defendants." Stitch Fix and the Individual Defendants are referred to herein, collectively, as "defendants."

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS
DURING THE CLASS PERIOD**

20. The Class Period starts on June 8, 2018. On June 7, 2018, after the close of trading, Stitch Fix issued a press release and letter to shareholders announcing its 3Q18 financial results for the period ended April 28, 2018. The press release emphasized that Stitch Fix had experienced growth in active clients, to 2.7 million, an increase of 30% year over year:

**Stitch Fix Announces Third Quarter Fiscal 2018 Financial Results**

. . . Stitch Fix, Inc. (NASDAQ:SFIX), the leading online personal styling service, has released its financial results for its third quarter of fiscal year 2018 ended April 28, 2018 and posted a letter to its shareholders on its investor relations website. Highlights include delivering:

Active clients of 2.7 million, an increase of 30% year over year

Net revenue of $316.7 million, an increase of ***29% year over year***

Net income of $9.5 million and adjusted EBITDA of $12.4 million

Diluted earnings per share of $0.09

"In addition to driving strong net revenue, net income, and adjusted EBITDA, ***we grew our active client count to 2.7 million, an increase of 30% year-over-year***," said Stitch Fix founder and CEO Katrina Lake. "***We continue to balance growth and profitability, demonstrated by our ability to consistently deliver top-line growth*** of over 20% even as we invest in category expansions, technology talent, and marketing. ***Our third quarter results demonstrate continued positive momentum*** for Stitch Fix and the power of our unique ability to deliver personalized service at scale."

Today Stitch Fix also announced the upcoming launch of Stitch Fix Kids.

"Our new Stitch Fix Kids offering is a testament to the scalability of our platform," explained Lake. "We're excited for Stitch Fix to style everyone in the family and to create an effortless way for parents to shop for themselves and their children."

21.     The shareholder letter, which was posted on the Company's website and filed with the SEC, repeated Stitch Fix's claim that it had "[grown] active clients to 2.7 million as of April 28, 2018," from 2.5 million in 2Q18, and from 2.07 million in 3Q17, an increase of 614,000 and 29.6% year-over-year growth.

22.     As to "Advertising," the 3Q18 shareholder letter stated that Stitch Fix's "Q3'18 advertising spend," which it said then included "the costs associated with the production of advertising, *television*, radio and online advertising," had "increased relative to [its] Q3'17 expense [to] 8.7% of net revenue." It also stated that the Company "*continue[s] to make strategic and measured marketing investments designed to achieve near-term payback*."

23.     Stitch Fix conducted a conference call with investors later that afternoon hosted by defendants Lake, Yee and Smith during which they provided additional positive commentary about the Company's 3Q18 financial results and its purportedly ongoing strong business metrics and financial prospects. Defendant Lake opened her remarks by reiterating that Stitch Fix had grown its "active client count to 2.7 million as of April 28, 2018, *an increase of 614,000 and 30% year over year*," and that the "Q3 also marked the fifth consecutive quarter of over 20% year over year top-line growth." She went on to emphasize that Stitch Fix had "*significant opportunities to acquire new clients in [its] existing business*," and that the "*30% year-over-year growth [it had] seen in active client count [was] the result of [efforts to serve new client groups], efficiently leveraging [its] performance marketing capabilities and increasing [its] brand awareness*."

24.     Commenting during the Q&A portion of the call on the impact that the new Men's and Plus-sized client offerings was having on the growth of active clients, defendant Lake emphasized that for "Plus directionally," there were "75,000 . . . people that were waiting on the wait list before [they] even launched the business," and though she stated Stitch Fix "[would not] be providing the exact numbers, the number of people that [were] benefiting from that service [was] significantly higher than that and *certainly continue[d] to grow*." She also emphasized that "from a

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                - 6 -

1  category perspective, Men's [and] Plus size . . . are all great opportunities for us to be able to have *many, many paths for long-term growth*."

25. Asked which categories of active clients were providing Stitch Fix with the confidence to provide the strong 4Q18 financial guidance announced that day, defendant Yee responded that, "*from a driver's standpoint, we grew active clients by 30% year-over-year*, and that's both for our Women's and Men's categories," adding that the Company was "really pleased with efficiencies . . . seen with [its] *marketing spend to attract new clients as well as ability to reengage and engage clients* with the various tools . . . to really please [its] clients."

