1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   MATTHEW S. MELAMED (260272)
3  CAROLINE M. ROBERT (254293)
   Post Montgomery Center
4  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
5  Telephone:  415/288-4545
   415/288-4534 (fax)
6  shawnw@rgrdlaw.com
   mmelamed@rgrdlaw.com
7  crobert@rgrdlaw.com

8  Lead Counsel for Lead Plaintiff

9  [Additional counsel appear on signature page.]

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13  In re STITCH FIX, INC. SECURITIES        )   Case No. 3:18-cv-06208-JD
    LITIGATION                               )
14  ─────────────────────────────────       )   CLASS ACTION
                                             )
15  This Document Relates To:                )   CONSOLIDATED COMPLAINT FOR
                                             )   VIOLATIONS OF THE FEDERAL
16        ALL ACTIONS.                       )   SECURITIES LAWS
    ─────────────────────────────────       )
17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.      SUMMARY OF THE ALLEGATIONS ...................................................................1

II.     JURISDICTION AND VENUE ...........................................................................4

III.    PARTIES ........................................................................................................5

IV.     RELEVANT BACKGROUND AND OVERVIEW OF STITCH FIX...........................6

      A.      Active Client Count Is the Most Important Key Indicator of Stitch Fix's
           Overall Financial Health ................................................................................7

      B.      Television Advertising Drives Stitch Fix's Active Customer Growth ...................9

V.      FRAUDULENT STATEMENTS AND OMISSIONS DURING THE CLASS
      PERIOD ...........................................................................................................11

      A.      Defendants' False and Misleading Statements Concerning Continued
           Active Client Growth and Television Advertising (June 7 and 8, 2018)...............11

      B.      Stitch Fix's Stock Price Surges Due to Defendants' Material
           Misrepresentations ........................................................................................15

VI.     THE TRUTH BEGINS TO BE REVEALED .........................................................22

VII.    ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS...........27

VIII.   THE PSLRA SAFE HARBOR DOES NOT APPLY ...........................................31

IX.     ADDITIONAL CONTROL PERSON ALLEGATIONS............................................31

X.      CLASS ACTION ALLEGATIONS AND THE FRAUD-ON-THE-MARKET
      PRESUMPTION OF RELIANCE ........................................................................32

COUNT I ..................................................................................................................35

COUNT II .................................................................................................................36

PRAYER FOR RELIEF ................................................................................................37

Court-appointed lead plaintiff Ganesh Kasilingam ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned counsel, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and, as to all other matters, upon information and belief based on the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Stitch Fix, Inc. ("Stitch Fix" or the "Company"), transcripts of conference calls hosted by the Company and its executives, including defendants Katrina Lake ("Lake"), Paul Yee ("Yee") and Mike C. Smith ("Smith") (the "Individual Defendants" and, together with Stitch Fix, "Defendants"), and media and analyst reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Pursuant to the Court's August 9, 2019 Order re Consolidation, Lead Plaintiff and Lead Counsel, Plaintiff attaches hereto as Exhibit A its securities fraud allegations in chart form.

## I.   SUMMARY OF THE ALLEGATIONS

1.   This is a securities fraud class action brought on behalf of all purchasers of Stitch Fix common stock between June 8, 2018, and October 1, 2018, inclusive (the "Class Period").  It seeks remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.   Defendant Stitch Fix is an online retail fashion subscription service.  Stitch Fix purchases clothing, shoes and accessories from name-brand manufacturers, and designs additional clothing, shoes and accessories in-house that it has manufactured.  Stitch Fix employees then select and deliver curated boxes of items to "clients" to try on, keep and buy what they like, and return the rest.  While some or all items may be returned free of charge, clients are incentivized to accept the entire selection through a 25% price discount that is only applied if the client accepts the entire shipment.

3.   As part of the Company's regular course of business, Stitch Fix collects troves of information about its clients' clothing sizes, style preferences and purchasing habits, and processes that data through complex algorithms to match specific client preferences.  The Company boasts that

1  it is "reinventing the shopping experience by delivering one-to-one personalization to our clients

2  through the combination of data science and human judgment."

3      4.      As acknowledged by the Company and the investment community following the

4  Company, for subscription-based businesses like Stitch Fix, the most important business metric to

5  investors is the number and growth rate of its "active clients." Stitch Fix defines an "active client"

6  as a client who has purchased all or part of a curated box of items the client received at least once

7  during the preceding 12-month period. Accordingly, Stitch Fix intentionally directed investors'

8  focus on the growth of its active clients. In the Registration Statement and Prospectus filed in

9  support of the Company's initial public offering in November 2017, more than six months before the

10 Class Period started, Defendants stated that "the number of active clients is a key indicator of our

11 growth and the overall health of our business."

12     5.      Judging by the number of active clients it reported in the lead-up to the Class Period,

13 Stitch Fix presented itself to be in good overall health. In connection with the Company's efforts to

14 market its November 2017 initial public stock offering, Stitch Fix emphasized its substantial recent

15 active client growth, which had grown from 867,000 as of August 1, 2015, to 1,674,000 as of July

16 30, 2016, to 2,194,000 as of July 29, 2017. These numbers reflect year-over-year growth rates of

17 93.1% as of July 30, 2016, and 31.1% as of July 29, 2017. But the key question for investors and

18 analysts was whether Stitch Fix could retain that active client growth profile as it matured, or

19 whether its growth would begin to plateau after years of achieving active client growth via the

20 lowest hanging fruit.

21     6.      Stitch Fix provided a partial answer to this during 2017 and early 2018, continuing its

22 dramatic active client growth rate in large part due to a nascent television advertising campaign.

23 Stitch Fix placed its first television advertising campaign in 2017 and quickly recognized the

24 benefits of television advertising. As Stitch Fix founder and CEO Katrina Lake stated on February

25 14, 2018, before the Class Period, at the Goldman Sachs Technology Internet Conference, "TV

26 works for us in a very performance-oriented way that we can attribute directly back to the spots that

27 we're airing." During an investor conference call at the end of the Class Period, Lake said that "we

28 always knew that TV was an important component" of the Company's marketing.

7.      Throughout the Class Period, Defendants' alleged material misrepresentations and omissions set investor expectations far above the undisclosed reality the Company was actually experiencing.  For example, on June 7, 2018, the first day of the Class Period, Defendants repeatedly represented to investors that the Company's ***active client growth in 3Q18[1] experienced an increase of 30% year-over-year, "demonstrate[ing] continued positive momentum for Stitch Fix*** and the power of our unique ability to deliver personalized service at scale."  But Defendants would later concede the true state of affairs: as early as April 29, 2018, approximately ***six weeks before the statement was made***, active client growth had in fact stalled to a near standstill.

8.      Also on June 7, 2018, Defendants told investors that "the costs associated with the production of . . . television, radio and online advertising" had increased to 8.7% of net revenue, that the Company would "***continue to make strategic and measured marketing investments designed to achieve near-term payback***" and that it was "***really pleased with efficiencies we've seen with our marketing spend to attract new clients***."  But, unbeknownst to investors, the truth was that Defendants had already instituted a halt on television advertising that had already started and would last for 10 of the 13 weeks in 4Q18.  The decision to cease television advertising was made by Defendants and commenced ***before*** the start of the Class Period.

9.      Investors sent Stitch Fix shares skyrocketing on Defendants' June 7, 2018 announcement of its 3Q18 results with investors, specifically referencing its ability to continue "'growing its user base by an outstanding number.'"  Numerous analysts reported that active client growth beat Wall Street expectations.  One analyst summed up investor reaction as follows: "***As active clients continue to grow in the 30% range for the fourth straight quarter, we believe that investors remain excited for the large opportunity moving forward***."

10.     As the market continued to digest the impact of the Company's reported 3Q18 growth and the continued momentum it purported to represent, Stitch Fix's share price increased to as high as $51.19 per share on September 17, 2018, ***up $31.52, or 160%***, from the closing price on the day

---

[1]     Stitch Fix's fiscal year 2018 was as follows: 1Q18 ran from July 30, 2017 to October 28, 2017; 2Q18 ran from October 29, 2017 to January 27, 2018; 3Q18 ran from January 28, 2018 to April 28, 2018; and 4Q18 ran from April 29, 2018 to July 28, 2018.

1    before the Class Period started.  While the stock price remained inflated due to Defendants'

2    misrepresentations and omissions, Defendants Lake and Smith sold ***more than $16 million*** worth of

3    common stock.  Lake's proceeds were more than twenty times greater than her base annual salary for

4    fiscal year 2018; Smith's were more than seven times greater than his.

5            11.     Then, on October 1, 2018, after trading closed, Stitch Fix reported its 4Q18 financial

6    results, which, with the number of active clients remaining essentially flat for the quarter, fell far

7    short of expectations.  ***Sequential active client growth had plummeted by 70%, from 180,000 new***

8    ***additions in 3Q18 to just 54,000 in 4Q18, the lowest of any prior reported quarter in the***

9    ***Company's history***, and was well below the 120,000 active clients added during 4Q17.  Defendants

10   also disclosed, for the first time, that the Company had ***halted the Company's television advertising***

11   ***campaign for 10 of the 13 weeks*** during 4Q18.

