UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE STITCH FIX, INC. SECURITIES LITIGATION | Case No. 18-cv-06208-JD <br><br> **ORDER RE MOTION TO DISMISS** <br> Re: Dkt. No. 93 |

This is a securities class action against defendants Stitch Fix, Inc. and its CEO, Katrina Lake; CFO, Paul Yee; and COO, Mike C. Smith.  Court-appointed lead plaintiff Ganesh Kasilingam filed a consolidated complaint on behalf of all purchasers of Stitch Fix common stock between June 8, 2018, and October 1, 2018.  The complaint alleges that defendants made false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission Rule 10b-5.  Dkt. No. 92.  Defendants moved to dismiss the complaint for failure to state a claim, citing the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  Dkt. No. 93.  The motion is granted with leave to amend.

## BACKGROUND

As alleged in the consolidated complaint, Stitch Fix is an online retail fashion subscription service.  Dkt. No. 92 ¶ 2.  Co-founded by defendant Lake and a partner in 2011, the company went public in November 2017, and it bills itself on its website as "the world's leading online personal styling service."  *Id*. ¶¶ 23, 25.  The company's business model starts with the clothing, shoes and accessories that the company buys from other manufacturers or makes itself.  *Id*. ¶ 24.  Stitch Fix

curates these items into personalized shipments to customers that are called a "Fix." *Id*. ¶¶ 24, 26. Customers can try on the items in their Fix, buy what they like, and return the rest. They are incentivized to buy all the items in their shipment with a 25% discount that is applied only if the entire Fix is accepted. *Id*. ¶ 24. This business model is said to allow Stitch Fix to collect "troves of information about its clients' clothing sizes, style preferences and purchasing habits," and Stitch Fix "boasts" of personalizing Fix deliveries "through the combination of data science and human judgment." *Id*. ¶ 3.

The complaint alleges that "[f]or subscription businesses like Stitch Fix, the most important business metric to investors is the number and growth rate of its 'active clients.'" *Id*. ¶ 26. For Stitch Fix, an "active client" means "a client who checked out [*i.e.*, decided to keep all or part of] a Fix in the preceding 12-month period." *Id*. Stitch Fix's active client growth has been substantial, from 261,000 in Fiscal Year (FY) 2014, to 2,194,000 active clients in FY 2017. *Id*. ¶ 29. The company "had continued to add more than 100,000 active client[s] in each quarter since 2Q17 through 2Q18. *Id*. These client increases were initially fueled by "years of organic growth," and then by advertising campaigns on TV, which were first launched in 2017 and became an "integral tool in continuing to drive the Company's active client growth as it matured." *Id*. ¶ 33.

The complaint focuses on two main events. For 10 of the 13 weeks during 4Q18, Stitch Fix suspended its national TV advertising, an action it disclosed in a shareholder letter made available on the company's website on October 1, 2018. *Id*. ¶¶ 11, 61. Stitch Fix also reported 4Q18 financial results on October 1, 2018, which showed "the number of active clients remaining essentially flat for the quarter," falling "far short of expectations." *Id*. ¶ 11. "Sequential active client growth had plummeted by 70%, from 180,000 new additions in 3Q18 to just 54,000 in 4Q18, the lowest of any prior reported quarter in the Company's history." *Id*. By close of trading the next day, Stitch Fix's stock price had dropped by more than 35%. *Id*. ¶ 12.

The complaint challenges six statements made on June 7 and 8, 2018, as false and misleading. *Id*. ¶¶ 37-42 & Ex. A. In those statements, defendants are alleged to have "materially misrepresented that: the Company was continuing to experience active client growth -- the core

2

metric indicating the Company's health and performance -- without disclosing that active client growth had, in truth, nearly ground to a halt by the time of the statements; and that the Company's marketing efforts continued to include a television advertising campaign, when, in truth, the Company had ceased its national advertising campaign by the time of the statements." *Id*. ¶ 36.

Defendants group the statements into two categories: (1) statements about Stitch Fix's "television advertising and expected marketing expenses," and (2) statements about "active client growth." Dkt. No. 93. Defendants say the complaint must be dismissed because it does not adequately plead falsity, scienter or loss causation for any of the six statements. *Id*.