26. On the same day, after the Company's reported its financial results, CNBC aired a segment and published an article repeating Lake's claims of continuing positive momentum in scaling the Company's business:

> Stitch Fix soared after the company reported strong earnings and user growth on Thursday.
>
> Here's how the company did compared to what Wall Street expected:
>
> - Earnings: 9 cents vs. 3 cents forecast by Thomson Reuters
> - Revenue: $316.7 million vs. $306 million forecast by Thomson Reuters
> - Active clients: 2.7 million vs. 2.66 million forecast by StreetAccount
>
> In the year-ago quarter, Stitch Fix reported a loss per share of 38 cents on $245.1 million in revenue.
>
> \*   \*   \*
>
> Founder and CEO Katrina Lake said the company has been able to post revenue growth without sacrificing investment in the business.
>
> "*Our third quarter results demonstrate continued positive momentum for Stitch Fix* and the power of our unique ability to deliver personalized service at scale," Lake said in a statement.

27. After the Company's positive statements in its 3Q18 report and conference call, the price of Stitch Fix common stock *surged more than 29%*, or $5.71 per share, to trade as high as $25.38 per share in intraday trading on June 8, 2018, on unusually high volume.

28. On June 8, 2018, Stitch Fix filed its 3Q18 quarterly report on Form 10-Q with the SEC, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 7 -

Lake and Yee. The Management's Discussion and Analysis ("MD&A") section of the Form 10-Q contained the following discussion of Stitch Fix's active client growth, which the Form 10-Q emphasized was a "key indicator of growth and the overall health of [the Company's] business," stating in pertinent part as follows:

> ***Active Clients***
>
> ***We believe that the number of active clients is a key indicator of our growth and the overall health of our business***. We define an active client as a client who checked out a Fix in the preceding 12-month period, measured as of the last date of that period. A client checks out a Fix when she indicates what items she is keeping through our mobile application or on our website. ***We had 2,688,000 and 2,074,000 active clients as of April 28, 2018 and April 29, 2017, respectively, representing year-over-year growth of 29.6%***.

29.     Detailing the "Factors Affecting [its] Performance," the MD&A section of Stitch Fix's 3Q18 Form 10-Q further emphasized the Company's ongoing active customer growth success and how its marketing spend was contributing to that growth, stating in pertinent part as follows:

> ***Client Acquisition and Engagement***
>
> To grow our business, we must continue to acquire clients and successfully engage them. We believe that implementing broad-based marketing strategies that increase our brand awareness has the potential to strengthen Stitch Fix as a national consumer brand, ***help us acquire new clients*** and drive revenue growth. As our business has achieved a greater scale and we are able to support a large and growing client base, ***we have increased our investments in marketing to take advantage of more marketing channels to profitably acquire clients***. For example, ***we recently significantly increased our advertising spend, from $21.3 million and $46.8 million for the three and nine months ended April 29, 2017 to $25.2 million and $73.2 million for the three and nine months ended April 28, 2018, respectively, to support the growth of our business. We expect to continue to make significant marketing investments to grow our business***. We currently utilize both digital and offline channels to attract new visitors to our website or mobile app and subsequently convert them into clients. ***Our current marketing efforts include*** client referrals, affiliate programs, partnerships, display advertising, ***television***, print, radio, video, content, direct mail, social media, email, mobile "push" communications, search engine optimization and keyword search campaigns.

30.     Discussing the Company's revenue growth in 3Q18, the MD&A section of the Form 10-Q stated that "[r]evenue increased by $71.7 million and $189.4 million, or 29.2% and 26.3% during the three and nine months ended April 28, 2018 compared with the same periods last year," noting "[t]he increase in revenue was primarily attributable to a 29.6% increase in active clients from April 29, 2017 to April 28, 2018, which drove increased sales of merchandise."

31.  Elsewhere, the 3Q18 Form 10-Q emphasized the importance of the television advertising campaigns to Stitch Fix's sales and promotional efforts, stating that because its "continued growth depend[ed] on attracting new clients," "[s]tarting in calendar year 2017, [it] began to increase [its] paid marketing expenses by investing more in digital marketing and launching [its] first television advertising campaigns." The Form 10-Q also expressly stated that the Company then "expect[ed] to increase [its] spending on these and other paid marketing channels in the future."

32.  On June 19, 2018, CNBC published another article discussing the Company's 3Q18 earnings report titled "Trader: this company could be the Netflix of apparel." The article emphasized the Company's reported 30% year-over-year subscriber growth:

> **Trader: this company could be the "Netflix of apparel"**
>
> - Josh Brown, Ritholtz Wealth Management CEO, bought Stitch Fix.
>
> - It "might be the answer" to apparel companies that have had trouble building their online businesses, he said on Monday's "Halftime Report"
>
> - ***The company topped Q3 analyst estimates when it reported earnings on June 7, and noted that active clients grew 30% compared to a year earlier***.
>
> On Monday Ritholtz Wealth Management CEO and "Halftime Report" trader Josh Brown bought Stitch Fix since he believes it could become the "Netflix of apparel."
>
> The San Francisco-based company is a clothing subscription service. Users fill out a style profile online and then receive a package with personally-curated clothing and accessories from the company. Subscribers can decide what they would like to buy from the box, and they can return the remaining items free of charge.
>
> As e-commerce growth accelerates and traditional retailers struggle to keep up, Brown believes Stitch Fix could be a bright spot in the sector.
>
> "If you look at the trouble the apparel companies have had building an online business fast enough to offset the decline in foot traffic Stitch Fix might be an answer," he said on Monday's "Halftime Report." "It may become the Netflix of apparel."
>
> ***Brown also likes the fundamentals of the company. He noted that it is "growing its user base by an outstanding number" and that it's also showing accelerating revenue. "I think they found a way to build a business in apparel online that just absolutely delights their customers,"*** he said.
>
> Stitch Fix went public on November 17, 2017, and shares are up 81% since through Monday's close. ***The company most recently reported quarterly results on June 7 that topped analyst estimates for both earnings and revenue, and the number of subscribers grew 30% in Q3 compared to a year earlier. The stock has soared 33% since the company announced results***.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 9 -

As the market continued to digest the impact of the Company's reported 3Q18 growth and the continuing momentum that it purported to represent, the price of the Company's stock increased to a Class Period high of $51.19 per share on September 17, 2018.

33.     On July 15, 2018, defendant Lake presented for Stitch Fix on NBC's *Today* show. A video link to the segment remained on the Company's website throughout the Class Period. Lake explained how she had launched Stitch Fix with just 29 customers, with NBC digitally displaying the number rapidly growing to 2.7 million active clients. As a result, it was stated that Stitch Fix was then "worth about two billion dollars." Asked whether business had been negatively impacted by the new Amazon.com Prime Wardrobe service rolled out earlier in 2018, which similarly "ship[s] customers clothes to try before they buy," Lake claimed that it had not impacted the business, emphasizing that "[t]he hardest part is that there's a million pairs of jeans out there literally and which ones are going to be the best ones for your body. And that's actually the hardest part to solve and we don't see anybody else doing that."

34.     Each of defendants' statements set forth in ¶¶20-26 and 28-33 were materially false and misleading when made because they misrepresented and/or omitted material facts necessary to make the statements made not misleading. These material facts, which were known to or deliberately disregarded by each of the defendants, were:

(a)     that Stitch Fix's active client growth had slowed to a crawl;

(b)     that Stitch Fix had completely shut down its television advertising campaign for 10 of the 13 weeks in 4Q18, dramatically decreasing the number of new active client additions; and

(c)     that as a result, the Company's current business metrics and financial prospects were not as strong as it had led the market to believe during the Class Period.

35.     On October 1, 2018, after the close of trading, Stitch Fix issued a press release announcing its financial results for 4Q18, the period ended July 28, 2018. In the press release, the Company reported 2.7 million active clients, disclosing that its new active client growth had stalled throughout 4Q18. The press release stated as follows:

**Stitch Fix Announces Fourth Quarter and Full Fiscal Year 2018 Financial Results**

. . . Stitch Fix, Inc. (NASDAQ:SFIX), the leading online personal styling service, has released its financial results for the fourth quarter and full fiscal year 2018 ended July 28, 2018 and posted a letter to its shareholders on its investor relations website.

**Fourth quarter highlights**

- Active clients of 2.7 million, an increase of 25% year over year
- Net revenue of $318.3 million, an increase of 23% year over year
- Net income of $18.3 million and adjusted EBITDA of $11.1 million
- Diluted earnings per share of $0.18

**Full year highlights**

- Net revenue of $1.2 billion, an increase of 26% year over year
- Net income of $44.9 million and adjusted EBITDA of $53.6 million
- Diluted earnings per share of $0.34

"Q4 was another strong quarter for us," said Stitch Fix Founder and CEO, Katrina Lake. "We grew our active client count 25% year over year and delivered $318.3 million in net revenue and $11.1 million in adjusted EBITDA."

36. During the conference call held with investors later that evening, Stitch Fix conceded that despite having reported on June 7, 2018 – only three weeks before the end of 4Q18 – that it had grown active clients by 180,000 quarter-over-quarter and 29.6% year-over-year – to 2.7 million – its active client growth rate had already dramatically declined and it was only up 54,000 quarter-over-quarter and 548,000, or 25%, year-over-year, and that its active client count still remained at 2.7 million. Also during the call, which was hosted by defendants Lake, Yee and Smith, defendant Smith disclosed that, unbeknownst to investors, Stitch Fix had decided to "temporarily cease[] [its] national TV campaign for 10 weeks" during the 13 weeks of 4Q18, purportedly to "measure channel efficacy." Defendant Smith conceded that the decision had had a negative impact on new client growth during the quarter, acknowledging that defendants had "learned that TVE was a more effective acquisition channel than [they] had previously modeled as measured on a cost per acquisition basis." During the Q&A session, when asked whether television advertising had "already turned back on," defendant Lake replied that Stitch Fix had "turned TV back on," expressly

acknowledging that "TV is an important part of that portfolio." Later she reiterated that "we always knew that TV was an important component of [marketing], but I think having gone through this test and having really understood more granularly how TV impacts, I think, we feel like it's a really important part of the portfolio and you'll continue to see us invest there."