12           12.     Media and analysts immediately reported on the negative results.  *The Wall Street*

13   *Journal* published an article titled, "Fashion Emergency at Stitch Fix: The clothing subscription

14   service had its first big stumble as the number of active clients stagnated."  Analysts noted that

15   active client growth hit record lows, and ascribed the decline to the decision to halt television

16   advertising for almost the entire quarter.  By the close of trading on October 2, 2018, Stitch Fix's

17   stock price had ***declined $15.69 per share to $28.94 – more than 35%*** – on a volume of more than

18   9.5 times the average daily volume during the preceding ten trading days.  More than $600 million in

19   market capitalization simply vanished.  Shares of Stitch Fix common stock have continued to decline

20   since and currently trade at around $21 per share.

21   **II.     JURISDICTION AND VENUE**

22           13.     Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein

23   arise under §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

24           14.     Venue is proper in this District pursuant to §27 of the Exchange Act, as Stitch Fix is

25   headquartered in this District and many of the false and misleading statements alleged herein were

26   disseminated from this District.

27

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:18-cv-06208-JD                                                                            - 4 -
4845-8916-3429.v1

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**III.    PARTIES**

16.     Court-appointed lead plaintiff Ganesh Kasilingam purchased Stitch Fix common stock during the Class Period as set forth by the certification filed in this matter on December 10, 2018, and was damaged by the conduct alleged herein.

17.     Defendant Stitch Fix is a San Francisco, California-based online purveyor of clothing and accessories.  Stitch Fix common stock is listed and trades on the NASDAQ, an active market, under the ticker symbol "SFIX."  As of September 27, 2018, Stitch Fix had more than 38.5 million shares of common stock outstanding.  During the Class Period, Stitch Fix, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.  The Company has established and regularly publicizes the availability of a website at www.StitchFix.com, on which it maintains an Investor Relations section where SEC filings, press releases, conference call recordings, investor presentations, financial statements and information, corporate governance policies, descriptions of its business, and other information about the Company is made available to investors.

18.     Defendant Katrina Lake is, and was at all relevant times, the founder, Chief Executive Officer ("CEO") and a director of Stitch Fix.  As CEO, Lake had the power to authorize or approve publicly disseminated information about the Company and was regularly quoted in Stitch Fix's press releases, regularly spoke on Stitch Fix's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, regularly made live presentations at analyst-sponsored investor conferences, and signed or authorized all of Stitch Fix's  reports filed with the SEC.  Lake founded Stitch Fix in 2011.

19.     Defendant Paul Yee is, and was at all relevant times, the Chief Financial Officer ("CFO") of Stitch Fix.  Yee had the power to authorize or approve publicly disseminated information about the Company, regularly spoke on Stitch Fix's quarterly earnings calls to discuss

1  financial results with Wall Street analysts and investors, made live presentations at analyst-
2  sponsored investor conferences, and signed or authorized all of Stitch Fix's reports filed with the
3  SEC.  Yee joined Stitch Fix in June 2017.

4         20.    Defendant Mike C. Smith is, and was at all relevant times, the Chief Operating
5  Officer ("COO") of Stitch Fix.  Smith had the power to authorize or approve publicly disseminated
6  information about the Company, regularly spoke on Stitch Fix's quarterly earnings calls to discuss
7  financial results with Wall Street analysts and investors and made live presentations at analyst-
8  sponsored investor conferences.

9         21.    The Individual Defendants, because of their positions with the Company, individually
10  and collectively possessed the power and authority to control the contents of Stitch Fix's reports to
11  the SEC, press releases and public presentations to securities analysts, money and portfolio managers
12  and institutional investors.  Each Defendant was provided with copies of the Company's reports and
13  press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the
14  ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their
15  positions and access to material non-public information available to them, the Individual Defendants
16  knew that the adverse facts specified herein had not been disclosed to, and were being concealed
17  from, the public, and that the positive representations which were being made were then materially
18  false and/or misleading.

19         22.    As alleged herein, certain of the Company's SEC filings contained material
20  misrepresentations and omissions when issued.  In addition, throughout the Class Period, the
21  Individual Defendants participated in the Company's quarterly and/or annual earnings conference
22  calls wherein they made material misrepresentations, omitted material information, or failed to
23  correct the material misstatements or omissions of others.

24  **IV.    RELEVANT BACKGROUND AND OVERVIEW OF STITCH FIX**

25         23.    Stitch Fix is an online retail fashion subscription service that was founded in 2011 by
26  Defendant Lake and Erin Morrison Flynn.  According to its website, "Stitch Fix is the world's
27  leading online personal styling service.  We combine data science and human judgment to deliver
28  apparel, shoes, and accessories personalized to our clients' unique tastes, lifestyles, and budgets.

1    Our service is available for women, men, and kids, and designed to help all our clients look, feel, and

2    be their best selves."

3        24.    The Company's business model is, generally, as follows: Stitch Fix purchases

4    clothing, shoes and accessories from name-brand manufacturers, as well as designing clothing, shoes

5    and accessories in-house that it has manufactured.  Stitch Fix personnel then select and deliver

6    curated boxes of items to "clients" to try on, buy what they like, and return the rest.  While some or

7    all of the items can be returned free of charge, clients are incentivized to accept the entire selection

8    through a 25% discount applied only if the client accepts the entire shipment.  The Company's Form

9    10-K for the fiscal year 2018 states that Stitch Fix is "reinventing the shopping experience by

10   delivering one-to-one personalization to our clients through the combination of data science and

11   human judgment."

12       25.    On November 17, 2017, Stitch Fix filed with the SEC a Registration Statement and

13   Prospectus in connection with the Company's initial public offering of Class A common stock,

14   which began trading publicly on November 18, 2017.

15       **A.    Active Client Count Is the Most Important Key Indicator of Stitch
                 Fix's Overall Financial Health**

16

17       26.    For subscription businesses like Stitch Fix, the most important business metric to

18   investors is the number and growth rate of its "active clients."  Stitch Fix defined an active client as

19   "a client who checked out a Fix in the preceding 12-month period, measured as of the last date of

20   that period."  A "Fix" is the delivery of a personalized shipment to a client.  It functions as an offer

21   by the Company.  A client "checks out" a Fix when she notifies the Company through its website or

22   mobile app that she has decided to keep (and therefore purchase) all or part of the Fix.

23       27.    The Company identified active clients as one of two top-line key performance

24   indicators, sometimes referred to as KPIs, that Stitch Fix reports on a quarterly basis.  The other top-

25   line key performance indicator, net revenue per active client, is necessarily derived from and

26   incorporates the number of active clients.

27       28.    The Company's Registration Statement and Prospectus, filed with the SEC in

28   conjunction with Stitch Fix's November 18, 2017 initial public offering, directs investors to consider

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:18-cv-06208-JD                                                                         - 7 -
4845-8916-3429.v1

its active client growth as "a key indicator of our growth and the overall health of our business." The Prospectus identifies only three "key metrics" aside from its consolidated financial statements to measure its performance: two non-GAAP financial measures (adjusted EBITDA and non-GAAP net income) and, third, active clients.

29.    In the lead-up to the Class Period, Stitch Fix had had reported substantial active client growth: from 261,000 in FY14, to 867,000 in FY15, to 1,674,000 in FY16, to 2,194,000 in FY17. More important, quarterly growth had been consistent.  According to the Company's Q2 Fiscal 2018 Letter to Shareholders, posted to the Company's website on March 12, 2018, the Company had continued to add more than 100,000 active client in each quarter since 2Q17:



30.    Stitch Fix differentiates itself from competing clothing delivery services based on its use of "data science."  As Defendants stated in the Prospectus, "We are reinventing the shopping experience by delivering one-to-one personalization to our clients through the combination of data science and human judgment.:  According to Defendants, "This combination drives a better client experience and a more powerful business model than either element could deliver independently." Toward this end, Stitch Fix accumulates troves of data about its clients and runs that data through complex algorithms to match client preferences.  As the Prospectus further noted: "We believe our data science capabilities give us a significant competitive advantage, and as our data set grows, our algorithms become more powerful."  Defendant Lake elaborated during the Company's February 14, 2018, presentation at the Goldman Sachs Technology and Internet Conference: "data science in our

1  model, is really – it's not a feature, it's not kind of like an afterthought.  It's really at the core of all

2  of our operations."

3        31.    The Prospectus explained that, on average, each Stitch Fix client "directly provides us

4  with over 85 meaningful data points through his or her style profile, including detailed style, size, fit

5  and price preferences, as well as unique inputs such as how often he or she dresses for certain

6  occasions or which parts of his or her body the client likes to flaunt or cover up.  Over time, through

7  their feedback on Fixes they receive, clients share additional information about their preferences as

8  well as detailed data about both the merchandise they keep and return."

9        32.    The data points are classified in three broad categories: "client data," "merchandise

10  data," and "feedback data."  As reflected in the graphic below, "feedback data" includes "keep," *i.e.*,

11  data about whether each client checked out a Fix, thereby becoming an active client.  Defendants

12  therefore had access to the number of active clients at all times.



23      **B.    Television Advertising Drives Stitch Fix's Active Customer Growth**

24        33.    After years of organic growth, the Company recognized the need to extend the

25  Company's marketing efforts and, in 2017, launched its first television campaign.  Stitch Fix's

26  television campaign was an integral tool in continuing to drive the Company's active client growth

27  as it matured.