## DISCUSSION

### I. LEGAL STANDARDS

Under well-established standards, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), including "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The plausibility analysis is "context-specific" and not only invites, but "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

These basic pleading obligations are supplemented by rules specific to securities fraud cases. The circumstances constituting the alleged fraud must be stated with particularity under Federal Rule of Civil Procedure 9(b). *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). In addition, pursuant to the PSLRA, the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). For each alleged misstatement or omission, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).

"To plead a claim under Section 10(b) and Rule 10b-5, [plaintiff] must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the

1    misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic
2    loss; and (6) loss causation." *Or. Pub. Emps. Ret. Fund.*, 774 F.3d at 603 (citing *Stoneridge Inv.*
3    *Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Here, defendants contest
4    only elements (3) through (5): falsity, scienter, and loss causation.

## II.   SECTION 10(B) AND RULE 10B-5 CLAIM

The Court's task in deciding whether to dismiss *vel non* was made considerably more difficult by incongruities between the complaint and plaintiff's opposition brief. Plaintiff's brief backs away from many of the statements that were alleged to have been false and misleading in the consolidated complaint and its attached chart. For example, Statement No. 4 in plaintiff's chart contains this language by defendant Yee which plaintiff emphasized: "***And we're really pleased with efficiencies we've seen with our marketing spend to attract new clients*** . . . ." Dkt. No. 92-1. But plaintiff's opposition brief states that "[t]he Complaint does not assert that the opinion portion of Defendant Yee's representation -- that Defendants were 'really pleased' -- is actionable." Dkt. No. 96 at 6 n.6.

To make matters worse, plaintiff's chart contains several instances of italicized and bolded language in which defendants reported that Stitch Fix's 3Q18 results showed a 30% year-over-year growth rate in its active clients. *See*, *e.g.*, Dkt. No. 92-1, Statement No. 1 ("***Highlights*** [for Stitch Fix's third quarter of fiscal year 2018] ***include delivering: Active clients of 2.7 million, an increase of 30% year over year***"; and "***we grew our active client count to 2.7 million, an increase of 30% year-over-year***"); Statement No. 3 ("***The 30% year-over-year growth we've seen in active client count is the result of these efforts***"); Statement No. 4 ("***we grew active clients by 30% year-over-year***"). But plaintiff's opposition brief says that "[t]he Complaint does not allege that [the] historical fact" -- of the "30% year-over-year increase in active client growth for 3Q18" -- "was false." Dkt. No. 96 at 7. Rather, plaintiff says he is challenging only the "misleading qualitative analysis of the 30% year-over-year increase that indicated it was not just historic but remained ongoing," *e.g.*, that the 30% active client growth "demonstrate[s] Stitch Fix's ***continued*** positive momentum." *Id*. (quoting Compl. ¶ 37).

4

This moving-target theory of pleading is a far way from the short and plain statement Rule 8 demands, and does not give defendants fair notice of the allegations for which they are called to account. These circumstances are enough in themselves to require dismissal.

For the sake of completeness, and with an eye toward possible amendment by plaintiff, the Court also concludes that the complaint fails to adequately plead falsity. The Court declines to reach at this time the issues of scienter or loss causation.

To frame the falsity discussion, plaintiff uses the same grouping as defendants for his six challenged statements, addressing them as relating either to "TV advertising" or to "active client growth." Dkt. No. 96. The Court will address them in the same way.

### A.   Statements re Television Advertising

Defendants say that plaintiff has failed to adequately plead falsity for the statements relating to television advertising. Dkt. No. 93 at 7-8. To plead falsity under the PSLRA, plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). A public statement is only "misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (citing *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)) (quotations omitted).