37. Later that evening, as the after-hours price of the Company's common stock began plummeting, *The Wall Street Journal* published an article on Stitch Fix. According to the article, "[w]hen Stitch Fix, a subscription fashion service, had its initial public offering last November, investors were skeptical. How many people would continue to pay for constant wardrobe updates?" The article noted that while "[i]n its first quarters as a public company, Stitch Fix defied the skeptics and posted consistent growth, raising hopes that it could succeed where other subscription services ha[d]e failed" and causing its stock price to increase by "73% through Monday's close," the "fiscal fourth-quarter results show[ed] that the bullish thesis may be *coming apart at the seams*." The article concluded that "*Stitch Fix's stagnation with its core customer – American women – is a red flag*. If it misses again, investors will have good reason to believe it is going the way of Blue Apron Holdings, Birchbox, and other subscription services that *soared and then lost their novelty*."

38. On October 2, 2018, William Blair discussed the sharp deceleration in the growth of active clients and the Company's lower than expected 2019 revenue and earnings guidance:

**Greater-Than-Expected Deceleration of Active Clients Overshadows Plans to Launch Internationally**

What You Need to Know

- Active clients grew about 25% year-over-year to roughly 2.7 million. Sequential net adds of roughly 54,000 was lower than the Street estimate of roughly 128,000.

- Revenue slightly missed the Street estimate by less than 1%. Gross profit and EBITDA beat the Street by 2% and 13%, respectively.

- First quarter 2019 guidance was issued below the Street for both revenue and EBITDA.

- Initial fiscal 2019 guidance bracketed the Street for revenue and was below the Street for EBITDA. . . .

- The company announced plans to launch Women's and Men's offerings in the United Kingdom by the end of fiscal 2019.

> Stock Thoughts. ***Stitch Fix shares are down about 20% in the aftermarket, likely due to greater-than-expected deceleration on active clients and revenue, as well as lower-than expected EBITDA guidance for fiscal 2019***.

39. Following the Company's October 1, 2018 disclosures, the price of Stitch Fix common stock plummeted, falling $15.69 per share – ***more than 35%*** – on unusually high volume of more than 39.9 million shares traded, or ***more than 9.5 times*** the average daily volume over the preceding ten trading days.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

40. Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) Stitch Fix common stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Stitch Fix common stock; and

(e) Plaintiff and other members of the Class (as defined below) purchased Stitch Fix common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

41. At all relevant times, the market for Stitch Fix common stock was efficient for the following reasons, among others:

(a) As a regulated issuer, Stitch Fix filed periodic public reports with the SEC; and

(b) Stitch Fix regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

42. During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Stitch Fix common stock and operated as a fraud or deceit on Class Period purchasers of Stitch Fix common stock. As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Stitch Fix common stock fell precipitously, as the prior artificial inflation came out of the stock's price. As a result of their purchases of Stitch Fix common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

43. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Stitch Fix common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and defendants' legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

44. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Stitch Fix common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Stitch Fix and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

46. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

 (a) whether the Exchange Act was violated by defendants as alleged herein;

 (b) whether statements made by defendants misrepresented material facts about the business and operations of Stitch Fix; and

 (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

48. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**For Violation of §10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

49. Plaintiff incorporates ¶¶1-48 by reference.

50. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

51. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a

course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Stitch Fix common stock during the Class Period.

52. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Stitch Fix common stock. Plaintiff and the Class would not have purchased Stitch Fix common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

53. Plaintiff incorporates ¶¶1-52 by reference.

54. The Individual Defendants acted as controlling persons of Stitch Fix within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of Stitch Fix common stock, the Individual Defendants had the power and authority to cause Stitch Fix to engage in the wrongful conduct complained of herein. Stitch Fix controlled the Individual Defendants and all of the Company's employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: October 11, 2018

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS

*s/ Shawn A. Williams*
SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

JOHNSON FISTEL, LLP
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\Cpt Stitch Fix.docx

## CERTIFICATION OF PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Greg Sawicki, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint with my counsel and authorize its filing.

2. I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 10/1/2018 | 200 | 46.20 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|

*N/A*

5. I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of October, 2018.



Greg Sawicki