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:18-cv-06208-JD                                                            - 9 -
4845-8916-3429.v1

34.     Shortly after launching its television campaign, the Company boasted of its success to investors.  For example:

- On February 14, 2018, during her appearance at the Goldman Sachs Technology Internet Conference, Defendant Lake responded to a question about trends and customer acquisition costs by touting that "TV works for us in a very performance-oriented way," *i.e.*, it drove client growth, directly attributable "to the spots that were airing":

> We have a lot of room to find a lot of different types of productive channels and we are at a place now where we have a diverse set of channels.  ***TV works for us in a very performance-oriented way that we can attribute directly back to the spots that were airing***.  We put social I already talked about, their differences between men and women.  But we've been able to find a wide diverse range of channels where we're seeing very quick payback on that spend, and that continue to generate value after that.

- On March 12, 2018, during the Company's 2Q18 investor conference call, Lake responded to a question about the Company's marketing efforts that the Company could attribute direct responses by clients to television spots within seconds and referring to the Company's current marketing, including television, as "performance marketing," *i.e.*, marketing aimed at increasing the Company's performance by driving client growth:

> . . . I'll take the question on marketing.  The mix between brand and performance, today the – I mean, ***almost everything that we do would be categorized as performance***.  And so even on the TV front, ***for example, the TV spots that we're running, our direct response, we can attribute those within kind of a 5-second window directly to sign-ups that we're seeing in response to that***.  And so I think it's definitely an opportunity as we think about the longer term of the company and the kind of the longer-term horizon as the types of marketing that we want to do in building a brand that people know and love and that really has this kind of hearts and minds type of place with consumers.  And it's an area that we're excited about.  And I think we – you'll see over the course of, I don't know, a year or so, that you'll probably see us experiment with more types of marketing.  But ***today, the vast majority of the marketing spend that you see would be more of what people would consider performance marketing***.

- On May 16, 2018, during her appearance at the JPMorgan Global Technology, Media and Communications Conference, Lake was asked, "What's working best for you from a marketing perspective?  Anything [specific] to call out?" (modification in original).  In response, she again talked about the "direct response" in terms of client growth the Company was experiencing to its television spots, which fit with a "data-driven ROI approach":

> ***We use TV.  TV, we use all-in kind of a direct response way.  We were attributing back, I think, within 7 seconds of people seeing a spot and signing up.  So we use a very data-driven ROI approach*** . . . .

35.     Accordingly, in the months before the Class Period, Defendant Lake repeatedly informed investors about the importance of television advertising to the Company's continued

growth and about Defendants' immediate insight into the success of television advertising in driving new client growth.

## V.   FRAUDULENT STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.   Defendants' False and Misleading Statements Concerning Continued Active Client Growth and Television Advertising (June 7 and 8, 2018)

36.   During the Class Period, Defendants Stitch Fix, Lake, Yee and Smith, acting with scienter, each made, authorized or had ultimate authority over the statements set forth below, which materially misrepresented that: the Company was continuing to experience active client growth – the core metric indicating the Company's health and performance – without disclosing that active client growth had, in truth, nearly ground to a halt by the time of the statements; and that the Company's marketing efforts continued to include a television advertising campaign, when, in truth, the Company had ceased its national advertising campaign by the time of the statements.

37.   <u>Material Misrepresentation</u>.  After the close of trading on June 7, 2018, Stitch Fix issued a press release and, separately, a letter addressed to its shareholders announcing the Company's 3Q18 financial results, which concerned the three-month period ended April 28, 2018. The press release misleadingly emphasized that Stitch Fix had experienced growth in active clients, to 2.7 million, an increase of 30% year over year, and falsely represented that result demonstrated Stitch Fix's "continued positive momentum":

Stitch Fix Announces Third Quarter Fiscal 2018 Financial Results

. . . Stitch Fix, Inc. (NASDAQ:SFIX), the leading online personal styling service, has released its financial results for its third quarter of fiscal year 2018 ended April 28, 2018 and posted a letter to its shareholders on its investor relations website. **_Highlights include delivering:_**

- **_Active clients of 2.7 million, an increase of 30% year over year_**

- Net revenue of $316.7 million, an increase of 29% year over year

- Net income of $9.5 million and adjusted EBITDA of $12.4 million

- Diluted earnings per share of $0.09

"In addition to driving strong net revenue, net income, and adjusted EBITDA, **_we grew our active client count to 2.7 million, an increase of 30% year-over-year_**," said Stitch Fix founder and CEO Katrina Lake.  "We continue to balance growth and profitability, demonstrated by our ability to consistently deliver top-line growth of

over 20% even as we invest in category expansions, technology talent, and marketing. ***Our third quarter results demonstrate continued positive momentum*** for Stitch Fix and the power of our unique ability to deliver personalized service at scale."

38.   <u>Material Misrepresentation</u>.  A shareholder letter that was posted on the Company's website on or around June 7, 2018 and filed with the SEC on June 7, 2018 repeated Stitch Fix's materially misleading claim that it had "***[grown] active clients to 2.7 million as of April 28, 2018,*** ***from 2.5 million in 2Q18, and from 2.07 million in 3Q17, an increase of 614,000 and 29.6% year-*** ***over-year growth***.  The June 7, 2018 shareholder letter continued by noting the Company's increased and continuing advertising expenses, including television:

> **Advertising.  *We continue to make strategic and measured marketing*** ***investments designed to achieve near-term payback***.  In Q3'18, advertising expense was $25.2 million, or 8.0% of net revenue.  Our Q3'18 advertising spend increased relative to our Q3'17 expense of $21.3 million, or 8.7% of net revenue.

*            *            *

> ***Advertising expenses include the costs associated with the production of*** ***advertising, television, radio and online advertising***.

39.   <u>Material Misrepresentation</u>.  Later in the day on June 7, 2017, Defendants Lake, Yee, and Smith hosted an investor conference call to discuss the Company's 3Q18 results.  During the call, Defendants continued to provide materially misleading commentary about the significant growth in active clients.  In prepared remarks to open the call, Defendant Lake misleadingly touted that the Company had achieved significant active client growth: "***We grew our active client count to*** ***2.7 million as of April 28, 2018, an increase of 614,000 and 30% year-over-year***."  She then misleadingly ascribed that new client growth to the Company's marketing capabilities:

> Our second pillar for growth is in serving new clients.  We believe that we have significant opportunities to acquire new clients in our existing business.  **The** ***30% year-over-year growth we've seen in active client count is the result of these*** ***efforts***, efficiently leveraging our performance, ***marketing capabilities and*** ***increasing our brand awareness***.

40.   <u>Material Misrepresentation</u>.  During the investor conference call, in response to an analyst's question about what drove the Company's increased guidance in light of stagnant revenue-per-active-client, Defendant Yee misleadingly stated that the growth in active clients was largely due to marketing efforts:

[ANALYST:] [C]ould give us a little bit more detail about what drove the upside to guidance in the quarter. I think revenue per active client was flattish in the quarter after declines in prior quarters, so just curious what drove that specifically . . . .

*       *       *

[YEE:] Just to add on to our results for the quarter, our 29% retail growth – retail sales growth was above our range of 22% to 26% and really went – from a driver's standpoint, ***we grew active clients by 30% year-over-year***, and that's both for our Women's and Men's categories. ***And we're really pleased with efficiencies we've seen with our marketing spend to attract new clients*** as well as ability to reengage and engage clients with the various tools we have to really please our clients.

41.   <u>Material Misrepresentation</u>. On June 8, 2018, Stitch Fix filed with the SEC a Form 10-Q for the quarter ended April 28, 2018. The Form 10-Q, which was signed by Defendants Lake and Yee, falsely represented that the Company's current marketing efforts included television, that it had recently increased advertising spending and that it would continue making significant marketing investments to grow its business:

**Client Acquisition and Engagement**

To grow our business, we must continue to acquire clients and successfully engage them. We believe that implementing broad-based marketing strategies that increase our brand awareness has the potential to strengthen Stitch Fix as a national consumer brand, help us acquire new clients and drive revenue growth. As our business has achieved a greater scale and we are able to support a large and growing client base, we have increased our investments in marketing to take advantage of more marketing channels to profitably acquire clients. For example, we recently significantly increased our advertising spend, from $21.3 million and $46.8 million for the three and nine months ended April 29, 2017 to $25.2 million and $73.2 million for the three and nine months ended April 28, 2018, respectively, to support the growth of our business. We expect to continue to make significant marketing investments to grow our business. We currently utilize both digital and offline channels to attract new visitors to our website or mobile app and subsequently convert them into clients. ***Our current marketing efforts include*** client referrals, affiliate programs, partnerships, display advertising, ***television***, print, radio, video, content, direct mail, social media, email, mobile "push" communications, search engine optimization and keyword search campaigns.

42.   The Form 10-Q filed June 8, 2018 also included the following materially misleading risk disclosure concerning the importance of advertising, specifically television advertising, in driving customer growth and the expectation that spending on television would increase:

**Our continued growth depends on attracting new clients.**

Our success depends on our ability to attract new clients in a cost-effective manner. To expand our client base, we must appeal to and acquire clients who have historically used other means to purchase apparel, shoes and accessories, such as traditional brick-and-mortar apparel retailers or the websites of our competitors. We

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:18-cv-06208-JD
4845-8916-3429.v1

- 13 -

reach new clients through paid marketing, referral programs, organic word of mouth and other methods of discovery, such as mentions in the press or internet search engine results. ***Starting in calendar year 2017, we began to increase our paid marketing expenses by*** investing more in digital marketing and ***launching our first television advertising campaigns. We expect to increase our spending on these and other paid marketing channels in the future*** and cannot be certain that these efforts will yield more clients or be cost-effective.