For the state of affairs that "actually existed," plaintiff alleges that, as later disclosed in a shareholder letter, Stitch Fix ran a 10-week "TV incrementality test" during 4Q18, "during which [Stitch Fix] temporarily ceased [its] national TV campaign for 10 weeks to measure the channel's efficacy." Dkt. No. 92 ¶ 61. Even accepting this as true, it does not contradict or undermine any of Stitch Fix's challenged statements -- none of them amounted to a representation that national TV advertising was ongoing. For example, defendant Lake is alleged to have stated in a Q318 earnings conference call on June 7, 2018, that "[t]he 30% year-over-year growth we've seen in active client count is the result of these efforts, efficiently leveraging our performance, marketing capabilities and increasing our brand awareness." Dkt. No. 92-1, Statement No. 3. Lake's reference to "leveraging . . . marketing capabilities" is vague, to say the least, and bears no

5

1  apparent connection to whether Stitch Fix was running national TV campaigns as of June 7, 2018.
2  In addition, taken as a whole and viewed in context, Lake's statement is directed to prior
3  marketing efforts which contributed to the Q318 results.

4      While other statements challenged by plaintiff are mildly closer to addressing ongoing
5  efforts and future plans, they too are still not specific enough to national television campaigns to
6  have been made misleading because of Stitch Fix's "dark test" in 4Q18.  Plaintiff points to the
7  statement in Stitch Fix's June 7, 2018 shareholder letter that stated:  "**Advertising**.  *We continue*
8  *to make strategic and measured marketing investments designed to achieve near-term payback.*
9  *. . . Advertising expenses include the costs associated with the production of advertising,*
10  *television, radio and online advertising*."  Dkt. No. 92-1, Statement No. 2.  This statement did not
11  contain any representation that national television advertising was ongoing at the time the
12  statement was made.  It expressly made reference not just to television but also to "radio and
13  online advertising," and even as to television advertising, plaintiff does not dispute that "Stitch Fix
14  continued to run some local television advertising during 4Q18."  Dkt. No. 96 at 5.  Plaintiff
15  complains that "the first time Defendants even distinguished national from local advertising was
16  during the October 1, 2018 disclosure that national television advertising had been halted for 10 of
17  13 weeks in 4Q18."  *Id*.  But this misunderstands plaintiff's burden.  Defendants did not have any
18  obligation to specify whether they were talking about national or local television advertising, and
19  plaintiff does not assert otherwise.  As a plaintiff alleging that defendants committed securities
20  fraud, it is plaintiff's burden to plead why, against those facts, defendants' more general, earlier
21  statements about television advertising became misleading because it turned out Stitch Fix had
22  paused national television advertising only, for a period of 10 weeks.  Plaintiff's current complaint
23  fails to meet that burden.

24      The other advertising-related statements challenged by plaintiff were even less specific:

- We expect to continue to make significant marketing investments to grow our business.  We currently utilize both digital and offline channels to attract new visitors to our website or mobile app and subsequently convert them into clients.  ***Our current marketing efforts include*** client referrals, affiliate programs, partnerships, display advertising, ***television***, print, radio, video, content, direct mail, social media, email, mobile "push" communications, search engine optimization and keyword search campaigns.

- ***Starting in calendar year 2017, we began to increase our paid marketing expenses by*** *investing more in digital marketing and **launching our first television advertising campaigns. We expect to increase our spending on these and other paid marketing channels in the future*** *and cannot be certain that these efforts will yield more clients or be cost-effective.*

Dkt. No. 92-1, Statement Nos. 5 & 6 (from Stitch Fix Q318 Form 10-Q). The selective emphases here were made by plaintiff, who argues that "[c]ontrary to Defendants' representations, the Company's current marketing efforts did not include television advertising." *Id*. But when read as a whole and viewed in context, the statements cannot be characterized as "representations" that Stitch Fix was currently engaged in national television advertising. Even the statement that the company "expect[ed] to increase" its spending on television advertising campaigns "in the future" is not inconsistent with running a temporary incrementality test to assess the efficacy of Stitch Fix's national TV campaign. Plaintiff acknowledges, as he must, that "there is nothing wrong with Defendants' decision to test television advertising efficacy." Dkt. No. 96 at 1.