43.     <u>Reasons Why Statements in ¶¶37-42 Were Knowingly or Recklessly False and Misleading</u>. Defendants' representations in ¶¶37-42 were knowingly or recklessly false and misleading when made for the following reasons:

(a)     Defendants failed to disclose that Stitch Fix's active client growth had nearly halted by the time they made the statements on June 7 and 8, 2018.  The misrepresentations were made almost halfway through 4Q18, which commenced on April 29, 2018, and would continue through July 28, 2018.  When Defendants reported 4Q18's results in October 2018, they revealed that the Company's active client growth grew only 2% sequentially in 4Q18, with only 54,000 active clients added during the entirety of the quarter.  ¶¶11, 62, 65, 68, 70-72, 87.

(b)     Active client count was the core metric indicative of Stitch Fix's health. ¶¶26-32.  Stitch Fix reported two top-line key performance indicators on a quarterly basis: (1) active clients; and (2) net revenue per active client, which is derived from the number of active clients.  ¶27.

(c)     Defendants knew, or had immediate access to and deliberately disregarded, the Company's current active client count at all times, which reflected the near-total cessation of growth starting on April 29, 2018, the beginning of 4Q18.  The active client count was automatically generated by the Company's technological systems, which analysts and the Company itself touted repeatedly as one of its core competencies.  ¶¶30-32.  Among the data points collected was whether a client had decided to "keep" part or all of a Fix.  ¶32.  The definition of an active client was a client who kept all or part of a Fix within the last twelve months.  ¶26.  Thus, the present number of Stitch Fix's active clients was available to Defendants at all times, including in the lead-up to their June 7 and June 8, 2018 misrepresentations about active client growth.  ¶32.

(d)     Contrary to Defendants' representations, the Company's current marketing efforts did not include television advertising.  The Company in fact planned to and had already

1   halted television advertising before June 7, 2018, as Defendants knew or deliberately disregarded.

2   During the Company's October 1, 2018, earnings call, Defendant Smith revealed that Stitch Fix had

3   "temporarily ceased [its] national TV campaign for 10" of the 13 weeks in 4Q18.  ¶¶61, 63.

4          (e)    Defendants also knew or recklessly disregarded that the decision to halt

5   television advertising would negatively affect the Company's ability to drive continued active client

6   growth.  Defendants had repeatedly emphasized the integral nature of the Company's television

7   campaign to its ability to cost effectively attract new clients.  ¶¶33-35.  For example, in February

8   2018, Defendant Lake told investors that "TV works for us in a very performance-oriented way that

9   we can attribute directly back to the spots that were airing." ¶34.  In March 2018, she told investors

10  that Stitch Fix could trace the direct response to television advertisements.  *Id*.  In May 2018, she

11  told investors that television advertising was among the efforts "working best for [Stitch Fix] from a

12  marketing perspective," and that the Company could trace the direct response to television

13  advertisements within seconds.  *Id*.  According to Stitch Fix's Form 10-Q filed with the SEC on June

14  8, 2018, the Company launched its television campaign in 2017 and its active client count grew over

15  68.4% from 1,847,000 in 1Q17 to 2.7 million by 3Q18.  On October 1, 2018, Lake would state,

16  reflecting back, "we *always knew* that TV was an important component of [marketing]."  ¶66.

17      **B.    Stitch Fix's Stock Price Surges Due to Defendants' Material
              Misrepresentations**

18

19      44.    Following the Company's June 7, 2018 earnings release and June 8, 2018 earnings

20  call and Form 10-Q, many analysts affirmed the power of the Company's active client growth as a

21  catalyst for driving strong revenues in the third quarter, highlighting the materiality of the

22  misrepresentations pled above.

23      45.    On June 7, 2018, following the Company's earnings release, CNBC aired a segment

24  on the Company's earnings release and published an article with a title specifically linking the

25  Company's surging stock price to its statements about active client growth: "***Stitch Fix soars after***

26  ***online styling service says active clients grew 30%.***"  The article continued:

27          ***Stitch Fix soared after the company reported strong earnings and user growth on***
            ***Thursday***.

28      Here's how the company did compared to what Wall Street expected:

1    Earnings: 9 cents vs. 3 cents forecast by Thomson Reuters

2    Revenue: $316.7 million vs. $306 million forecast by Thomson Reuters

3    ***Active clients: 2.7 million vs. 2.66 million forecast by StreetAccount***

4    46.    On June 7, 2018, an RBC analyst report titled "Q3:18 was a 'good fit'"

5  stated that the active client growth, a key growth factor, "remain[ed] healthy," which was a positive

6  result":

7    ***Our view: Stitch Fix reported a Beat & Mix FQ3, with accelerating Revenue***
     ***growth (29%) and net Active Client additions***, and Gross and EBITDA Margin
8    expansion.

9                          *      *      *

10   ***Keys to Quarter: 1) Active Clients upside: Came in at 2.69MM, ahead of the Street***
     ***at 2.67MM, with 180K Net Adds vs. 154K in FQ3:17 and 112K in FQ2:18.  Good***
11   ***results!***

12                         *      *      *

13   ***Maintaining Outperform***: At the margin, ***we are more positive – intrinsically strong***
     ***quarter with revenue acceleration, gross margin expansion, and net client addition***
14   ***acceleration***.

15   47.    Concerning the Company's active clients, the RBC report continued: "***Stitch Fix's***

16  ***Active Clients came in at 2.688MM, above the Street's expectation of 2.665MM and our***

17  ***expectation of 2.675MM.   These were positive results, with Active Client growth remaining***

18  ***healthy at 30% Y/Y***, which compares to 31% Y/Y growth in FQ2:18."   That excerpt was

19  accompanied by the following chart visualizing the Company's growth in active clients from 1Q16

20  through 3Q18, and an accompanying year-over-year growth calculation starting in 1Q17:

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:18-cv-06208-JD                                                                    - 16 -



Exhibit 3: SFIX Active Clients

Source: RBC Capital Markets estimates, Company reports

48.     On June 8, 2018, Barclays issued an analyst report titled "Steady and Consistent, GM on Track," which noted that stable active client growth of 30% year-over-year and 614,000 net client additions year over year were positives for the Company in 3Q18:

> *Positives In 3Q*: . . . *Active Client growth was stable at 30% Y/Y and the 614K net additions Y/Y was the highest level in several quarters*.

49.     Also on June 8, 2018, Piper Jaffray issued an analyst report titled "Well Executed Q3; Strong Initiatives & Scaling Supply Chain Keep Us Optimistic," which credited the Company's quarterly active client growth for the Company's success:

> Q3 Top & Bottom Lines Beat; Gross Margin Inflects Positive: SFIX revenue of $317M (+29% Y/Y) came in above consensus expectations for $307M. *Q/Q active clients accelerated on a Y/Y basis for the third straight quarter to 2.7M*.

50.     On June 8, 2018, William Blair issued analyst report titled "Beat-and-Raise Quarter on Top and Bottom Line; Introducing Stitch Fix Kids," which also noted the year-over-year (*i.e.*, 3Q17 to 3Q18) and sequential (*i.e.*, 2Q18 to 3Q18) active client additions beat estimates.  It also said that active client growth in the 30% range for the fourth straight quarter "excited" investors:

> *Active clients grew about 30% year-over-year to roughly 2.7 million.  Sequential net adds of roughly 180,000 were greater than the FactSet estimate of roughly 157,000*.

>                    *      *      *

> **Stock Thoughts**. *Stitch Fix shares are up about 6% in the aftermarket, likely due to strong financial performance on the quarter, as well as boosted guidance for the full year.  As active clients continue to grow in the 30% range for the fourth straight quarter, we believe that investors remain excited for the large opportunity moving forward*.

51.   The price of Stitch Fix common stock surged in the wake of Defendants' June 7, 2018, and June 8, 2018, statements.  The share price increased more than 29%, or $5.71 per share, from a June 7 close of $19.67 to as high as $25.38 in intraday trading on June 8, 2018, on unusually high volume of 12.6 million shares, approximately twelve times the average volume during the prior ten trading days.

52.   While Defendants' misrepresentations and omissions regarding the then-current state of active user growth and television advertising caused the Company's stock to trade at artificially inflated values, ***Defendants Lake and Smith unloaded 550,000 shares of their common stock for proceeds of more than $16 million***, as reflected in the charts below.  The proceeds from Lake's and Smith's Class Period stock sales reflected exponential multiples over their annual base salaries. According to Stitch Fix's Proxy Statement for the 2018 Annual Meeting of Stockholders, Lake had a fiscal year 2018 base salary of $650,000, and Smith's base salary was $496,000.  As such, ***Lake's Class Period sales resulted in proceeds twenty times greater, and Smith's sales resulted in proceeds more than seven times greater, than their base salaries for the entire year***.