### B.  Statements re Active Client Growth

The challenged statements about active client growth also fail on the element of falsity. As discussed, plaintiff now abandons many of those statements he had highlighted in his complaint that purely reported the historical fact that Stitch Fix had experienced a "30% year-over-year increase in active client growth for 3Q18." Dkt. No. 96 at 7. Rather, plaintiff says he is challenging only these statements: "the 30% active client growth 'demonstrate[s] Stitch Fix's ***continued*** positive momentum' ([Compl.] ¶ 37); 'leveraging our performance, ***marketing capabilities*** and increasing our brand awareness' (¶ 39); and it reflecting [*sic*] '***efficiencies*** we've seen with our marketing spend to attract new clients' (¶ 40)." Dkt. No. 96 at 7. Plaintiff argues that "[e]ach of these were material misrepresentations and omissions because they gave the market the impression that active client growth continued as of June 7, 2018." *Id*.

The problems for plaintiff are manifold. The latter two statements, or rather snippets of statements, relating to "marketing capabilities" and "efficiencies" are a non sequitur from the rate of active client growth at the time of those statements. The first statement about "continued positive momentum" also, when read in context, was clearly an observation about 3Q18. Defendants' statement was that "[o]ur third quarter results demonstrate continued positive

momentum for Stitch Fix and the power of our unique ability to deliver personalized service at scale." Dkt. No. 92-1, Statement No. 1. This was an observation about what "[o]ur third quarter results demonstrate," and not a contemporaneous note about how the company was doing as of the time of the statement.

Plaintiff has also failed to sufficiently allege the "state of affairs" as it "actually exist[ed]" on the issue of active client growth as of June 7 and 8, 2018, when defendants' challenged statements were made. *Berson*, 527 F.3d at 985. Plaintiff alleges: "Defendants failed to disclose that Stitch Fix's active client growth had nearly halted by the time they made the statements on June 7 and 8, 2018. The misrepresentations were made almost halfway through 4Q18, which commenced on April 29, 2018, and would continue through July 28, 2018. When Defendants reported 4Q18's results in October 2018, they revealed that the Company's active client growth grew only 2% sequentially in 4Q18, with only 54,000 active clients added during the entirety of the quarter." Dkt. No. 92-1, Statement Nos. 1-4 ("Reasons Why False & Misleading When Made"). Those allegations are strikingly vague, and contain no direct allegations about what active client growth was as of June 7 and 8, 2018, other than that it had "nearly halted." That lacks the specificity required under the PSLRA.

None of the challenged statements can be read to have given the "false impression" plaintiff ascribes to them. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1013 (9th Cir. 2018). A reasonable investor would not have had the mistaken impression from these statements that Stitch Fix must have been engaged in a national television advertising campaign on the two days the statements were made, or that active client growth must have been at some unspecified measure on those days. Because the Court finds the element of falsity to be lacking for the active client growth statements too, the scienter and loss causation arguments for these statements are also deferred.[1]

---

[1] The Court finds that the adequacy of plaintiff's pleading can be determined in this instance without reference to the documents incorporated by reference into the complaint, and so terminates as moot defendants' two requests for judicial notice, Dkt. Nos. 94, 99, and plaintiff's objection to defendants' reply evidence, Dkt. No. 102.

8

### III. SECTION 20(A) CLAIM

To establish controlling person liability under Section 20(a), the plaintiff "must show that a primary violation was committed and that the defendant directly or indirectly controlled the violator." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) (quotations omitted). Since plaintiff has not adequately pled a violation of Section 10(b) and Rule 10b-5, plaintiff's claim under Section 20(a) must also be dismissed. *See Or. Pub. Emps. Ret. Fund*, 774 F.3d at 610.

### CONCLUSION

The motion to dismiss is granted, and the consolidated complaint is dismissed with leave to amend. An amended complaint may be filed by October 29, 2020. It may not add new claims or defendants without express leave of Court, and it must attach plaintiff's securities fraud allegations in chart form and in a manner that accurately reflects his actual allegations and theories of fraud against defendants. *See* Dkt. No. 80 at 5.

**IT IS SO ORDERED.**

Dated: September 30, 2020

JAMES DONATO
United States District Judge