| Lake's Class Period Sales | | | |
|---|---|---|---|
| Date | Price | Shares | Proceeds |
| 6/18/18 | $26.20 | 27,116 | $710,439 |
| 6/18/18 | $25.27 | 39,550 | $999,429 |
| 6/19/18 | $26.06 | 57,429 | $1,496,600 |
| 6/19/18 | $26.47 | 9,237 | $244,503 |
| 6/20/18 | $26.17 | 4,000 | $104,680 |
| 6/20/18 | $25.63 | 62,668 | $1,606,181 |
| 7/16/18 | $32.34 | 52,466 | $1,696,750 |
| 7/16/18 | $33.17 | 14,200 | $471,014 |
| 7/17/18 | $33.06 | 8,626 | $285,176 |
| 7/17/18 | $32.68 | 58,040 | $1,896,747 |
| 7/18/18 | $35.30 | 3,224 | $113,807 |
| 7/18/18 | $33.67 | 26,750 | $900,673 |
| 7/18/18 | $34.68 | 36,694 | $1,272,548 |
| 8/20/18 | $32.82 | 50,000 | $1,641,000 |
| *Lake's Totals* | | *450,000* | *$13,439,546* |

| Smith's Class Period Sales | | | |
|---|---|---|---|
| Date | Price | Shares | Proceeds |
| 6/15/18 | $26.83 | 300 | $8,049 |
| 6/15/18 | $26.26 | 24,700 | $648,622 |
| 7/16/18 | $33.29 | 14,880 | $495,355 |
| 7/16/18 | $32.47 | 10,020 | $325,349 |
| 7/16/18 | $34.10 | 100 | $3,410 |
| 8/15/18 | $32.58 | 19,791 | $644,791 |
| 8/15/18 | $33.08 | 5,209 | $172,314 |
| 9/17/18 | $48.35 | 5,583 | $269,938 |
| 9/17/18 | $51.07 | 12,707 | $648,946 |
| 9/17/18 | $49.10 | 4,560 | $223,896 |
| 9/17/18 | $50.42 | 2,150 | $108,403 |
| **Smith's Totals** | | **100,000** | **$3,549,074** |

53.     On June 19, 2018, CNBC published another article discussing the Company's 3Q18 earnings, titled "Trader: this company could be the 'Netflix of apparel.'"  The article emphasized the Company's reported 30% year-over-year subscriber growth and quoted the CEO of a wealth management company as saying that Stitch Fix was "'growing its user base by an outstanding number'":

**Trader: this company could be the "Netflix of apparel"**

- Josh Brown, Ritholtz Wealth Management CEO, bought Stitch Fix.

- It "might be the answer" to apparel companies that have had trouble building their online businesses, he said on Monday's "Halftime Report"

- ***The company topped Q3 analyst estimates when it reported earnings on June 7, and noted that active clients grew 30% compared to a year earlier.***

                    *        *        *

    "If you look at the trouble the apparel companies have had building an online business fast enough to offset the decline in foot traffic Stitch Fix might be an answer," he said on Monday's "Halftime Report."  "It may become the Netflix of apparel."

    ***Brown also likes the fundamentals of the company.  He noted that it is "growing its user base by an outstanding number" and that it's also showing accelerating revenue.***  "I think they found a way to build a business in apparel online that just absolutely delights their customers," he said.

54.     On July 15, 2018, Defendant Lake appeared on NBC's Today show.  A video link to the segment remained on the Company's website throughout the Class Period.  As Lake explained

1   how she had launched Stitch Fix with just 29 customers, NBC digitally displayed the number rapidly

2   growing to 2.7 million active clients.

3         55.    On August 9, 2018, analysts at SunTrust Robinson Humphrey Capital Markets

4   initiated coverage of Stitch Fix, issued a comprehensive analyst report titled "Disruptive by Design;

5   Initiate with Buy/$38 PT."   The report emphasized the core importance of active clients to the

6   Company's financial results, calling it a "key revenue driver":

7                **Stitch Fix also reports two top line KPIs on a quarterly basis: active clients**
              **and net revenue per active client.**

8

9                **Active Clients is a key revenue driver**.

10            (i)     **Active Clients**: An active client is defined as somebody that has
              checked out a Fix in the last 12 months.  A client "checks out" a Fix when he/she
              indicates which item(s) he/she is keeping through the company's mobile app or

11               website.

12

13 **FIGURE 6: ACTIVE CLIENT QUARTERLY TRENDS**

| | 1Q17A | 2Q17A | 3Q17A | 4Q17A | 1Q18A | 2Q18A | 3Q18A |
|---|---|---|---|---|---|---|---|
| Active clients | 1,847 | 1,920 | 2,074 | 2,194 | 2,396 | 2,508 | 2,688 |
| *Y/Y growth* | *70.2%* | *49.6%* | *37.4%* | *31.1%* | *29.7%* | *30.6%* | *29.6%* |
| Sequential net adds | 173 | 73 | 154 | 120 | 202 | 112 | 180 |

*Source: Company reports, SunTrust Robinson Humphrey*

16         56.    The report further focused on the increasing need for advertising to drive new

17   customer acquisition:

18       **Advertising Spend to Stabilize Core**

19            The core Women's category caters to sizes 0-14 (less than 50% of women in
           the U.S.), and though recently the category has decelerated, we believe there is still

20            plenty of room for growth in this ~$100B market (Coresight).  For example, through
           the first five years, the majority of the growth was more organic in nature, as the

21            company utilized word of mouth, customer referrals and social media
           influencers/bloggers.  As of a May 2017, aided brand awareness for women with

22            household income above $50K and ages 21-65 was just 41% (Millward Brown), and
           **we believe investments in both traditional and online advertising channels should**

23            **help grow this metric, and in turn allow the company to acquire new customers**.

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12



**FIGURE 11: HISTORICAL REVENUE GROWTH MOSTLY ORGANIC** [1] [2]

*(1) In $ millions*
*(2) FY17 launched Men's and Plus, but we estimate revenue impact was de minimis*
*Source: Company filings, SunTrust Robinson Humphrey*

13         ***We believe Stitch Fix will be able to attract new clients as the company***
14   ***leans into advertising.*** Importantly, the company has stated customer acquisition
      costs have remained stable over the last few quarters, suggesting this level of relative
15         spend is the new normal. We note the company has provided a long-term target of
      advertising expenses representing 9-11% of total revenues (vs. 9% for FY 2018E).

16         57. As the market continued to digest the impact of the Company's reported 3Q18 growth

17   and the continuing momentum that it purported to represent, the price of the Company's stock

18   increased to a Class Period high of $52.44 per share during intraday trading on September 18, 2018,

19   more than double the Class Period share price at the close of trading on June 7, 2018, the day before

20   the start of the Class Period.

21         58. On September 25, 2018, J.P. Morgan previewed the Company's upcoming

22   4Q18/FY18 earnings announcement in an analyst report titled "Thoughts Into 4QFY18 Earnings:

23   Focus on FY19 Revenue Guide, w/Consensus Low & Expectations High; Neutral, $36 PT." Once

24   again, the report emphasized the causal link between active client growth and revenue growth,

25   noting its expectation that Stitch Fix would report active clients of 2.808 million, a 28% year-over-

26   year increase:

27
28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:18-cv-06208-JD                                                                                      - 21 -
4845-8916-3429.v1

**4QFY18 Earnings Preview: Key Metrics & Topics:**

Stitch Fix reports 4Q earnings on Monday, 10/1 after market close, with the 5pm ET conference call available at: US: (800) 458-4121; Int'l: (323) 794-2093; Passcode: 8417189. We're looking for:

**1) Active Clients of 2.808M (+28% Y/Y),** driven by Women's Active Clients of 2.510M (+23% Y/Y) & Men's Active Clients of 298k (+94% Y/Y).  We do not model any contribution from Kids, which launched on 7/10, given SFIX's 4Q-end of 7/28.

59.     On September 28, 2018, RBC issued an analyst report previewing the Company's 4Q18 earnings announcement titled "FQ4 Preview & Cheat Sheet," which also emphasized active clients as a "key metric" for which it expected growth of 29% year-over-year:

**Key Metrics to Focus On: 1) Active Clients:** *For FQ4:18 we estimate **2.8MM active clients, up 29% Y/Y on 6-pt easier comp.  This translates to 148K new active clients**; **2) Revenue Per Client:** For FQ4 we estimate $433 in Annual Revenue Per Client, down (3%) Y/Y, and flat from FQ3, primarily due to a mix-shift to the Men's and Plus categories.

**VI.     THE TRUTH BEGINS TO BE REVEALED**

60.     On October 1, 2018, after the close of trading, Stitch Fix issued a press release announcing its financial results for 4Q18, the period ended July 28, 2018.  In the press release, the Company reported 2.7 million active clients, substantially below expectations, thereby disclosing that its active client growth had stalled throughout 4Q18.  The press release stated as follows:

**Stitch Fix Announces Fourth Quarter and Full Fiscal Year 2018 Financial Results**

. . . Stitch Fix, Inc. (NASDAQ:SFIX), the leading online personal styling service, has released its financial results for the fourth quarter and full fiscal year 2018 ended July 28, 2018 and posted a letter to its shareholders on its investor relations website.

**Fourth quarter highlights**

- ***Active clients of 2.7 million, an increase of 25% year over year***

- Net revenue of $318.3 million, an increase of 23% year over year

- Net income of $18.3 million and adjusted EBITDA of $11.1 million

- Diluted earnings per share of $0.18

1    61.    A shareholder letter made available on the Company's website on October 1, 2018,

2    disclosed for the first time that the Company had engaged in testing of its marketing channels during

3    4Q18 by halting the national television campaign for 10 weeks, about 80% of the quarter:

4          In Q4'18, we continued our measured and analytical approach to paid
           advertising as we tested key channels to better understand how to most effectively
5          allocate our marketing spend. ***Specifically, during the quarter we performed a TV
           incrementality test, during which we temporarily ceased our national TV campaign
6          for 10 weeks to measure the channel's efficacy***.

7    62.    The shareholder letter also disclosed sequential active client growth during 4Q18 of

8    only 54,000 – far lower than the Street's expectations and the smallest growth ever reported by the

9    Company.

10    63.    Defendants Lake, Yee, and Smith hosted a quarterly conference call later the same

11    day.  During the call, Defendant Smith reiterated the message from the investor letter disclosing that

12    Stitch Fix "temporarily ceased [its] national TV campaign for 10" of the 13 weeks in 4Q18.

13    64.    Analysts who participated in the investor conference asked several questions about

14    the cessation in television advertising and its effect on the Company's active client count.  For

15    example, an analyst from Piper Jaffray asked about the effect of the decision to halt television

16    advertising.  Her question strongly implied that she was looking for a reason the active customer

17    count had slowed so substantially in 4Q18: "I recognized you took the TV off during the majority of

18    the quarter.  But if you were to – knowing what you know now about how effective that is, if that

19    had been on throughout the quarter as you may have had in the past, what would customer net adds

20    have looked like?  Is there a way to kind of back into that?"  Defendant Lake refused to answer,

21    stating: "[O]n the first question around TV and just the specifics of it, unfortunately, we don't have

22    that data to share."

23    65.    Another analyst, from Barclays, asked whether the minimal active client growth was

24    due to the halt in television advertising or other reasons: "So if we look at client net adds quarter-on-

25    quarter, they were only up about 54,000 from last quarter.  That cadence was a bit lower than the

26    previous trend line.  So is that mostly just cutting back the TV program?  Or is there a different mix

27    of one and dones from these new categories that are growing fast?  And any other color on the net

28

adds would be helpful."  Again, Defendant Lake did not address the substantial sequential slowdown

in active client growth, instead pivoting to focus on the year-over-year comparison:

> I think we're looking good in terms of kind of a year-over-year rate and we saw active clients grow 25% year-over-year.  We're really happy with kind of the foundational fundamental that really helped us to achieve that higher end of our guidance range.  We don't have any of – we wouldn't say that this is a quality issue of like – that we have more one and ones.  I mean, if anything, I think this is a business where we're really focusing on client quality and really focusing on ROI and LTV and how clients are demonstrating value over the long term.  And the more that we're able to learn through things like the TV incrementality test, the more we're able to hone that and really improve that over time.  And so I think these are – our top line revenue is consistent with where we shared that we would be and consistent with where we plan to go in the future, and I think the underlying fundamentals are ones that we're happy with.

66.   An analyst from JP Morgan also asked about television, asking for more color about

the "better returns on the TV side than you expected."  In response, Defendant Lake stated that "we

always knew that TV was an important component of" marketing:

> I think the way to think about that is just that it's really us fine-tuning, understanding how all of our different marketing channels contribute to our portfolio.  Marketing diversification is something we've talked about for a long time. ***And we always knew that TV was an important component of that***, but I think having gone through this test and having really understood more granularly how TV impacts, I think, we feel like it's a really important part of the portfolio and you'll continue to see us invest there.

67.   Despite Defendants' attempts to spin the disappointing active client numbers as

positive when looked at year-over-year, and their attempt to portray the cessation of the Company's

television campaign as having provided important information about the role of TV advertising to

drive new active client growth, analysts reacted negatively to both disclosures and their effect on the

Company's quarterly financial results.

68.   Late on the evening of October 1, 2018, as the after-hours price of the Company's

common stock began plummeting, *The Wall Street Journal* published an article on Stitch Fix in

which the title reflected the consequential negative effect of the Company's failure to achieve active

client growth: "***Fashion Emergency at Stitch Fix: The clothing subscription service had its first***

***big stumble as the number of active clients stagnated***."  The article that focused on the stagnation of

the Company's active client growth:

When Stitch Fix, . . . a subscription fashion service, had its initial public offering last November, investors were skeptical.  How many people would continue to pay for constant wardrobe updates?

In its first quarters as a public company, Stitch Fix defied the skeptics and posted consistent growth, raising hopes that it could succeed where other subscription services have failed.  The stock had gained 73% this year through Monday's close.  ***Monday's fiscal fourth-quarter results show that the bullish thesis may be coming apart at the seams***.

\*          \*          \*

***[T]he key figure for this or any other subscription-based company is how many customers it can keep engaged.  Stitch Fix missed estimates for active clients, which were expected to reach 2.8 million.  Instead, that figure stagnated at 2.7 million, exactly where it had been at the end of the previous quarter, although that still is 25% higher than a year earlier.  Shares fell by one-fifth in after-hours trading***.

69.   Following the October 1, 2018, disclosures, analysts' reports were all-but-unanimous in their focus on the sharp deceleration in the growth of active clients and the Company's lower than expected 2018 revenue and 2019 earnings guidance, and in concluding that the Company's previously undisclosed halt in television advertising contributed to the poor active client results.

70.   On October 1, 2018, Piper Jaffray issued an analyst report titled "Remain Sidelined Post Q4 Net Adds Miss; Ests.  Moving Lower On Guidance; $31 PT."  The report noted that the net quarterly active client addition of 55,000 was "***the lowest sequential add[] we've seen in the last 12 quarters***" and stated that the pause in television advertising "***clearly had an adverse impact on this number***":

We believe newer businesses (men's) continued to grow solidly but believe the core women's business has decelerated – not just in Q4 but in Q1 we note kid's will be a revenue contributor in Q1.  ***Net adds (+55k Q/Q) were the lowest sequential adds we've seen in the last 12 quarters.  To be fair, TV advertising was paused in 10 weeks of the quarter in a test and clearly had an adverse impact on this number.*** As TV ads have now been reactivated in Q1, we will be monitoring the attach rate of new customers.

71.   On October 1, 2018, RBC Capital Markets issued an analyst report titled "FQ4:18: No Need To Get Your Fundies in A Bunch," which also focused on the "***10-week cessation of a national TV campaign***" and "***Record Low[]***" net client adds leading to "[w]eak results":

**Key points:**

**Mixed FQ4 Results:** Revenue of $318MM came in slightly below RBC/Street @ $319MM, ***largely due to lower than expected Active Clients.***

*(Overly?) aggressive ad testing – a 10-week cessation of a national TV campaign – was likely a factor*.  Gross Margin of 44.4% came in above RBC/Street at 43.7%/43.5%, due to a decrease in inventory reserve and clearance expense, as well as reduced shrink.  EBITDA of $11.1MM came in above RBC/Street @ $10MM.  FQ1 Revenue & EBITDA Guide Midpoints were below Street, while FY19 Revenue Guide Midpoint was above, while EBITDA range was below.  **All in, FQ4 Fundamentals were mixed** – *Revenue Growth and Client Net Adds were both Record Lows*, tho Gross Margin & EBITDA Margin both climbed nicely Y/Y.

**The Quarter Keys: 1)** *Active Clients Were Light: Came in at 2.74MM, below the Street @ 2.81MM, with 54K Net Adds vs. 180K in FQ3:18 and 120K in FQ4:17.  Weak results.*

\*     \*     \*

*Stitch Fix's Active Clients came in at 2.74MM (up 25% Y/Y vs. 30% Y/Y in F3Q:18), below the Street's expectation of 2.81MM and our expectation of 2.84MM.  This translates to ~54K in net additions (lowest we have seen yet) vs. our expectation of 148K.  While management did not call out any material cause for this decel, we believe that halting national TV campaigns for 10 weeks could have been a key reason.*

72.   On October 1, 2018, Wells Fargo issued a report titled "SFIX: Top-Line That Needs a 'Fix', 4Q Print Creates Some Concern," calling out the 4Q18 active client growth as "*the smallest net add number seen in 2 years (and potentially longer, our model doesn't go back that far)*":

So, expectations aside, what was wrong with their 4Q print? A few key points: **1)** SFIX missed sales – they hit the high-end of plan but missed the Street. *Digging deeper, net customer adds were just +2% from 3Q – said differently, they added just 54K active customers in 4Q, the smallest net add number seen in 2 years (and potentially longer, our model doesn't go back that far).*

\*     \*     \*

**The Bear Case** . . . .  We believe investors who are bearish on SFIX highlight that (1) top-line growth will come at the expense of margins as SFIX ramps its new categories, which are lower GM (mainly due to being sub-scale) *(2) active member growth is moderating just as ad spend has stabilized – which shows that the business requires significant investment in customer acquisition if it wants to remain a 20-25% top-line grower* and (3) top-line is slowing quickly despite new category additions, illustrating weakness in the "core."

73.   On October 1, 2018 SunTrust Humphrey Robinson issued an analyst report titled "Inline Quarter Fails to Impress; Fundamentals Intact/Maintain Buy" that also called out the stagnant active client growth, stating that "*sequential net adds of 54K this Q were below the 120K net adds in the year ago period*" and ascribing at least some of the stagnancy to the halt of television advertising:

**Key KPIs Under-whelming; Questions Remain Around Marketing Efficiency.** *Sequential net adds were 54K as active clients (as of period end) were 2.74M, below consensus expectations of 2.81M. [. . .]  One of the issues on investors' mind is the decline in marketing efficiency this quarter, as advertising expenses were up Y/Y while sequential net adds of 54K this Q was below the 120K net adds in the year ago period.* We note that there are several factors impacting this metric including investment in new categories (Plus, Kids, assortment across price points), and testing /experimenting.  Here, *the company experimented with its advertising budget throughout the quarter by pausing its national TV campaign, and continuing some regional spend.  This may have had some influence over marketing efficiency, though the company would not quantify the impact.*

74.   On October 2, 2018, William Blair issued an analyst report whose title reflected concern over the deceleration of active client growth: "*Greater-Than-Expected Deceleration of Active Clients Overshadows Plans to Launch Internationally*."  The report continued by ascribing the 20% decline in Stich Fix's share price to that deceleration in active client growth:

**Stock Thoughts.** *Stitch Fix shares are down about 20% in the aftermarket, likely due to greater-than-expected deceleration on active clients and revenue*, as well as lower-than expected EBITDA guidance for fiscal 2019.

75.   On October 2, 2018, Barclays issued an analyst report titled "Solid 4Q, Despite Missing Buyside,"  which reacted with surprise to the *slowing of active client growth to* "*the lowest yet*" *due to* "*pull[ing] back on national TV advertising*":

The one area we were surprised was marketing efficiency eroding.  *SFIX pulled-back on national TV advertising (and continued to run some local TV) to test efficacy, which negatively weighed on both client growth and marketing efficiency. Active client growth slowed to 25% Y/Y, and SFIX added just 54K net clients Q/Q, the lowest yet, with much higher ad expense-per-net-add.*

76.   Following the Company's October 1, 2018 disclosures, the price of Stitch Fix common stock plummeted, *falling $15.69 per share by market close on October 2, 2018 – a decline of more than 35%* – on unusually high volume of more than 39.9 million shares traded, or more than 9.5 times the average daily volume over the preceding ten trading days.

## VII.   ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS

77.   As set forth above, Defendants' deceptive conduct, misrepresentations, and omissions of material facts were a significant cause of the artificial inflation of Stitch Fix's stock price throughout the Class Period.  The chart below displays the Class Period surge in Stich Fix's stock price, followed by the dramatic fall as the truth began to come out on October 1, 2018:



78.     On June 7, 2018, the day before the Class Period, Stitch Fix's stock price closed at $19.67 per share.  After the market closed, Stitch Fix issued and filed with the SEC a press release and a shareholder letter announcing its 3Q18 results, in which Defendants made  materially false and misleading statements about the strength of its active client growth and its TV campaign. Defendants' misrepresentations led reasonable investors to believe that, since the close of 3Q18 about six weeks earlier, the number of active clients continued to grow consistent with past quarters, and that the Company was still running and increasing spending on TV advertising, which would help deliver continued active client growth.  On the 3Q18 earning call later that day, Defendants again misrepresented the Company's active client growth, crediting their marketing capabilities.

79.     After these misrepresentations, Stitch Fix's stock price increased 26.5%, from $19.67 at close on June 7, 2018 to $24.88 at close on June 8, 2018, on heavy volume of more than 12.6 million shares.[2]  This increase was specific to Stich Fix; by way of contrast, the NASDAQ Composite Index increased only 0.13% from close on June 7, 2018 to close on June 8, 2018.

---

[2]     Average daily volume during the Class Period was approximately 3 million shares.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:18-cv-06208-JD
4845-8916-3429.v1

80.   Media and analyst coverage noted that Stitch Fix's stock price soared in the wake of the June 7, 2018 misrepresentations due to news about the Company's active client growth.  For example:

(a)   On June 7, 2018, following the Company's earnings release, CNBC published an article with a title specifically linking the Company's surging stock price to its statements about active client growth: "Stitch Fix soars after online styling service says active clients grew 30%."

(b)   On June 7, 2018, following the Company's earnings release, RBC Capital Markets issued an analyst report focusing on active client growth, stating: "Stitch Fix's Active Clients came in at 2.688MM, above the Street's expectation of 2.665MM and our expectation of 2.675MM.  These were positive results, with Active Client growth remaining healthy at 30% Y/Y."

81.   On June 8, 2018, after market close, Defendants filed Form 10-Q with the SEC, in which they continued to make misrepresentations about active client growth, the use of TV as an active advertising medium and increased spending on TV advertising.  These statements maintained the artificial inflation in Stitch Fix's stock price, which closed at $23.85 on June 11, 2018.

82.   Analyst and media coverage during the middle of the Class Period continued to laud the Company's active client count, demonstrating that Defendants' misrepresentations led to a sustained price inflation of the Company's stock price.  For example:

(a)   On June 19, 2018, CNBC published an article quoting the CEO of Ritholtz Wealth Management as saying that Stitch Fix could be the "'Netflix of apparel'" based on the fact that it is "'growing its user base by an outstanding number,'" and specifically "not[ing] [that] active clients grew 30% compared to a year earlier."

83.   Stitch Fix's stock price reached a Class Period high of $51.19 at close on September 17, 2018.

84.   In advance of the Company's 4Q18 earnings announcement, analysts continued to report on the importance of active client growth to Stitch Fix's stock price.  For example:

(a)   On September 25, 2018, J.P. Morgan issued an analyst report previewing the upcoming 4Q18 earnings announcement, in which it stated "We're looking for . . . Active Clients of 2.808M (+28% Y/Y)."

(b)     On September 28, 2018, RBC Capital Markets issued an analyst report previewing the upcoming 4Q18 earnings announcement, in which it listed "Active Clients" first among "Key Metrics to Focus On" and stated that "[f]or FQ4:18, we estimate 2.8MM active clients, up 29% Y/Y," which "translates to 148K new active clients."

85.     On October 1, 2018, Stitch Fix issued and filed with the SEC a press release and shareholder letter announcing its financial results for 4Q18. The press release disclosed that active client growth had stalled throughout 4Q18. The shareholder letter disclosed for the first time that the Company had halted all television advertising during 10 of the 13 weeks of 4Q18. During the quarterly conference call hosted the same day, Defendants reiterated the information about the cessation of TV advertising during 4Q18.

86.     In response to this company-specific news, Stitch Fix's stock price declined 35.15% by the close of trading on October 2, 2018, on heavy volume of more than 39.9 million shares, from $44.63 at the close of trading on October 1, 2018, to $28.94 at the close of trading on October 2, 2018. This decline was Stitch Fix-specific; by way of contrast, the NASDAQ Composite Index fell by only 0.47% between the close of trading on October 1, 2018 and the close of trading on October 2, 2018.

87.     Analysts and media linked the stock price decline to the revelation of the truth concerning the stagnant active client count, which they tied to the Company's decision to halt the national television campaign in order to conduct testing. For example:

(a)     On October 1, 2018, *The Wall Street Journal* issued an article titled, "Fashion Emergency at Stitch Fix: The clothing subscription service had its first big stumble as the number of active clients stagnated," which stated: "Stitch Fix missed estimates for active clients, which were expected to reach 2.8 million. Instead, that figure stagnated at 2.7 million, exactly where it had been at the end of the previous quarter." As a result, "Shares fell by one-fifth in after-hours trading."

(b)     On October 1, 2018, Piper Jaffray issued a report reducing its price target, stating that the quarterly active client addition was "the lowest sequential adds we've seen in the last 12 quarters," and stating that halting television advertising "clearly had an adverse impact on this number,"

1    (c)    On October 1, 2018, RBC Capital Markets issued an analyst report stating that

2    revenues came in lower than RBC and Street estimates "largely due to lower than expected Active

3    Clients," which were the "lowest we have seen yet."  It continued, "we believe that halting national

4    TV campaigns for 10 weeks could have been a key reason."

5    (d)    On October 1, 2018, Wells Fargo issued an analyst report stating that "net

6    customer adds were just +2% from 3Q – said differently, they added just 54K active customers in

7    4Q, the smallest net add number seen in 2 years (and potentially longer, our model doesn't go back

8    that far."

9    **VIII.   THE PSLRA SAFE HARBOR DOES NOT APPLY**

10    88.    The Private Securities Litigation Reform Act of 1995 ("PSLRA") "Safe Harbor"

11    warnings that accompanied Defendants' forward-looking statements issued during the Class Period

12    were ineffective to shield Defendants from liability for their false and misleading statements and

13    omissions of material fact.

14    89.    To the extent that the false and misleading statements related to existing facts or

15    conditions, the Safe Harbor does not apply.  To the extent that the false and misleading statements

16    are forward looking, Defendants are still liable.  Defendants knew at the time they spoke or failed to

17    speak fully that each of their forward-looking false and misleading statements were false and

18    misleading.  Defendants' false and misleading forward-looking statements were authorized or

19    approved by an executive officer or director of Stitch Fix, who knew that the forward-looking

20    statements were false.  The forward-looking statements were contradicted by existing, undisclosed

21    material facts that were required to be disclosed so that the forward-looking statements would not be

22    misleading.  And the "Safe Harbor" warnings were inadequate, boilerplate and were themselves

23    misleading because they warned of "risks" that had already materialized or failed to provide

24    meaningful disclosures of the relevant risks.

25    **IX.    ADDITIONAL CONTROL PERSON ALLEGATIONS**

26    90.    As alleged herein, each of the Individual Defendants acted as control persons of

27    Stitch Fix and the other Individual Defendants within the meaning of §20(a) of the Exchange Act as

28    alleged herein.

91.     By virtue of their high-level positions, participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by Stitch Fix and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

92.     The Individual Defendants participated in conference calls with investors and analysts and interviews with media, and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after the statements were issued, and had the ability to prevent the issuance of statements or cause the statements to be corrected.

93.     Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had and exercised the power to control or influence the actions giving rise to the securities violations alleged herein.

94.     Each of the Individual Defendants had consistent and constant access to information about active client count and active client growth, and the use of and Company spending on television advertising.

95.     As set forth above, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions.  By virtue of their positions as controlling persons, the Individual Defendants are liable under §20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class (defined below) suffered damages in connection with their purchases of the Company's publicly-traded securities during the Class Period.

## X.     CLASS ACTION ALLEGATIONS AND THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE

96.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Stitch Fix common stock on the open

1    market during the Class Period, and were damaged thereby (the "Class").  Excluded from the Class

2    are Defendants, directors and officers of Stitch Fix and their families and affiliates.

3        97.    The members of the Class are so numerous that joinder of all members is

4    impracticable.  During the Class Period, there were more than 38.5 million outstanding shares almost

5    certainly owned by thousands, if not tens of thousands, of persons.  Thus, the disposition of their

6    claims in a class action will provide substantial benefits to the parties and the Court.

7        98.    There is a well-defined community of interest in the questions of law and fact

8    involved in this case.  Questions of law and fact common to the members of the Class predominate

9    over questions that may affect individual Class members include:

10       (a)    Whether the federal securities laws were violated by Defendants;

11       (b)    Whether Defendants engaged in fraudulent conduct and omitted and/or

12   misrepresented material facts;

13       (c)    Whether Defendants' statements omitted material facts necessary to make the

14   statements made, in light of the circumstances under which they were made, not misleading;

15       (d)    Whether Defendants knew or recklessly disregarded that their statements were

16   materially false and misleading;

17       (e)    Whether the prices of Stitch Fix common stock were artificially inflated;

18       (f)    Whether Defendants' fraudulent conduct, misrepresentations and omissions

19   caused Class members to suffer economic losses, i.e., damages; and

20       (g)    The extent of damage sustained by Class members and the appropriate

21   measure of damages.

22       99.    Plaintiff's claims are typical of those of the Class because Plaintiff and the members

23   of the Class purchased Stitch Fix securities during the Class Period and sustained damages from

24   Defendants' wrongful conduct.  Plaintiff will adequately protect the interests of the Class and has

25   retained counsel experienced in class action securities litigation.  Plaintiff has no interests that

26   conflict with those of the Class.

27       100.    A class action is superior to other available methods for the fair and efficient

28   adjudication of this controversy.  A class action will achieve economies of time, effort and expense

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:18-cv-06208-JD
4845-8916-3429.v1

1    and provide uniformity of decision to the similarly situated members of the Class without sacrificing

2    procedural fairness or bringing about other undesirable results.  Class members have not indicated an

3    interest in prosecuting separate actions; none have been filed.  The number of Class members and the

4    relatively small amounts at stake for individual Class members make separate suits impracticable.

5    No difficulties are likely to be encountered in the management of this action as a class action.

6         101.    In addition, a class action is superior to other methods of fairly and efficiently

7    adjudicating this controversy because the questions of law and fact common to the Class

8    predominate over any questions affecting only individual Class members.  Although individual Class

9    members have suffered disparate damages, the fraudulent scheme and the misrepresentations and

10   omissions causing damages are common to all Class members.  And, as discussed below, there are

11   no individual issues of reliance that could make this action unsuited for treatment as a class action

12   because all Class members relied on the integrity of the market and are entitled to the fraud-on-the-

13   market presumption of reliance.

14        102.    The market for Stitch Fix's securities was open, well-developed and efficient at all

15   relevant times.  Stitch Fix's stock met the requirements for listing, and was listed and actively traded

16   on the NASDAQ, a highly efficient and automated market.  As a regulated issuer, Stitch Fix filed

17   periodic public reports with the SEC and the NASDAQ.  Stitch Fix regularly communicated with

18   public investors via established market communication mechanisms, including through regular

19   disseminations of press releases on the national circuits of major newswire services and through

20   other wide-ranging public disclosures, such as communications with the financial press and other

21   similar reporting services.

22        103.    As alleged herein, the change in the price of Stitch Fix's stock – compared to the

23   changes in the peer group and NASDAQ – in response to the release of unexpected material positive

24   and negative information about the Company shows there was a cause-and-effect relationship

25   between the public release of the unexpected information about Stitch Fix and the price movement in

26   the Company's stock.  Numerous analysts followed Stitch Fix, attended the Company's conference

27   calls and issued reports throughout the Class Period.  Numerous National Association of Securities

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:18-cv-06208-JD                                                                                          - 34 -
4845-8916-3429.v1

Dealers member firms were active market makers in Stitch Fix stock throughout the Class Period. According to the Company, it was eligible to register securities on Form S-3 during the Class Period.

104.     As a result of the foregoing, the market for Stitch Fix common stock promptly digested current information regarding Stitch Fix from all publicly available sources and reflected such information in the Company's stock price.  Under these circumstances, all purchasers of Stitch Fix securities during the Class Period suffered similar injury through their purchases of Stitch Fix stock at artificially inflated prices and the subsequent revelations concerning declines in price, and a presumption of reliance applies.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

105.     Plaintiff incorporates ¶¶1-104 by reference.

106.     During the Class Period, Stitch Fix and the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

107.     Stitch Fix and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Stitch Fix common stock during the Class Period.

108.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially-inflated prices for Stitch Fix common stock.  Plaintiff and the Class would not have purchased Stitch Fix common stock at the prices they paid, or at all, if they had been

aware that the market price had been artificially and falsely inflated by Stitch Fix's and the Individual Defendants' misleading statements.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act**
**Against Defendants Lake, Yee and Smith**

109.    Plaintiff incorporates ¶¶1-108 by reference.

110.    Defendants Lake, Yee and Smith acted as controlling persons of Stitch Fix within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by Stitch Fix and disseminated to the investing public, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of these Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

111.    Each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and therefore had the power to control or influence the statements regarding active client growth and the running of Stitch Fix's television campaign that give rise to the securities violations as alleged herein and exercised the same.  Furthermore, throughout the Class Period, these Defendants had access to the data and other internal reports regarding active client count and growth and television advertising.

112.    As set forth above, Stitch Fix and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants Lake, Yee and Smith are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff

and other members of the Class suffered damages in connection with their purchases of the

Company's publicly-traded securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil

Procedure 23;

B.     Awarding Plaintiff and the members of the Class damages, including interest;

C.     Awarding Plaintiff reasonable costs and attorneys' fees; and

D.     Awarding such equitable or injunctive, or other relief, as the Court may deem just and

proper.

DATED:  September 18, 2019                    ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                              SHAWN A. WILLIAMS
                                              MATTHEW S. MELAMED
                                              CAROLINE M. ROBERT


                                                   s/ Matthew S. Melamed
                                              MATTHEW S. MELAMED

                                              Post Montgomery Center
                                              One Montgomery Street, Suite 1800
                                              San Francisco, CA  94104
                                              Telephone:  415/288-4545
                                              415/288-4534 (fax)

                                              Lead Counsel for Lead Plaintiff

                                              ROBBINS ARROYO LLP
                                              BRIAN J. ROBBINS
                                              CRAIG W. SMITH
                                              600 B Street, Suite 1900
                                              San Diego, CA  92101
                                              Telephone:  619/525-3990
                                              619/525-3991 (fax)

                                              Additional Counsel for Plaintiff

1

<u>CERTIFICATE OF SERVICE</u>

2       I hereby certify under penalty of perjury that on September 18, 2019, I authorized the

3  electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

4  send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

5  and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

6  the non-CM/ECF participants indicated on the attached Manual Notice List.

7
                             s/ Matthew S. Melamed

8                            MATTHEW S. MELAMED

9                            ROBBINS GELLER RUDMAN
                                & DOWD LLP

10                         Post Montgomery Center
                         One Montgomery Street, Suite 1800

11                         San Francisco, CA  94104
                         Telephone:  415/288-4545

12                         415/288-4534 (fax)
                         E-mail:  mmelamed@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:18-cv-06208-JD Sawicki v. Stitch Fix, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter Arthur Binkow**
  info@glancylaw.com,pbinkow@glancylaw.com,peter-binkow-7144@ecf.pacerpro.com

- **Donald J. Enright**
  denright@zlk.com

- **Patrick Edward Gibbs**
  pgibbs@cooley.com,bgiovannoni@cooley.com

- **Richard W. Gonnello**
  rgonnello@faruqilaw.com,ecf@faruqilaw.com,dbehnke@faruqilaw.com

- **Dillon Joseph Hagius**
  dhagius@faruqilaw.com,smarton@faruqilaw.com,ecf@faruqilaw.com

- **Benjamin Heikali**
  Bheikali@faruqilaw.com,smarton@faruqilaw.com,ecf@faruqilaw.com,bgiacalone@faruqilaw.com

- **Shannon L Hopkins**
  shopkins@zlk.com,shalliday@zlk.com

- **Katherine M. Lenahan**
  klenahan@faruqilaw.com

- **Rosanne L. Mah**
  rmah@zlk.com,snath@zlk.com,arocco@zlk.com,rlm@classlitigation.com,shopkins@zlk.com,jgrohsgal@zlk.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew Seth Melamed**
  mmelamed@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Sherief Morsy**
  smorsy@faruqilaw.com,ecf@faruqilaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,disaacson@pomlaw.com,cgarcia@pomlaw.com,abarbosa@pomlaw.com

- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com

- **Caroline Maryse Robert**
  crobert@rgrdlaw.com

- **Jessica Valenzuela Santamaria**
  jsantamaria@cooley.com,galancr@cooley.com

- **Jessie A. R. Simpson Lagoy**
  jlagoy@cooley.com,galancr@cooley.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,kmccarty@rgrdlaw.com,e_file_sd@rgrdlaw.com,1101510420@filings.docketbird.com,sbloyd@rgrdlaw.com,3608655420@filings.docketbird.c

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)