ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
MATTHEW S. MELAMED (260272)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
mmelamed@rgrdlaw.com
      – and –
CAROLINE M. ROBERT (254293)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
crobert@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re STITCH FIX, INC. SECURITIES LITIGATION | )<br>)<br>) | Case No. 3:18-cv-06208-JD<br><br>CLASS ACTION |
| This Document Relates To:<br><br>     ALL ACTIONS. | )<br>)<br>)<br>)<br>)<br>) | AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

# TABLE OF CONTENTS

**Page**

I.       INTRODUCTION ...................................................................................................1

II.      SUMMARY OF THE AMENDMENTS....................................................................1

III.     BACKGROUND AND SUMMARY OF ACTION....................................................5

IV.      JURISDICTION AND VENUE ...............................................................................13

V.       PARTIES ................................................................................................................13

VI.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED
         DURING THE CLASS PERIOD .............................................................................15

         A.      Defendants' June 7 and 8, 2018 False and Misleading Statements
                 and Omissions Concerning Marketing and Television Advertising..........15

         B.      Reasons Why Defendants' June 7 and 8, 2018 Misrepresentations
                 and Omissions Concerning Marketing and Television Advertising
                 Were Knowingly or Recklessly False and Misleading.............................19

         C.      Stitch Fix's Stock Price Surges on 3Q18 Results and Reports as
                 Investors Are Unaware that the Company Halted Television
                 Advertising, a Major Engine of Active Client Growth............................23

         D.      The Utilization of National Television Advertising, and Therefore
                 Its Stoppage, Was Material to the Company's Financial
                 Performance .........................................................................................26

         E.      While Stitch Fix's Stock Price Was Artificially Inflated Due to the
                 Undisclosed Stoppage of National Television Advertising,
                 Company Insiders Unloaded 550,000 Shares of Stitch Fix Stock
                 for Proceeds of More Than $16,000,000 ...............................................29

VII.     THE TRUE FACTS BEGIN TO BE REVEALED ...................................................32

VIII.    LOSS CAUSATION AND ECONOMIC LOSS......................................................38

IX.      THE PSLRA SAFE HARBOR DOES NOT APPLY ..............................................41

X.       ADDITIONAL CONTROL PERSON ALLEGATIONS...........................................42

XI.      APPLICABILITY OF THE FRAUD ON THE MARKET AND AFFILIATED
         UTE PRESUMPTION OF RELIANCE ..................................................................43

XII.     CLASS ACTION ALLEGATIONS AND THE FRAUD-ON-THE-MARKET
         PRESUMPTION OF RELIANCE ..........................................................................43

COUNT I ........................................................................................................................46

COUNT II .......................................................................................................................47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Page**

PRAYER FOR RELIEF ............................................................................................................48

1    I.      INTRODUCTION

2           Lead plaintiff Ganesh Kasilingam ("Plaintiff"), individually and on behalf of all others

3    similarly situated, by Plaintiff's undersigned counsel, alleges the following based on personal

4    knowledge as to Plaintiff and Plaintiff's own acts, and, as to all other matters, upon information

5    and belief based on the investigation conducted by and through Plaintiff's counsel, which included,

6    among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by

7    Stitch Fix, Inc. ("Stitch Fix" or the "Company"), transcripts of conference calls hosted by the

8    Company and its executives, including defendants Katrina Lake ("Lake") and Paul Yee ("Yee")

9    (the "Individual Defendants" and, together with Stitch Fix, "Defendants"), and media and analyst

10   reports about the Company and interviews with certain former employees of Stitch Fix.  Plaintiff

11   believes that substantial additional evidentiary support will exist for the allegations set forth herein

12   after a reasonable opportunity for discovery.  Plaintiff attaches hereto as Exhibit A its securities

13   fraud allegations in chart form.  *See* ECF No. 80 at 5.

14   II.     SUMMARY OF THE AMENDMENTS

15          1.      On September 30, 2020, the Court issued an Order re Motion to Dismiss the

16   consolidated complaint identifying certain infirmities in the pleading and providing for leave to

17   amend.  ECF No. 109 ("MTD Order").  The MTD Order substantively addressed only the element

18   of falsity of Plaintiff's Rule 10b-5 claim.  First, the Court found that Plaintiff had failed to

19   adequately allege that Defendants' representations concerning 3Q18 active client growth were

20   materially false and misleading, correctly concluding that such statements were not alleged to be

21   inaccurate statements of historical facts.  MTD Order at 7-8.  Second, the Court found that alleged

22   misrepresentations concerning the state of the Company's television advertising were not

23   adequately alleged to be false because: (a) the statements did not contain any representation that

24   national television advertising was in fact ongoing at the time the statements were made; and (b)

25   a reasonable investor would not have interpreted the statements that the Company was currently

26   using television advertising as misleading just because it had stopped its national television

27   advertising program.  MTD Order at 6.  Finally, the MTD Order found that Plaintiff's chart of

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:18-cv-06208-JD                                                          - 1 -
4843-2935-8031.v4

1    false statements was not consistent with the consolidated complaint's allegations and briefing on

2    the motion to dismiss.  MTD Order at 4.

3        2.    The Amended Consolidated Complaint for Violations of the Federal Securities

4    Laws (the "AC") directly addresses each of the pleading deficiencies identified by the MTD

5    Order.  First, the AC is clear that statements concerning the Company's 3Q18 reported historical

6    active client growth are not alleged to be actionable misrepresentations.

7        3.    Second, with respect to the alleged misrepresentations and omissions concerning

8    the then purportedly current status of television advertising, including the scope of television

9    advertising during the Class Period, the AC now pleads facts more clearly casting the

10    misrepresentations as material omissions.  Further, the AC now pleads additional specific

11    allegations clarifying that while Stitch Fix emphasized the material nature of its television

12    marketing campaign, at no time during the Class Period (or afterward) did the Company make

13    any explicit distinction between its national television advertising campaign and local or regional

14    television advertising.  In fact, as alleged herein, Defendants specifically represented Stitch Fix

15    as a **national brand** whose **national image** and growth had been and would continue to be

16    strengthened by television advertising.  Investors had no reason to believe that Stitch Fix engaged

17    in anything other than a national advertising campaign that had fueled active client growth.  By

18    failing to disclose the true state of television advertising during the Class Period, Defendants'

19    representations left reasonable investors with the impression that their current television

20    advertising was national in scope.  *See* ¶¶27, 40-41, 45, 58, 72, 78, *infra*.

21        4.    Third, the AC provides additional facts reported by a former Stitch Fix employee,

22    Former Employee No. 1 ("FE 1") who worked at the Company as a Growth Marketing Manager

23    for Offline Channels during the Class Period and specifically between July 2017 and October

24    2018.  FE 1 was a member of the acquisition marketing team responsible for acquiring new

25    customers.  Specifically, FE 1 worked on customer acquisition through offline marketing

26    channels, which included television, radio, broadcast and direct mail.  During FE 1's tenure at the

27    Company, FE 1 reported to Head of Growth Mike Duboe.  During FE 1's tenure at the Company,

28    Duboe reported to several different individuals, including Defendant Katrina Lake, Chief

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:18-cv-06208-JD      - 2 -

1  Algorithms Officer Eric Colson and, once she was hired in May 2018, Chief Marketing Officer

2  Deirdre Findlay ("Findlay").

3      5.    FE 1 provided facts concerning the Company's shut down of national television

4  advertising in the spring/summer of 2018.  FE 1 reported that, while the Company had done some

5  testing of the efficacy of its television advertising prior to FE 1's start date in 2017, it became

6  necessary after FE 1 was hired to prove out TV by performing a so-called "matched market test."

7  FE 1 further reported that the matched market test required the Company to "go dark" on its

8  national advertising, meaning that during the pendency of the test it would cease all national

9  television  advertising  and  would  instead  only  run  television  advertising  in  very  limited

10  geographies.  The Company would then use data from those limited geographies to measure client

11  acquisition and use the results to project client acquisition in similar geographies.

12      6.    FE 1 also reported that internally, and prior to its execution, there was substantial

13  discussion within the Company about whether to conduct the matched market test.  According to

14  FE 1, conducting the test was a huge decision because there were concerns about the impact that

15  the test would have on business during the time the test was being performed.  For that reason,

16  according to FE 1, before deciding to run the test, the Company first undertook an impact analysis

17  to attempt to estimate the potential impact that going dark would have on customer acquisitions.

18  FE 1 reported that, based on that analysis, the Company expected that there would be a negative

19  impact on customer acquisitions.  Nevertheless, FE 1 reported that the test was conducted during

20  what he/she described as the summer before FE 1's October 2018 departure from the Company.

21  FE 1 explained that planning and executing the test took approximately three months and recalled

22  that the matched market test was already ongoing by the time Findlay started at the Company in

23  May 2018.  FE 1 reported that at its conclusion the test results showed that television advertising

24  did have a positive impact on customer acquisitions and that, as a result, the Company intended

25  to continue doing national television advertising.

26      7.    Fourth, the AC provides additional facts concerning the content of the Company's

27  October 1, 2018 disclosures, which informed investors for the first time that it had ceased all of

28  its national television advertising for 10 of the 13 weeks of the quarter, and investors' immediate

reactions to the disclosure of that previously undisclosed information.  Specifically, the AC now alleges that the Company's stock price immediately declined in after-market trading following Defendants' 4Q18 earnings press release, shareholder letter and conference call – well before any mention by analysts that the Company had continued "some" local television advertising. Moreover, the AC pleads additional facts showing that analysts specifically linked the Company's poor 4Q18 active client growth to its decision to cease national television advertising for the majority of the quarter.  The dramatic and negative impact of the 10-week cessation of national television advertising on the Company's active client growth and the immediacy of the Company's stock price decline show that investors had understood that the Company's television advertising campaign was compromised, and that the decision to cease that campaign which had been a key driver of active client growth was material undisclosed information that was important to investors' investment decisions .  *See* ¶¶24-29, 58(d), 65-81, 88-92, *infra*.

8.      Accordingly, the AC now pleads specific facts showing that investors learned for the first time on October 1, 2018 that the Company had ceased national television advertising for 80% of 4Q18.  The stock price declined by more than 35%, a clear indication that the new information disclosed by Defendants was material to investors.  The AC further details that Defendants' disclosures made no mention that the Company had continued running "some local advertising."  Rather, the only reference to the fact that the Company continued some local advertising during the quarter it halted its national television advertising occurred in a small sampling of analyst reports, the first of which was filed five hours after Defendants' initial disclosures.  By that time, Stitch Fix's stock price had already fallen precipitously in after-hours trading.  *See* ¶¶24-29, 58(d), 65-81, 88-92, *infra*.

9.      Fifth, and similarly, the AC provides more specific facts concerning the materiality of the representations and omissions concerning television advertising to address the Court's prior ruling that a reasonable investor would not have been misled by these representations.  The AC clarifies that, based on Defendants' pre-Class Period representations concerning the significance of television advertising to active client growth and their Class Period statements concerning the current utilization of television advertising, information about television advertising was material.

1   The AC also clarifies the fact that the Company had gone "dark" on television advertising three

2   to six weeks before the Class Period began, demonstrating that Defendants' statements were in

3   fact false when made.   At the time of the alleged misrepresentations, the Company was not

4   utilizing national television advertising, which was, according to Defendants themselves, among

5   its most effective drivers of active client growth.  *See* ¶¶13-26, 40-41, 45-46, 58, *infra*.

6         10.    Sixth, the AC provides a chart of the alleged misrepresentations and the reasons

7   why those statements are false in alignment with the allegations of the AC, as the Court required.

8   *See* Exhibit A.

9   **III.    BACKGROUND AND SUMMARY OF ACTION**

10         11.    This is a securities fraud class action brought on behalf of all purchasers of Stitch

11   Fix common stock between June 8, 2018, and October 1, 2018, inclusive (the "Class Period").  It

12   seeks remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

13   Act") and SEC Rule 10b-5 promulgated thereunder.

14         12.    Defendant Stitch Fix is an online retail fashion subscription service.  The Company

15   delivers curated boxes of items to "clients" to try on, keep and buy what they like, and return the

16   rest, offering a 25% price discount to clients who accept the entire shipment.  As acknowledged

17   by the Company and the investment analysts following the Company, the most important business

18   metrics to investors for subscription-based businesses like Stitch Fix are the number and growth

19   rate of "active clients."  Stitch Fix defines an "active client" as a client who has purchased all or

20   part of a curated box of items the client received at least once during the preceding 12-month

21   period.

22         13.    In the lead-up to the Class Period, Stitch Fix had reported substantial and

23   consistent active client growth: from 261,000 in FY14, to 867,000 in FY15, to 1,674,000 in FY16,

24   to 2,194,000 in FY17.  According to the Company's Q2 Fiscal 2018 Letter to Shareholders, posted

25   to the Company's website on March 12, 2018, the Company had continued to add more than

26   100,000 active clients in each quarter since 2Q17:

27

28



**ACTIVE CLIENTS (000s)**

14.     After several years of organic growth, and in order to continue growing at a similar pace, Stitch Fix extended its marketing efforts to include television advertising.  Stitch Fix launched its first television campaign in 2017 and, according to Defendants, television advertising became a key marketing component driving the Company's active client growth from its 2017 launch through the end of 3Q18.

15.     The positive impact of television advertising on active client growth was almost immediate and remained consistent throughout the time period it was used.  In a shareholder letter filed with the SEC on December 19, 2017, Defendants noted that "TV is a recent area of marketing focus and in each of our three TV waves to date, we've seen growth in brand awareness and marketing efficiency."  During the Company's 1Q18 investor call later the same day, Defendant Lake elaborated as follows: "Each wave has been more effective than the last" and, as a result, television advertising "is something that we've been really pleased with."  She concluded by stating that "we've seen a positive impact on brand awareness through the ***broad-based TV campaigns*** that we've been doing."

16.     Journalists covering the Company also noted the positive effect of television advertising on active client growth.  On December 19, 2017, *Recode* reported that the Company's new mass-market (*i.e.*, national) television advertising push was successfully playing a big role in attracting new customers:

> **Stitch Fix's TV advertising push attracted new customers.  One problem: They want cheaper stuff**.

Online personal styling service Stitch Fix stepped up its advertising spending by 84 percent in the first quarter of its 2018 fiscal year, **with TV campaigns playing a big role in trying to attract new customers**.

**But the new customers attracted by the mass-market commercials** had one common piece of feedback: Stitch Fix needs to offer a bigger selection of less-expensive clothing.

17.   In subsequent months, Defendants continued to repeatedly confirm the importance of the Company's television advertising campaign to its success in generating active client growth.  For example,

(a)   February 14, 2018: During Defendant Lake's presentation to institutional investors at the Goldman Sachs Technology Internet Conference, an investor asked about trends and customer acquisition costs.  Lake responded by specifically identifying television advertising: "TV works for [Stitch Fix] in a very performance-oriented way," *i.e.*, television advertising was an important driver of client growth.

**TV works for us in a very performance-oriented way that we can attribute directly back to the spots that were airing**.  We put social I already talked about, their differences between men and women.  But we've been able to find a wide diverse range of channels where we're seeing very quick payback on that spend, and that continue to generate value after that.

(b)   March 12, 2018: During the Company's 2Q18 investor conference call, an analyst asked about the Company's marketing efforts.  In response, Defendant Lake again responded by discussing the successes of the Company's television advertising.  Lake told investors that the Company could directly attribute client responses to television ads within seconds, thereby connecting television advertisements directly to new client sign-ups.  Further, Lake specifically referred to television advertising as an area within the Company's marketing program that the Company was excited about:

[Lake]: . . . I'll take the question on marketing.  The mix between brand and performance, today the – I mean, almost everything that we do would be categorized as performance.  And so **even on the TV front, for example, the TV spots that we're running, our direct response, we can attribute those within kind of a 5-second window directly to sign-ups that we're seeing in response to that**.

*        *        *

**And it's an area that we're excited about**.  And I think we – you'll see over the course of, I don't know, a year or so, that you'll probably see us experiment with

more types of marketing.  But today, the vast majority of the marketing spend that you see would be more of what people would consider performance marketing.

(c)     May 16, 2018: During Defendant Lake's presentation at the J.P. Morgan Global Technology, Media and Communications Conference, an analyst asked, "What's working best for you from a marketing perspective?  Anything [specific] to call out?" (modification in original).  In response, Lake again specifically highlighted television advertising and the active client growth the Company was deriving directly from its television spots, which fit with a "data-driven ROI approach":

> [Lake]: Yes.  I mean, social, definitely.  The social channels work really well for us. We're not – as a lot of e-commerce is very Google SEO, SEM-driven.  We're not as much.  I mean, we still spend with Google, and we still have a lot of traffic through Google.  But Facebook video, for example, actually, has been very effective for us.  What else?  I mean, we found Twitter to be effective, actually, with men. We use Pinterest for women. And we use direct mail.  **We use TV.  TV, we use all-in kind of a direct response way.  We were attributing back, I think, within 7 seconds of people seeing a spot and signing up.  So we use a very data-driven ROI approach** across all channels, but it's been very important to us, actually, that we don't have one channel that represents more than half of our paid spend.  And so we want to be able to have a lot of different channels with a lot of horsepower behind them and a lot of diversity just because you just don't want to become overdependent on one channel.

18.     On June 20, 2018, the online trade magazine Digiday published an article titled "Direct-to-consumer brands see gains from traditional TV," reporting on a study that found Stitch Fix "saw [its] revenues jump after [it] increased [its] TV spend":

> The study said DTC companies like Peloton, Chewy, Carvana, Ancestry, Poshmark and Stitch Fix also saw their revenues jump after they increased their TV spend. The companies seem to think TV is working because they're spending more there.

19.     In the three quarters preceding the Class Period, the Company grew active clients by 30% or more, which the Company and the market attributed in substantial part to television advertising.

20.     On June 7, 2018, the day before the start of the Class Period, Stitch Fix announced the Company's 3Q18 financial results.  While revenue per active client was flat year-over-year, the Company reported active client growth of 30% year-over-year, "demonstrat[ing] continued positive momentum for Stitch Fix and the power of our unique ability to deliver personalized

1   service at scale."   The reported active client growth exceeded Wall Street expectations, and

2   investors sent Stitch Fix shares skyrocketing more than 29%.

3       21.   In addition to the reported 3Q18 financial results, Defendants repeatedly affirmed

4   that television advertising remained an important engine for driving "near-term payback" by

5   helping the Company "acquire new clients."   For example:

6   • On June 7, 2018, in the Company's shareholder letter published on the Company's
7   website and filed with the SEC, Defendants represented that they "continue to make
    strategic and measured marketing investments designed to achieve near-term
8   payback," specifically including investments in television advertising.

9   • On June 7, 2018, during the 3Q18 earnings call, Defendant Lake represented that
    Defendants were "efficiently leveraging" their "marketing capabilities," which
10  were defined to include television advertising, in order "to acquire new clients."

11  • On June 8, 2018, Defendants' Form 10-Q filed with the SEC represented that their
    "broad-based" "current marketing efforts include" television so as to "grow our
12  business," "strengthen Stitch Fix as a national consumer brand," "acquire new
13  clients and drive revenue growth."

14      22.   Each of the above representations concerning the Company's efficient[]

15  leveraging of its marketing capabilities to achieve near-term payback – specifically, as those

16  representations purported to reflect the current utilization of television advertising – were

17  materially false and misleading when they were made.   Defendants knew or deliberately

18  disregarded and failed to disclose the following true facts:

19      (a)   Defendants had already decided to and commenced the execution of a

20  complete halt of the Company's national television advertising campaign in order to engage in a

21  "dark test" to test advertising efficacy before these statements were made.   As Defendants would

22  later disclose, the dark test lasted for 10 of 4Q18's 13 weeks.   Because the quarter began on April

23  29, 2018, by the time of the June 7 and 8, 2018 misrepresentations, the Company was already

24  approximately six weeks into the quarter.

25      (b)   Nothing in Defendants' representations alerted investors to the fact that the

26  Company had halted all national television advertising – which had substantially driven active

27  user growth – and therefore that Stitch Fix's television advertising was not among the marketing

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:18-cv-06208-JD                                                    - 9 -
4843-2935-8031.v4

1   efforts that would help drive "near-term payback" and "strengthen Stitch Fix as a national

2   consumer brand" for substantially all of 4Q18.

3           (c)      Defendants knew even prior to the Class Period that national advertising

4   would be going "dark" during the Class Period and that as of June 7, 2018, the Company's

5   national advertising had already been shut down.  FE 1 reported that internally there was

6   substantial discussion within the Company about whether to conduct the matched market test

7   because it was a huge decision that would impact the business and that planning and executing

8   the test took approximately three months.  For that reason, according to FE 1, before deciding to

9   run the test, the Company first undertook an impact analysis which showed that there would be a

10  negative impact on customer acquisitions.

11          (d)      Defendants also knew that the representations and omissions concerning

12  the current marketing campaign left reasonable investors with the impression that Stitch Fix was,

13  as it stated, continuing its television advertising campaign in largely the same manner that had

14  successfully driven active client growth, including in 3Q18.  In the four months before the Class

15  Period commenced, Defendant Lake had repeatedly praised the Company's television advertising

16  as key to the Company's marketing effort to drive client growth.

17          (e)      Defendants were themselves involved in the decision to implement the

18  "TV dark test."  They later disclosed that they had deliberately halted all national television

19  advertising in order to conduct the test and measure the channel's efficiency even though as

20  Defendant Lake acknowledged, "we *always* knew that TV was an important component of

21  [marketing]."

22          23.      Throughout the Class Period, the Company's stock price traded at artificially

23  inflated prices as high as $52.44.  Based on Defendants' misrepresentations and omissions,

24  investors' expected that television advertising would continue to be a key driver of active client

25  growth.  The artificial inflation of the Company's stock price was maintained by Defendants'

26  continued boasting of the active client growth, as the truth about the ongoing television dark test

27  remained concealed from the investing public.

28

24.     On October 1, 2018, after trading closed, Stitch Fix issued a press release announcing its 4Q18 financial results and contemporaneously issued a shareholder letter on its website providing further discussion of the results.  The Company reported that sequential active client growth had plummeted **by 70%**, from 180,000 new additions in 3Q18, to just 54,000 new additions in 4Q18 – the lowest of any prior reported quarter in the Company's history.  The shareholder letter also disclosed for the first time that, during the Class Period, the Company had "ceased our national TV campaign for 10 weeks" of the 13 weeks during 4Q18:

> In Q4'18, we continued our measured and analytical approach to paid advertising as we tested key channels to better understand how to most effectively allocate our marketing spend.  Specifically, during the quarter we performed a TV incrementality test, during which ***we temporarily ceased our national TV campaign for 10 weeks to measure the channel's efficacy***.

25.     Investors were shocked by this news.  This was the first public disclosure that the Company had ceased all of its national television advertising during the majority of the quarter.

26.     During a conference call following the issuance of the press release and shareholder letter, Defendants reiterated that the Company had ceased national television advertising for most of the quarter and Defendant Lake acknowledged that she and the other Defendants ***always*** knew of the importance of television advertising to the effectiveness of its marketing campaign:

> Marketing diversification is something we've talked about for a long time.  ***And we always knew that TV was an important component of that***, but I think having gone through this test and having really understood more granularly ***how TV impacts, I think, we feel like it's a really important part of the portfolio*** and you'll continue to see us invest there.

27.     Stitch Fix's stock price began to fall precipitously and immediately in after-hours trading, from $44.63 at the close of trading at 4:00 p.m. Eastern on October 1, 2018, to $35.70 by 7:57 p.m. Eastern.  *See* ¶¶73, 90.  Nothing in the Company's October 1, 2018 press release, shareholder letter or conference call indicated that the Company had continued any local advertising during the 10-week stoppage of national television advertising for the dark test.[1]  And

---

[1]     The first report mentioning that, while Stitch Fix shut off national television advertising, it had continued to engage in some local or regional television advertising was in a SunTrust Robinson Humphrey analyst report disseminated at 10:45 p.m. Eastern, more than six hours after Defendants' disclosure on October 1, 2018 and almost three hours after the stock's precipitous

investors had no reason to believe or otherwise perceive that Stitch Fix had ever been engaged in anything other than a national television advertising campaign, let alone during 4Q18, especially in light of the fact that Defendants had represented that marketing was a national strategy designed to strengthen the Company's "national consumer brand."

28.    Analysts covering the Company immediately attributed the lowest active client growth in the Company's history to Defendants' decision to halt all national advertising for 10 of the quarter's 13 weeks.  For example:

- <u>October 1, 2018, RBC</u>: Stitch Fix's ***"([o]verly?) aggressive ad testing – a 10-week cessation of a national TV campaign" as a "key reason" for the "record lows" in revenue growth and net client add-ins.***

- <u>October 1, 2018, Piper Jaffray</u>: ***The pause in television advertising "clearly had an adverse impact" on the "lowest sequential adds"*** *in active clients*.

- <u>October 2, 2018, Barclays</u>: "***The one area we were surprised*** was marketing efficiency eroding.  SFIX pulled-back on national TV advertising (and continued to run some local TV) to test efficacy, ***which negatively weighed on both client growth and marketing efficiency***.  Active client growth slowed to 25% Y/Y, and SFIX added just 54K net clients Q/Q, the lowest yet, with much higher ad expense-per-net-add."

29.    In response to Defendants' October 1, 2018 disclosures, Stitch Fix's stock price declined $15.69 per share, from $44.63 at market close on October 1, 2018 to $28.94 by the close of trading on October 2, 2018 – a drop of more than 35% in a single day on a volume of more than 9.5 times the average daily volume during the preceding 10 trading days.  The decline resulted in a loss of more than $600 million in market capitalization.

---

drop in after-market trading.  By that time the SunTrust Robinson Humphrey analyst report was issued, the stock price had ***already*** fallen from $44.63 to $35.70 in after-market trading.  *See infra*, ¶¶73, 74, 78, 90.

## IV.    JURISDICTION AND VENUE

30.    Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

31.    Venue is proper in this District pursuant to §27 of the Exchange Act, as Stitch Fix is headquartered in this District and many of the false and misleading statements alleged herein were disseminated from this District.

32.    In connection with the acts alleged in this AC, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## V.    PARTIES

33.    Lead Plaintiff Ganesh Kasilingam purchased Stitch Fix common stock during the Class Period as set forth by the certification filed in this matter on December 10, 2018, and was damaged by the conduct alleged herein.

34.    Defendant Stitch Fix is a San Francisco, California-based online purveyor of clothing and accessories.  Stitch Fix common stock is listed and trades on the NASDAQ, an active market, under the ticker symbol "SFIX."  As of September 27, 2018, Stitch Fix had more than 38.5 million shares of common stock outstanding.  During the Class Period, Stitch Fix, through

1   its officers and directors, published periodic filings with the SEC and made public statements that,

2   as alleged herein, contained material misrepresentations and omissions that artificially inflated

3   the price of the Company's common stock.   The Company has established and regularly

4   publicizes the availability of a website at www.StitchFix.com, on which it maintains an Investor

5   Relations section where SEC filings, press releases, conference call recordings, investor

6   presentations, shareholder letters, financial statements and information, corporate governance

7   policies, descriptions of its business, and other information about the Company is made available

8   to investors.

9       35.    Defendant Katrina Lake is, and was at all relevant times, the founder, CEO and a

10  director of Stitch Fix.  As CEO, Lake had the power to authorize or approve publicly disseminated

11  information about the Company and was regularly quoted in Stitch Fix's press releases, regularly

12  spoke on Stitch Fix's quarterly earnings calls to discuss financial results with Wall Street analysts

13  and investors, regularly made live presentations at analyst-sponsored investor conferences, and

14  signed or authorized all of Stitch Fix's reports filed with the SEC.  Lake founded Stitch Fix in

15  2011.

16      36.    Defendant Paul Yee was at all relevant times the Chief Financial Officer ("CFO")

17  of Stitch Fix.  During that time, Yee had the power to authorize or approve publicly disseminated

18  information about the Company, regularly spoke on Stitch Fix's quarterly earnings calls to discuss

19  financial results with Wall Street analysts and investors, made live presentations at analyst-

20  sponsored investor conferences, and signed or authorized all of Stitch Fix's reports filed with the

21  SEC.  Yee joined Stitch Fix as CFO in June 2017 and left in January 2020.

22      37.    The Individual Defendants, because of their positions with the Company,

23  individually and collectively possessed the power and authority to control the contents of Stitch

24  Fix's reports to the SEC, press releases and public presentations to securities analysts, money and

25  portfolio managers and institutional investors.  Each Defendant was provided with copies of the

26  Company's reports and press releases alleged herein to be misleading prior to or shortly after their

27  issuance, and had the ability and opportunity to prevent their issuance or cause them to be

28  corrected.  Because of their positions and access to material non-public information available to

1   them, the Individual Defendants knew that the adverse facts specified herein had not been

2   disclosed to, and were being concealed from, the public, and that the positive representations

3   which were being made were thus materially false and/or misleading.

4          38.     As alleged herein, certain of the Company's SEC filings, including press releases,

5   shareholder letters, and quarterly reports, contained material misrepresentations and omissions

6   when issued.  In addition, throughout the Class Period, the Individual Defendants participated in

7   the Company's quarterly and/or annual earnings conference calls wherein they made material

8   misrepresentations, omitted material information, or failed to correct the material misstatements

9   or omissions of others.

10  **VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED
         DURING THE CLASS PERIOD**

11

12         **A.    Defendants' June 7 and 8, 2018 False and Misleading Statements and
                Omissions Concerning Marketing and Television Advertising**

13         39.     On June 7, 2018, after the close of trading, Stitch Fix issued a press release

14  published a letter addressed to its shareholders announcing the Company's 3Q18 financial results,

15  which concerned the three-month period ended April 28, 2018.  The press release emphasized

16  that in 3Q18, Stitch Fix had experienced continued growth in active clients, to 2.7 million (an

17  increase of 30% year-over-year), and represented that the results demonstrated Stitch Fix's

18  continued positive momentum:

19      Stitch Fix Announces Third Quarter Fiscal 2018 Financial Results

20          . . . Stitch Fix, Inc. (NASDAQ:SFIX), the leading online personal styling
        service, has released its financial results for its third quarter of fiscal year 2018
21      ended April 28, 2018 and posted a letter to its shareholders on its investor relations
        website.  Highlights include delivering:
22

23          •       Active clients of 2.7 million, an increase of 30% year over year

24          •       Net revenue of $316.7 million, an increase of 29% year over year

25          •       Net income of $9.5 million and adjusted EBITDA of $12.4 million

26          •       Diluted earnings per share of $0.09

27          "In addition to driving strong net revenue, net income, and adjusted
        EBITDA, we grew our active client count to 2.7 million, an increase of 30% year-
28      over-year," said Stitch Fix founder and CEO Katrina Lake.  "We continue to
        balance growth and profitability, demonstrated by our ability to consistently deliver

top-line growth of over 20% even as we invest in category expansions, technology talent, and marketing.  Our third quarter results demonstrate continued positive momentum for Stitch Fix and the power of our unique ability to deliver personalized service at scale."

40.      The Company's shareholder letter, published on the Company's website and filed with the SEC, stated that Stitch Fix had "[grown] active clients to 2.7 million as of April 28, 2018," from 2.5 million in 2Q18, and from 2.07 million in 3Q17, an increase of 614,000, or 29.6% year-over-year growth.  The shareholder letter also represented that Stitch Fix was continuing to make "strategic and measured marketing investments," specifically including continued investments in television advertising (which Defendants previously said had been highly effective in growing active users), and that these continued investments were designed to achieve "near-term payback."

> **Advertising.  *We continue to make strategic and measured marketing investments designed to achieve near-term payback***.  In Q3'18, advertising expense was $25.2 million, or 8.0% of net revenue.  Our Q3'18 advertising spend increased relative to our Q3'17 expense of $21.3 million, or 8.7% of net revenue.

> *                *                *

> *Advertising expenses include the costs associated with* the production of advertising, *television*, radio and online *advertising*.

41.      Later in the day on June 7, 2018, Defendants Lake and Yee, along with the Company's Chief Operating Officer ("COO") Mike C. Smith ("Smith"), hosted an earnings call to discuss the Company's 3Q18 results.  During the call, Defendant Lake continued to trumpet the Company's significant active client growth during the quarter: "We grew our active client count to 2.7 million as of April 28, 2018, an increase of 614,000 and 30% year-over-year."  Lake then addressed what she described as the Company's current strategic road map: "Our strategic road map consists of 3 primary pillars for growth."  The second pillar for growth specifically ascribed the ability to drive client growth to the Company's efficient leverage of its marketing capabilities, which, as noted above, were defined to include television advertising:

> Our second pillar for growth is in serving new clients.  We believe that we have significant opportunities to acquire new clients in our existing business.  The 30% year-over-year growth we've seen in active client count *is the result of these efforts, efficiently leveraging* our performance, *marketing capabilities and increasing our brand awareness*.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:18-cv-06208-JD
4843-2935-8031.v4

- 16 -

42.     During the earnings call, in response to an analyst's question about what drove the Company's 3Q18 results to exceed the Company's previously issued guidance in light of reported stagnant revenue-per-active-client, Defendant Yee touted the "efficiencies" of the Company's marketing efforts to attract new clients, which, as noted above, were defined to include television advertising.

> [ANALYST:] [C]ould give us a little bit more detail about what drove the upside to guidance in the quarter.  I think revenue per active client was flattish in the quarter after declines in prior quarters, so just curious what drove that specifically . . . .
>
> *       *       *
>
> [YEE:] Just to add on to our results for the quarter, our 29% retail growth – retail sales growth was above our range of 22% to 26% and really went – from a driver's standpoint, we grew active clients by 30% year-over-year, and that's both for our Women's and Men's categories.  And we're really pleased with efficiencies we've seen with our marketing spend to attract new clients[2] as well as ability to reengage and engage clients with the various tools we have to really please our clients.

43.     On June 7, 2018, CNBC aired a segment highlighting the Company's impressive earnings report from that day and published an article with a title specifically linking the Company's surging stock price to its statements about active client growth: "Stitch Fix soars after online styling service says active clients grew 30%."  The article continued:

> Stitch Fix soared after the company reported strong earnings and user growth on Thursday.
>
> Here's how the company did compared to what Wall Street expected:
>
> Earnings: 9 cents vs. 3 cents forecast by Thomson Reuters
>
> Revenue: $316.7 million vs. $306 million forecast by Thomson Reuters
>
> Active clients: 2.7 million vs. 2.66 million forecast by StreetAccount

44.     Also on June 7, 2018, RBC issued a report titled "Q3:18 was a 'good fit,'" which stated that active client growth "remain[ed] healthy at 30% Y/Y": "Stitch Fix's Active Clients came in at 2.688MM, above the Street's expectation of 2.665MM and our expectation of

---

[2]     While the Company may have been pleased with the marketing spending to attract new clients, the Company failed to disclose that it had ceased the national television advertising spending, which was a key driver of active client growth.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:18-cv-06208-JD                                                      - 17 -
4843-2935-8031.v4

2.675MM.  These were positive results, with Active Client growth remaining healthy at 30% Y/Y,

which compares to 31% Y/Y growth in FQ2:18."  That excerpt was accompanied by the following

chart visualizing the Company's growth in active clients from 1Q16 through 3Q18, and an

accompanying year-over-year active client growth calculation starting in 1Q17.  The year-over-

year calculation showed active client growth remaining largely consistent at around 30% from

Q417 through 3Q18:



45.     On June 8, 2018, Stitch Fix filed with the SEC a Form 10-Q for the quarter ended

April 28, 2018.  The Form 10-Q, signed by Defendants Lake and Yee, emphasized that the

Company's implementation of broad-based marketing efforts were necessary to grow its business,

"strengthen Stitch Fix *as a national consumer brand*," acquire new clients and drive revenue

growth.  The Form 10-Q also specifically stated that the Company was *currently utilizing* digital

and offline channels to attract new customers, including television.[3]

### Client Acquisition and Engagement

To grow our business, we must continue to acquire clients and successfully
engage them.  ***We believe that implementing broad-based marketing strategies
that increase our brand awareness has the potential to strengthen Stitch Fix as a
national consumer brand, help us acquire new clients and drive revenue
growth***. . . .  We expect to continue to make significant marketing investments to
grow our business.  ***We currently utilize both digital and offline channels to attract
new visitors to our website or mobile app and subsequently convert them into
clients.  Our current marketing efforts include*** client referrals, affiliate programs,
partnerships, display advertising, ***television***, print, radio . . . .

---

[3]     Offline marketing channels included TV, radio, broadcast and direct mail.

\*     \*     \*

Starting in calendar year 2017, we began to increase our paid marketing expenses by investing more in digital marketing and launching our first *television advertising campaigns*. *We expect to increase our spending on these and other paid marketing channels in the future* and cannot be certain that these efforts will yield more clients or be cost-effective.

**B.**     **Reasons Why Defendants' June 7 and 8, 2018 Misrepresentations and Omissions Concerning Marketing and Television Advertising Were Knowingly or Recklessly False and Misleading**

46.     The statements identified above at ¶¶40-41, 45, concerning the current state of the Company's marketing program, including representations concerning television advertising, were materially false and misleading when made, as Defendants knew or deliberately disregarded and failed to disclose the following true facts:

(a)     Even before the June 7, 2018 announcement of 3Q18 financial results, the Company had halted all of its national television advertising campaign in order to run a dark test, also referred to as a market match test, on the efficiency and efficacy of its national television advertising. Because each of Stitch Fix's fiscal quarters is 13 weeks long,[4] because the misrepresentations detailed above were made on June 7-8, 2018, because June 7, 2018 was approximately six weeks into 4Q18, and because the Company admitted that it ceased all national television advertising for 10 of the 13 weeks in the quarter (¶¶22(a), 24, 66, 68, 88), it is evident that the Company had already halted national television advertising at least three and as many as six weeks before the June 7-8 representations. Accordingly, the Company was not currently utilizing national television advertising, let alone continuing its marketing in the form that it had during the prior quarter. The ongoing dark/matched market television advertising test conducted during 4Q18 completely eliminated national television advertising as a marketing method for the substantial majority of the quarter. Stitch Fix had previously engaged in national television marketing to both drive client growth and national brand awareness, but national television advertising did not – and could not – contribute to either active client growth or national brand

---

[4]     According to the Company's SEC Form 10-K for the fiscal year 2018, "Each fiscal year generally consists of four 13-week fiscal quarters, with each fiscal quarter ending on the Saturday that is closest to the last day of the last month of the quarter."

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:18-cv-06208-JD       - 19 -
4843-2935-8031.v4

1   awareness during almost all of the fourth quarter.  These undisclosed facts were materially

2   inconsistent with the Company's representations that the Company's current utilization of

3   marketing methods included television, which had helped fuel the Company's impressive active

4   client growth, and that television advertising would continue to deliver near-term payback, was a

5   current marketing activity, would increase national brand awareness, and would continue.

6      (b) In addition, nothing in Defendants' representations – including those

7   specifically related to the scope of or spending on marketing, which included television – alerted

8   investors to the fact that, when Defendants represented that Stitch Fix's television advertising was

9   among the marketing efforts that would help drive "near-term payback" (¶40), the Company had

10  already halted all national television advertising, and that it would remain halted for substantially

11  all of 4Q18.  ¶22(b).  Nothing in the Company's television-related statements on June 7 and June

12  8 disclosed the true facts that, though Defendants referred to television as a "current" aspect of

13  the Company's marketing (¶45), the Company's current marketing plan did not include national

14  television advertising, which had substantially driven active user growth, and would not include

15  national television advertising for substantially all of 4Q18.  Nothing alerted investors that the

16  purported broad-based marketing strategies implemented to "strengthen Stitch Fix as a ***national***

17  consumer brand" (¶45) did not then include national television advertising, and would not include

18  national television advertising for substantially all of 4Q18.  Nothing alerted investors to the fact

19  that, while Defendants had "efficiently leverag[ed]" (¶41) television advertising in 3Q18 as a tool

20  capable of increasing brand awareness, they were no longer doing so for substantially all of 4Q18.

21  Nothing alerted investors to the fact that, while Defendants may have expected or intended to

22  "increase our spending" (¶45) on television advertising campaigns in the future, there would be

23  almost no spending to execute any national television advertising in 4Q18.  Nothing alerted

24  investors to the fact that neither the Company's "strategic and measured marketing investments

25  designed to achieve near-term payback" nor its "advertising expenses" (¶40) included

26  investments or expenses associated with the production of national television advertising for the

27  substantial majority of 4Q18.

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:18-cv-06208-JD
4843-2935-8031.v4

(c)     Defendants also knew or recklessly disregarded that the representations and omissions concerning the current marketing campaign left reasonable investors with the impression that Stitch Fix was continuing its television advertising campaign in largely the same manner that had successfully driven active client growth including in 3Q18.  In the four months before the Class Period commenced, Defendant Lake had repeatedly praised the Company's television advertising as key to the Company's marketing effort to drive client growth, stating it "works for us in a very performance-oriented way that we can attribute directly back to the spots that were airing," telling investors that she and the Company could directly attribute client responses to television spots within "seconds" and touting that television advertising was among the efforts "working best for [Stitch Fix] from a marketing perspective."  ¶¶17, 22(d), 58(a). Defendants' representations and omissions gave reasonable investors the impression that the only possible change to the Company's television marketing as of June 2018 was that spending on its television advertising campaign would increase because it was driving active customer growth and national brand recognition.  *See* ¶¶40-41, 45.  Reasonable investors' expectations, based on Defendants' representations, were therefore materially out of alignment with the true state of affairs, which was that the Company's national television advertising campaign had been halted and would remain so for substantially all of the fourth quarter.

(d)     Defendants either knew or were deliberately reckless in not knowing the true state of affairs, namely that the Company had ceased all national television advertising at least three and as many as six weeks before June 7 and 8, 2018, and that it would remain halted throughout the substantial majority of 4Q18.  They acknowledged on October 1, 2018 that they had been personally involved in the decision to implement a "TV dark test" and in monitoring its impact on active client growth, stating that they had deliberately halted all national television advertising to better understand how to most effectively allocate marketing spend and measure television advertising's efficacy.  ¶¶22(e), 24, 66, 68-69, 72.  Lake further acknowledged that "we *always* knew that TV was an important component of [marketing]."  ¶¶22(e), 26, 72.  The acknowledgement that Defendants always knew about the importance of television advertising to the Company's marketing, that they were personally involved in the decision to implement the

1    television dark test, and were personally involved in monitoring the test, its impact on active client

2    growth, and in using those results to better understand television advertising's efficacy and

3    effectiveness are admissions that they knew the details about the test all along, including that

4    television advertising had been halted before June 7 and 8, 2018 and that it would remain halted

5    for substantially all of 4Q18.   The fact that Defendants spoke repeatedly about television

6    advertising's important role in driving client growth and the efficiencies in the Company's

7    marketing to attract new clients (¶¶15, 17, 22(d), 42, 50), provides further evidence of knowledge

8    or deliberate recklessness.

9              (e)     The account of FE 1 corroborates and is corroborated by the other facts

10   showing Defendants knew or recklessly disregarded that even prior to the Class Period, national

11   television would be going "dark" during the Class Period, and that as of June 7, 2018, the

12   Company's national television advertising had already been shut down.  FE 1 reported that though

13   the Company had done some testing of the efficacy of its television advertising before 2017, it

14   became necessary after FE 1 was hired to prove out TV by performing a so-called "matched

15   market test."  FE 1 further reported that the matched market test required the Company to "go

16   dark," meaning that during the pendency of the test it would cease all national television

17   advertising and would instead only run television advertising in very limited geographies.  The

18   Company would then use data from those limited geographies to measure client acquisition and

19   use the results to project client acquisition in similar geographies.  FE 1 reported that there was

20   substantial internal discussion at Stitch Fix about whether to conduct the matched market test.

21   According to FE 1, conducting the test was a huge decision because there were concerns about

22   the impact that the test would have on business during the time the test was being performed.  For

23   that reason, according to FE 1, the Company undertook an impact analysis before deciding to run

24   the test in an attempt to estimate the potential impact that going dark would have on customer

25   acquisitions.   FE 1 reported that, based on the impact analysis conducted before the Company

26   decided to run the test, it expected that there would be a negative impact on customer acquisition.

27   Nevertheless, FE 1 reported that the decision was nevertheless made to go forward with the test.

28   FE 1 explained that planning and executing the test took approximately three months and recalled

1   that the matched market test was already ongoing by the time Findlay started at the Company in

2   May 2018.  FE 1 reported that at its conclusion, the test results showed that television advertising

3   did have a positive impact on customer acquisitions in the tested markets and that, as a result, the

4   Company intended to continue doing national television advertising.  ¶¶5-6, 22(c), 58(c).

5          C.      **Stitch Fix's Stock Price Surges on 3Q18 Results and Reports as**
   **Investors Are Unaware that the Company Halted Television**

6                   **Advertising, a Major Engine of Active Client Growth**

7         47.    Following Defendants' June 7, 2018 and June 8, 2018 announcements of and

8   commentary in connection with the Company's 3Q18 results, analysts credited its continued pace

9   of active client growth as leading to a surge in the price of Stitch Fix common stock.  Analysts

10  also widely anticipated continued strong performance in 4Q18, based in part on the expectation

11  that the Company's strong marketing campaign, including the national television advertising

12  campaign that Defendants lauded for its contribution to driving active client growth, would

13  continue as it had in 3Q18.

14        48.    On June 8, 2018, as the market continued to digest the Company's earnings

15  announcements and call from the day before, and as the Company issued its Form 10-Q for 3Q18,

16  analysts issued bullish reports based on the Company's active client growth.  Analysts at Barclays

17  discussed, as one of the "Positives In 3Q," that "Active Client growth was stable at 30% Y/Y and

18  the 614K net additions Y/Y was the highest level in several quarters."  Piper Jaffray issued a

19  report crediting the Company's quarterly active client growth for the Company's success: "Q/Q

20  active clients accelerated on a Y/Y basis for the third straight quarter to 2.7M."  William Blair

21  reported that the Company's year-over-year (*i.e.*, 3Q17 to 3Q18) and sequential (*i.e.*, 2Q18 to

22  3Q18) active client growth beat estimates.  The William Blair report also said that active client

23  growth in the 30% range for the fourth straight quarter excited investors about the Company's

24  future prospects:

25        Active clients grew about 30% year-over-year to roughly 2.7 million.  Sequential
          net adds of roughly 180,000 were greater than the FactSet estimate of roughly
26        157,000.

27                            *      *      *

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:18-cv-06208-JD                                - 23

*As active clients continue to grow in the 30% range for the fourth straight quarter, we believe that investors remain excited for the large opportunity moving forward*.

49.     News of the Company's continued 3Q18 active client growth and statements regarding the Company's current and historical marketing strength, including representations that marketing spending on television advertising would continue at the same level or increase, sent the price of Stitch Fix common stock surging.  The share price increased more than 29%, or $5.71 per share, from $19.67 at market close on June 7, 2018, to as high as $25.38 in intraday trading on June 8, 2018, on volume of 12.6 million shares, 12 times the average volume during the prior 10 trading days.

50.     On June 13, 2018, Stitch Fix held an investor presentation at the William Blair Growth Stock Conference.  During the presentation, Defendants noted that the Company generally experiences a quick payback from marketing efforts, which had enabled Stitch Fix to drive 30% active client growth.  Defendant Lake also boasted about "the payback that we get on our marketing efforts," stating that "we have very efficient marketing, marketing that is paying back within six months":

> So there's a couple of reasons why this is important.  First is because of the payback that we get on our marketing efforts.  So Paul will talk a little bit about financials later, but in the last quarter, we spent 8% of our revenue on marketing, and using that, we drove 30% client growth and 29% revenue growth.  And so we have very efficient marketing, marketing that is paying back within six months.  If you apply our gross margins here, you can kind of do some back-of-the-envelope math of what that looks like.

51.     Because Defendants continued to conceal the current true facts about national television advertising, investor, journalist, and analyst excitement grew as 4Q18 unfolded.  That excitement was based on the market's impression that the Company's historical marketing efficiencies, of which television advertising was a big and important part, were continuing during the fourth quarter.  Investors had no reason to believe that the Company was doing anything other than continuing to deploy the broad-based marketing strategy it discussed extensively on June 7 and June 8, including television advertising, consistent with, or even more aggressively than, the manner that had led to sustained active growth at around 30% over the past four quarters.

52.     On June 19, 2018, CNBC published another article discussing the Company's 3Q18 earnings, titled "Trader: this company could be the 'Netflix of apparel.'"  The article emphasized the Company's reported 30% year-over-year active client growth and quoted the CEO of a wealth management company as saying that the fundamentals of the company remained strong, specifically Stitch Fix's ability to keep "'growing its user base by an outstanding number.'"

53.     On Sunday, July 15, 2018, Defendant Lake appeared on a nationally televised segment on NBC's Today show, which focused on the continued success of the Company's active client growth.  As Lake explained how she had launched Stitch Fix with just 29 customers, NBC digitally displayed the number rapidly growing to 2.7 million active clients.  But even as NBC showed illustrations of the rapid growth in Stitch Fix's active clients, and featured Stitch Fix TV spots, Lake continued to conceal the known and undisclosed fact that as of July 15, 2020, the national television advertising, which had substantially fueled the continuation of that growth since late 2017 had gone "dark" and had been dark for at least *8 weeks*.  With only two weeks remaining in the quarter, the negative impact of the dark test, to which analysts later connected the 70% sequential decline in active clients, would have been known or deliberately disregarded by Lake.

54.     Following the July 15, 2018 NBC Today show segment, the Company's stock price continued to trade at artificially inflated prices which had been maintained by the Company's continued concealment of the fact that from as early as the beginning of the Class Period, the Company had completely halted all of its national television advertising.

55.     On August 9, 2018, analysts at SunTrust Robinson Humphrey Capital Markets initiated coverage of Stitch Fix and issued a comprehensive analyst report titled "Disruptive by Design; Initiate with Buy/$38 PT."  The report focused on the importance of advertising to driving new customer acquisition, emphasizing that "investments in both traditional and online advertising channels should help grow this metric, and in turn allow the company to acquire new customers."  It concluded, "We believe Stitch Fix will be able to attract new clients as the company leans into advertising."

56.     The representations in the market by Lake and the Company left the investing public with the impression, as evidenced by the analyst coverage concerning the Company's focus on advertising, that Stitch Fix was currently continuing or expanding its advertising campaign, which would continue to lead to near-term payback.  However, unbeknownst to SunTrust and the investors they served, the Company had ceased all national television advertising months earlier, thereby hindering its ability to attract active clients.  ¶¶24, 66, 68, 88.  The truth was not, as SunTrust perceived, that Stitch Fix was "lean[ing] into advertising" – at least in the near-term.  Instead, by halting television advertising to conduct the "TV dark test," Defendants had ensured that television advertising could not deliver "near-term payback."  *See* ¶46.

57.     Defendants' continued claims concerning active client growth – which had been driven in large part by national television advertising – without disclosure of the ongoing television dark test caused the artificial inflation in the stock price to be maintained.  Stitch Fix stock traded at a Class Period high of $52.44 per share during intraday trading on September 18, 2018, more than double the share price at the close of trading on June 7, 2018.  Indeed, as investors considered past performance in looking at the Company's prospects for the near future – without knowing that Defendants had halted national television advertising in May 2018 and that national television advertising had not run for 10 of the fourth quarter's 13 weeks – the artificial inflation only grew.

### D.     The Utilization of National Television Advertising, and Therefore Its Stoppage, Was Material to the Company's Financial Performance

58.     Information about the Company's television advertising was material to investors. Defendants made such information material by repeatedly emphasizing that television advertising was an important engine for continuing to drive active client growth of about 30% year-over-year, which had become the measuring stick for the Company's financial performance.  The information omitted from Defendants' June 7 and 8, 2018 misrepresentations, and concealed throughout the Class Period – that Defendants had ceased all national television advertising even before June 2018 – would have been viewed by a reasonable investor as having significantly altered the total mix of information made available about Stitch Fix for all of the reasons below.

(a)      Following the inception of the television advertising campaign in 1Q18, before the Class Period, Defendants boasted that "TV is a recent area of marketing focus and in each of our three TV waves to date, we've seen growth in brand awareness and marketing efficiency."  ¶15.  A few hours after that statement, the publication *Recode* ran an article about the success of Stitch Fix's television advertising push in attracting new customers, which commented that during 1Q18, the television campaign had played a substantial role in attracting new customers.  ¶16.  In the months after the *Recode* article was published, Defendants reinforced that message.  Defendant Lake told investors that "TV works for us in a very performance-oriented way that we can attribute directly back to the spots that were airing," and specifically identified television advertising as one of the marketing efforts that was "working best" for the Company.  ¶¶17(a), 17(c) 46(c).  Another report confirmed that Stitch Fix's pre-Class Period embrace of and increased spending on television advertising had caused Stitch Fix's active client growth and revenues to jump.  ¶18.  Thus, in the lead up to the Class Period, investors had been conditioned to incorporate news about the Company's marketing program, including specifically news about its television advertising, into the total mix of information used to value the Company and weigh their investment decisions.

(b)      Defendants' Class Period misrepresentations and omissions further informed investors that television advertising was an important component of the Company's marketing strategy.  For example, Defendants specifically identified television advertising as one of the Company's "strategic and measured marketing investments designed to achieve near-term payback" (¶40) and discussed how they were leveraging their marketing capabilities, defined to including television, to drive active client growth (¶¶41, 45).  Thus, even as Defendants failed to disclose material information necessary to make those statements not misleading, they were telling investors that news about the Company's marketing capabilities, specifically television advertising, was important.  Defendants concealed that they had already completely shut down national television advertising, a key part of the Company's marketing effort that had been highly effective at driving active client growth – a metric that the market used to measure the Company's financial condition and growth prospects – well above market expectations in 3Q18.  ¶¶12-20.

1   That performance contributed to what analysts and observers called a "soar[ing]" stock price.

2   ¶¶43, 85(a).  Even if the decision to halt national television advertising was made for a good

3   reason, reasonable investors would have considered the omitted information that television

4   advertising had been halted and would remain so for most of the quarter to test its efficacy as

5   having substantially altered the total mix of information available.

6           (c)      Because television advertising was such a crucial engine for driving active

7   client growth, the decision to run a TV dark test or material market test for 10 weeks of the fourth

8   quarter was undeniably an important decision that involved substantial near-term risk to the

9   Company's financial performance.  Stitch Fix's dark test involved stopping the marketing channel

10  being tested (here, television) on a national basis, while continuing to run television advertising

11  in select limited geographic areas.  ¶¶5, 46(e).  The data collected from those select limited

12  geographic areas would be used to inform Defendants about the extent to which the advertising

13  was successful at driving active customer growth and other key metrics.  ¶¶5, 46(e).  This method

14  of evaluating a marketing channel presents "one major risk: *if the media does have an impact,*

15  *sales will go down while it is turned off*."[5]  Given television advertising's role as a key engine

16  Defendants used to drive active client growth, there existed a substantial risk that active client

17  growth would slow considerably while television advertising was halted nationally during the

18  dark test.  And that is precisely what the impact analysis FE 1 reports was performed during the

19  three-month lead-up to the decision to halt national television advertising showed – that the

20  Company expected that there would be a negative impact on customer acquisitions.  ¶¶6, 22(c),

21  46(e).  A reasonable investor would have considered information about the risks arising from

22  running the TV dark test as material.

23          (d)      Lastly, the fact that Stitch Fix's stock price immediately plunged by over

24  35% on high trading volume when investors learned for the first time that: (i) the Company halted

25  national advertising for 10 weeks during the quarter; and (ii) fourth quarter active user growth

---

[5]  *From Clicks To Bricks- Getting Digital Campaigns' In-Store Measurement Right*, Optimine Blog (April 15, 2019), https://optimine.com/from-clicks-to-getting-digital-campaigns-in-store-measurement-right.

fell by 70%, is strong evidence of falsity, materiality and loss causation.  ¶¶29, 81, 92.  Analysts widely attributed the sharp decline, in active client growth to the previously undisclosed TV dark test.  ¶¶28, 75-81, 91.  The immediacy and magnitude of the decline, and the specificity with which analysts linked it to the fact that national television advertising had been halted for most of the quarter, bolsters the inference that investors regarded the information as material.  ¶¶27-29, 73-81, 90-92.  Investors' negative reaction was based on record low active client growth, which analysts immediately linked to the Company's "aggressive TV dark test," during which Defendants halted television advertising for 10 of the quarter's 13 weeks.  ¶¶28, 77; *see* ¶¶28, 75-80, 91.  A stock price drop of such magnitude that materialized so quickly following the disclosure of previously undisclosed information would not occur in response to disclosures perceived as immaterial.  Further, because analysts' role is to provide information they believe relevant to investment decisions, the fact that numerous analysts immediately reported that the Company's record low active client growth was linked to and caused by Defendants' decision to halt television for the substantial majority of the quarter provides additional evidence that the information omitted from Defendants' June 7 and 8, 2018 representations about marketing and television advertising was material.

**E.**     **While Stitch Fix's Stock Price Was Artificially Inflated Due to the Undisclosed Stoppage of National Television Advertising, Company Insiders Unloaded 550,000 Shares of Stitch Fix Stock for Proceeds of More Than $16,000,000[6]**

59.     While Defendants' material misrepresentations and omissions, which led investors to believe that television advertising remained a continuing core part of driving near-term growth and national brand awareness, caused the Company's stock to trade at artificially inflated values, Stitch Fix executives, including Defendant Lake, unloaded 550,000 shares of common stock for proceeds of more than $16 million, as reflected in the charts below.  The proceeds from Defendant Lake's Class Period stock sales – $13.4 million – reflected an exponential multiple over her

---

[6]    While Stitch Fix insiders' massive stock sales are relevant to the Court's holistic scienter analysis, Plaintiff does not contend that these stock sales by themselves create a strong inference of scienter.

annual base salary.  According to Stitch Fix's Proxy Statement for the 2018 Annual Meeting of Stockholders, Lake had a fiscal year 2018 base salary of $650,000.  As such, Lake's Class Period sales, which occurred during a span of merely three months at a time when she knew or deliberately disregarded that television advertising was shut down, resulted in proceeds 20 times greater than her base salary for the entire year.

| Lake's Class Period Sales | | | |
|---|---|---|---|
| Date | Price | Shares | Proceeds |
| 6/18/18 | $26.20 | 27,116 | $710,439 |
| 6/18/18 | $25.27 | 39,550 | $999,429 |
| 6/19/18 | $26.06 | 57,429 | $1,496,600 |
| 6/19/18 | $26.47 | 9,237 | $244,503 |
| 6/20/18 | $26.17 | 4,000 | $104,680 |
| 6/20/18 | $25.63 | 62,668 | $1,606,181 |
| 7/16/18 | $32.34 | 52,466 | $1,696,750 |
| 7/16/18 | $33.17 | 14,200 | $471,014 |
| 7/17/18 | $33.06 | 8,626 | $285,176 |
| 7/17/18 | $32.68 | 58,040 | $1,896,747 |
| 7/18/18 | $35.30 | 3,224 | $113,807 |
| 7/18/18 | $33.67 | 26,750 | $900,673 |
| 7/18/18 | $34.68 | 36,694 | $1,272,548 |
| 8/20/18 | $32.82 | 50,000 | $1,641,000 |
| *Totals* | | *450,000* | *$13,439,546* |

60.    COO Smith also made substantial sales during the period of time when Stitch Fix's stock price was artificially inflated.  Smith unloaded 100,000 shares, pocketing proceeds of more than $3.5 million during the Class Period – more than seven times his annual base salary of $496,000 – at a time when he knew or deliberately disregarded that television advertising was shut down.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:18-cv-06208-JD

- 30 -

4843-2935-8031.v4

| Smith's Class Period Sales | | | |
|---|---|---|---|
| Date | Price | Shares | Proceeds |
| 6/15/18 | $26.83 | 300 | $8,049 |
| 6/15/18 | $26.26 | 24,700 | $648,622 |
| 7/16/18 | $33.29 | 14,880 | $495,355 |
| 7/16/18 | $32.47 | 10,020 | $325,349 |
| 7/16/18 | $34.10 | 100 | $3,410 |
| 8/15/18 | $32.58 | 19,791 | $644,791 |
| 8/15/18 | $33.08 | 5,209 | $172,314 |
| 9/17/18 | $48.35 | 5,583 | $269,938 |
| 9/17/18 | $51.07 | 12,707 | $648,946 |
| 9/17/18 | $49.10 | 4,560 | $223,896 |
| 9/17/18 | $50.42 | 2,150 | $108,403 |
| **Totals** | | **100,000** | **$3,549,074** |

61.     Market expectations for continued active client growth remained bullish in anticipation of Stitch Fix's 4Q18/FY18 earnings announcement, with analyst estimates once again nearing 30% year-over-year growth.  On September 25, 2018, analysts at J.P. Morgan previewed the Company's upcoming 4Q18/FY18 earnings announcement, noting high expectations including active client growth of 28% year-over-year.

**4QFY18 Earnings Preview: Key Metrics & Topics:**

Stitch Fix reports 4Q earnings on Monday, 10/1 after market close, with the 5pm ET conference call available at: US: (800) 458-4121; Int'l: (323) 794-2093; Passcode: 8417189.  We're looking for:

**1) Active Clients of 2.808M (+28% Y/Y),** driven by Women's Active Clients of 2.510M (+23% Y/Y) & Men's Active Clients of 298k (+94% Y/Y).  We do not model any contribution from Kids, which launched on 7/10, given SFIX's 4Q-end of 7/28.

62.     On September 28, 2018, RBC issued an analyst report previewing the Company's 4Q18 earnings announcement titled "FQ4 Preview & Cheat Sheet," which expected active client growth of 29% year-over-year:

**Key Metrics to Focus On: 1) Active Clients:** For FQ4:18 we estimate 2.8MM active clients, up 29% Y/Y on 6-pt easier comp.  This translates to 148K new active clients; **2) Revenue Per Client:** For FQ4 we estimate $433 in Annual Revenue Per Client, down (3%) Y/Y, and flat from FQ3, primarily due to a mix-shift to the Men's and Plus categories.

63.     As of October 1, 2018, Stitch Fix's stock price continued to trade at artificially inflated prices as high as $46.67 during intraday trading.

64.     These expectations for active client growth would not be met, and analysts and investors would perceive that the disappointing results were due to the Company's decision to halt national television advertising for 10 of 13 weeks during 4Q18.

**VII.     THE TRUE FACTS BEGIN TO BE REVEALED**

65.     After market close on October 1, 2018, at approximately 4:25 p.m. Eastern, Stitch Fix issued a press release announcing its financial results for 4Q18, the period ended July 28, 2018.   In the press release, the Company reported active clients of 2.7 million, far below expectations of more than 2.8 million, and active client growth of 25% year-over-year, far below analysts' expectations of 28-29%.

66.     At or around the same time, the Company also published a shareholder letter made available on the Company's website, which disclosed sequential active client growth during 4Q18 of only 54,000, the smallest quarter-over-quarter growth ever reported by the Company. Importantly, the letter also disclosed for the first time that the Company had halted its national television advertising campaign for 10 weeks during 4Q18 to test its efficacy:

> In Q4'18, we continued our measured and analytical approach to paid advertising as we tested key channels to better understand how to most effectively allocate our marketing spend. ***Specifically, during the quarter we performed a TV incrementality test, during which we temporarily ceased our national TV campaign for 10 weeks to measure the channel's efficacy***.

67.     The price of Stitch Fix common stock began to plummet at 4:29 p.m. Eastern, immediately following Defendants' filing of its press release and shareholder letter with the SEC at 4:25 p.m. Eastern.

68.     At approximately 5:00 p.m. Eastern on October 1, 2018, Defendants Lake and Yee and COO Smith hosted a quarterly earnings conference call to discuss 4Q18 results and address the newly disclosed stoppage of all national television advertising for most of the quarter.   In prepared remarks at the outset of the call, Smith provided further information about Defendants' decision to cease the Company's national TV campaign for 10 weeks:

One key marketing focus in Q4 was to drive channel learnings associated with [TVE][7] and to better determine channel efficacy through a series of incrementality tests. To achieve this, ***we temporarily ceased our national TV campaign for 10 weeks to measure channel efficacy***.

69.  In addition to disclosing that the Company had stopped national television advertising for the vast majority of the quarter, Smith also reported that television advertising was even more effective at acquiring new clients than the Company had previously understood:

Through this testing, ***we learned that TVE was a more effective acquisition channel than we had previously modeled*** as measured on a cost per acquisition basis.  The tests also enabled us to evaluate and quantify the interaction between TV and other advertising channels, which we believe will help us better determine the optimal ratio of advertising spend between TV and our other portfolio channels in future quarters.

70.  Numerous analysts participating in the investor conference immediately responded to the new disclosure that Defendants had ceased the Company's national television campaign for 10 weeks of the fourth quarter and sought clarification about the impact of that decision on the Company's disappointing active client growth.  An analyst from Piper Jaffray asked about the effect of the decision to halt television advertising, and specifically what active customer growth would have been had the Company run national television advertising throughout the quarter.  Defendant Lake did not directly answer the question.

[Analyst]: I recognized you took the TV off during the majority of the quarter.  But if you were to – ***knowing what you know now about how effective that is, if that had been on throughout the quarter as you may have had in the past, what would customer net adds have looked like***?  Is there a way to kind of back into that?

[Lake]: [O]n the first question around TV and just the specifics of it, unfortunately, we don't have that data to share.

71.  An analyst from Barclays asked directly whether the minimal active client growth was due to the halt in television advertising:

***So if we look at client net adds quarter-on-quarter, they were only up about 54,000 from last quarter***.  That cadence was a bit lower than the previous trend line.  ***So is that mostly just cutting back the TV program***?  Or is there a different mix of one and dones from these new categories that are growing fast?  And any other color on the net adds would be helpful.

---

[7]  TVE means "TV everywhere," a business model whereby users can stream television content to internet-connected devices.

Again, Defendant Lake did not answer the question directly nor did she identify any other reason for the decline in active client growth.  Instead, Lake pivoted to focus on the year-over-year comparison in active client growth:

> I think we're looking good in terms of kind of a year-over-year rate and we saw active clients grow 25% year-over-year.  We're really happy with kind of the foundational fundamental that really helped us to achieve that higher end of our guidance range.  We don't have any of – we wouldn't say that this is a quality issue of like – that we have more one and dones.  I mean, if anything, I think this is a business where we're really focusing on client quality and really focusing on ROI and LTV and how clients are demonstrating value over the long term.  And the more that we're able to learn through things like the TV incrementality test, the more we're able to hone that and really improve that over time.  And so I think these are – our top line revenue is consistent with where we shared that we would be and consistent with where we plan to go in the future, and I think the underlying fundamentals are ones that we're happy with.

72.     A J.P. Morgan analyst also asked about television advertising, seeking more information about the "better returns on the TV side than you expected."  In response, Defendant Lake admitted that the Company always "knew" (as did investors) that "TV was an important component of" marketing.[8]

> [Analyst]  [O]n marketing, you're seeing better returns on the TV side than you expected. Any more color that you can add on kind of the plan around marketing as you go into '19 – or your fiscal – yes, your fiscal '19?

> [Lake] I think the way to think about that is just that it's really us fine-tuning, understanding how all of our different marketing channels contribute to our portfolio.  *Marketing diversification is something we've talked about for a long time.  And we always knew that TV was an important component of that*, but I think having gone through this test and having really understood more granularly *how TV impacts*, I think, we feel like it's a really important part of the portfolio and you'll continue to see us invest there.

---

[8]    Lake did not distinguish between national and local television advertising, or even indicate that Stitch Fix engaged in any local television advertising during the quarter.

73.     Stitch Fix's stock price declined in after-hours trading from $44.63 at market close to $35.70 by 7:57 p.m. Eastern, roughly three hours later, as reflected in the Bloomberg chart below:



74.     The immediate decline in the price of Stitch Fix stock on the disclosure of the new information in the press release, shareholder letter and conference call regarding the stoppage of national television advertising and its impact on active client growth are strong indicators of the materiality of the new information and loss causation.

75.     Analyst reports issued in the wake of Defendants' disclosures and the decline of the stock price in after-market trading were nearly unanimous in their focus on the sharp deceleration in active client growth ***and*** in attributing the deceleration and disappointing quarterly results to the Company's previously undisclosed decision to halt national television advertising for 10 weeks during the quarter.

76.     Later in the evening of October 1, 2018, Piper Jaffray issued an analyst report titled "Remain Sidelined Post Q4 Net Adds Miss; Ests.  Moving Lower On Guidance; $31 PT." The report noted that ***the net quarterly active client addition of 55,000 was "the lowest sequential***

*add[] we've seen in the last 12 quarters*" and stated that **the pause in television advertising**

**"clearly had an adverse impact on this number"**:

> We believe newer businesses (men's) continued to grow solidly but believe the core women's business has decelerated – not just in Q4 but in Q1 we note kid's will be a revenue contributor in Q1. ***Net adds (+55k Q/Q) were the lowest sequential adds we've seen in the last 12 quarters. To be fair, TV advertising was paused in 10 weeks of the quarter in a test and clearly had an adverse impact on this number***. As TV ads have now been reactivated in Q1, we will be monitoring the attach rate of new customers.[9]

77.     That same evening of October 1, 2018, RBC Capital Markets issued an analyst

report titled "FQ4:18: No Need To Get Your Fundies in A Bunch," which noted that **the "10-**

**week cessation of a national TV campaign" was a "key reason" for the "Record Low[]" net**

**client adds**:

> Mixed FQ4 Results: Revenue of $318MM came in slightly below RBC/Street @ $319MM, largely due to lower than expected Active Clients. ***(Overly?) aggressive ad testing – a 10-week cessation of a national TV campaign – was likely a factor***.

> The Quarter Keys: 1) ***Active Clients Were Light: Came in at 2.74MM, below the Street @ 2.81MM, with 54K Net Adds vs. 180K in FQ3:18 and 120K in FQ4:17. Weak results***.

> \*       \*       \*

> Stitch Fix's Active Clients came in at 2.74MM (up 25% Y/Y vs. 30% Y/Y in F3Q:18), below the Street's expectation of 2.81MM and our expectation of 2.84MM. This translates to ~54K in net additions (lowest we have seen yet) vs. our expectation of 148K. ***While management did not call out any material cause for this decel, we believe that halting national TV campaigns for 10 weeks could have been a key reason***.

> \*       \*       \*

> ***TV As a Marketing Channel***

> ***SFIX performed marketing tests in FQ4:18 and ceased TV campaigns for 10 weeks to measure the channel's efficacy***. Management learned that TV was a more attractive channel than expected on a CAC basis.

78.     SunTrust Humphrey Robinson also issued an analyst report the evening of October

1, 2018, titled "Inline Quarter Fails to Impress; Fundamentals Intact/Maintain Buy" that also

---

[9]   The Piper Jaffray Report made no distinction between national and local or regional advertising.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:18-cv-06208-JD                                                     - 36 -
4843-2935-8031.v4

called out the stagnant active client growth, stating that "sequential net adds of 54K this Q were below the 120K net adds in the year ago period" and ascribing at least some of the stagnancy to *"experiment[s]" the Company conducted "by pausing its national TV campaign*."

> ***Key KPIs Under-whelming; Questions Remain Around Marketing Efficiency***.  Sequential net adds were 54K as active clients (as of period end) were 2.74M, below consensus expectations of 2.81M. [ . . .]   One of the issues on investors' mind is the decline in marketing efficiency this quarter, as advertising expenses were up Y/Y while sequential net adds of 54K this Q were below the 120K net adds in the year ago period.   We note that there are several factors impacting this metric including investment in new categories (Plus, Kids, assortment across price points), and testing /experimenting.  Here, ***the company experimented with its advertising budget throughout the quarter by pausing its national TV campaign***, and continuing some regional spend.  This may have had some influence over marketing efficiency, though the company would not quantify the impact.

This report is the first instance where it was publicly reported that Stitch Fix continued some regional television advertising.  However, the SunTrust Humphrey Robinson analyst report was issued after 10:45 p.m. Eastern, more than six hours after Defendants' disclosures and approximately three hours after the stock price had plummeted to $35.70 in after-hours trading.  Moreover, as this information about the continuation of some regional advertising was not disclosed publicly by Defendants and was reported by only a few select analysts, it was likely information obtained in one-on-one meetings with Defendants.

79.     On October 2, 2018, J.P. Morgan issued an analyst report titled "Solid Results, But Against High Expectations; Executing on Innovations & UK Expansion in FY19; Remain Neutral & $36 PT," which ***attributed the deceleration in revenue growth to the pause in national TV advertising in 4Q18***:

> Revenue growth decelerated from +29% in 3QFY18 to +23% Y/Y in 4QFY18 & more than anticipated by investors, but the growth in 3Q was against easier comps ***while growth in 4Q was without a national TV campaign for 10 weeks in the quarter***. Mgmt has turned TV back on and highlighted that the TV incrementality test in 4Q showed that TV was more effective than previously modeled & will lead to better marketing optimization going forward.

80.     On October 2, 2018, Barclays issued an analyst report titled "Solid 4Q, Despite Missing Buyside," that reacted with surprise to the slowing of active client growth to "the lowest yet" due to "pull[ing] back on national TV advertising":

> ***The one area we were surprised*** was marketing efficiency eroding.  ***SFIX pulled-back on national TV advertising*** (and continued to run some local TV) to test efficacy, **which negatively weighed on both client growth and marketing efficiency**.  ***Active client growth slowed to 25% Y/Y, and SFIX added just 54K net clients Q/Q, the lowest yet***, with much higher ad expense-per-net-add.

The Barclays analyst report that Defendants had "continued to run some local TV" was immaterial to investors, who had already began selling the stock immediately following Defendants' post-market disclosures the day before.  ¶¶27, 73-74, 90.

81.     Following the Company's October 1, 2018 disclosures, the price of Stitch Fix common stock plummeted, falling $15.69 from $44.63 at the close of trading on October 1, 2018, to $28.94 per share by market close on October 2, 2018.  This decline of more than 35% occurred on unusually high volume of more than 39.9 million shares traded, or more than 9.5 times the average daily volume over the preceding 10 trading days.

## VIII.   LOSS CAUSATION AND ECONOMIC LOSS

82.     Lead Plaintiff hereby incorporates ¶¶39-81, above.   Defendants' deceptive conduct, misrepresentations, and omissions of material facts were a significant cause of the artificial inflation of Stitch Fix's stock price throughout the Class Period.

83.     On June 7, 2018, the day before the Class Period, Stitch Fix's stock price closed at $19.67 per share.  After the market closed, Stitch Fix issued and filed with the SEC a press release and a shareholder letter announcing its 3Q18 results in which Defendants made numerous statements about television advertising's ongoing importance to the Company's active client growth, financial results, and national brand.  These statements omitted the fact that the Company had halted its national television advertising campaign at least three weeks before June 7, 2018 to conduct a test of its efficacy that would last 10 weeks.  As a result, television advertising would not contribute to near-term results or strengthen the Company's image as a national brand during 4Q18.  Nevertheless, on the 3Q18 earnings call later that day, Defendants again credited their ongoing television advertising for driving the Company's active client growth and strengthening the Company's national brand recognition, and again omitted that it had already halted television advertising.

84.     These omissions maintained the artificial inflation in Stitch Fix's share price, which increased 26.5%, from $19.67 at close on June 7, 2018 to $24.88 at close on June 8, 2018, on heavy volume of more than 12.6 million shares, as the misrepresentations maintained the artificial inflation in the share price.[10]  This increase was specific to Stich Fix; by way of contrast, the NASDAQ Composite Index increased only 0.13% from close on June 7, 2018 to close on June 8, 2018.

85.     Media and analyst coverage noted that Stitch Fix's stock price soared due to news about the Company's active client growth, which was driven in substantial part by its television advertising campaign.  For example:

(a)     On June 7, 2018, following the Company's earnings release, CNBC published an article with a title specifically linking the Company's surging stock price to its statements about active client growth: "Stitch Fix soars after online styling service says active clients grew 30%."

(b)     On June 7, 2018, following the Company's earnings release, RBC Capital Markets issued an analyst report focusing on active client growth, stating: "Stitch Fix's Active Clients came in at 2.688MM, above the Street's expectation of 2.665MM and our expectation of 2.675MM.  These were positive results, with Active Client growth remaining healthy at 30% Y/Y."

86.     On June 8, 2018, after market close, Defendants filed Form 10-Q with the SEC, in which they continued to materially omit the truth about the Company's use of television as a current marketing method that was helping to drive active client growth.  These omissions maintained the artificial inflation in Stitch Fix's stock price, which closed at $23.85 on June 11, 2018, the next trading day.

87.     Throughout the Class Period, the truth remained concealed from investors, and Stitch Fix's stock price reached a Class Period high of $51.19 at close on September 17, 2018.

---

[10]   Average daily volume during the Class Period was approximately 3 million shares.

88.     At approximately 4:25 p.m. Eastern on October 1, 2018, Stitch Fix issued and filed with the SEC a press release and shareholder letter announcing its financial results for 4Q18, which revealed that active client growth had substantially slowed throughout 4Q18.   The shareholder letter disclosed for the first time that the Company had halted all national television advertising during 10 of the 13 weeks of 4Q18.

89.     During the quarterly earnings call hosted on October 1, 2018 at 5:00 p.m. Eastern, Defendants reiterated the information about the cessation of national TV advertising during substantially all of 4Q18, disclosing that the Company had temporarily ceased its national television advertising campaign for 10 weeks to measure its efficiency.

90.     In response to Defendants' disclosures, Stitch Fix's stock price began to fall precipitously immediately in after-hours trading, from $44.63 at the close of trading at 4:00 pm Eastern on October 1, 2018, to $35.70 by 7:57 p.m. Eastern.

91.     Following the decline in the stock price in the after-market trading on October 1, 2018, analysts linked the stock price decline to the stagnant active client count, which they specifically ascribed to the revelation of the truth concerning the Company's decision to halt its national television campaign for 10 weeks in order to conduct testing.  For example:

(a)     On October 1, 2018, Piper Jaffray issued a report reducing its price target, stating that the quarterly active client addition was "the lowest sequential adds we've seen in the last 12 quarters," and stating that halting television advertising "clearly had an adverse impact on this number."

(b)     On October 1, 2018, RBC Capital Markets issued an analyst report stating that revenues came in lower than RBC and Street estimates "largely due to lower than expected Active Clients," which were the "lowest we have seen yet."  It continued, "we believe that halting national TV campaigns for 10 weeks could have been a key reason."

(c)     On October 1, 2018, SunTrust Humphrey Robinson issued an analyst report stating that "sequential net adds of 54K this Q were below the 120K net adds in the year ago period" and ascribing at least some of the stagnancy to "experiment[s]" the Company conducted "by pausing its national TV campaign."

(d)     On October 2, 2018, J.P. Morgan issued an analyst report stating that "growth in 3Q was against easier comps while growth in 4Q was without a national TV campaign for 10 weeks in the quarter."

(e)     On October 2, 2018, Barclays issued an analyst report stating ascribing the surprising slowing of active client growth, "the lowest yet," to the "pull[ing] back on national TV advertising."

92.     In response to this company specific news, Stitch Fix's stock price declined 35.15%, from $44.63 at the close of trading on October 1, 2018, to $28.94 at the close of trading on October 2, 2018, on heavy volume of more than 39.9 million shares.  This decline was Stitch Fix-specific; by way of contrast, the NASDAQ Composite Index fell by only 0.47% between the close of trading on October 1, 2018 and the close of trading on October 2, 2018.

## IX.     THE PSLRA SAFE HARBOR DOES NOT APPLY

93.     The Private Securities Litigation Reform Act of 1995 ("PSLRA") "Safe Harbor" warnings that accompanied Defendants' forward-looking statements issued during the Class Period were ineffective to shield Defendants from liability for their false and misleading statements and omissions of material fact.

94.     To the extent that the false and misleading statements related to existing facts or conditions, the Safe Harbor does not apply.  To the extent that the false and misleading statements are forward looking, Defendants are still liable.  Defendants knew at the time they spoke or failed to speak fully that each of their forward-looking false and misleading statements were false and misleading.  Defendants' false and misleading forward-looking statements were authorized or approved by an executive officer or director of Stitch Fix, who knew that the forward-looking statements were false.  The forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.  And the "Safe Harbor" warnings were inadequate, boilerplate and were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

1

## X.      ADDITIONAL CONTROL PERSON ALLEGATIONS

2      95.      As alleged herein, each of the Individual Defendants acted as control persons of

3   Stitch Fix and the other Individual Defendants within the meaning of §20(a) of the Exchange Act

4   as alleged herein.

5      96.      By virtue of their high-level positions, participation in and awareness of the

6   Company's operations and intimate knowledge of the false statements and omissions made by

7   Stitch Fix and disseminated to the investing public, the Individual Defendants had the power to

8   influence and control, and did influence and control, directly or indirectly, the Company's

9   decision-making, including the content and dissemination of the various statements that Plaintiff

10  contends are false and misleading.

11      97.      The Individual Defendants participated in conference calls with investors and

12  analysts and interviews with media, and were provided with or had unlimited access to copies of

13  the Company's reports, press releases, public filings and other statements alleged by Plaintiff to

14  be misleading prior to and/or shortly after the statements were issued, and had the ability to

15  prevent the issuance of statements or cause the statements to be corrected.

16      98.      Each of the Individual Defendants had direct and supervisory involvement in the

17  day-to-day operations of the Company and had and exercised the power to control or influence

18  the actions giving rise to the securities violations alleged herein.

19      99.      Each of the Individual Defendants had consistent and constant access to

20  information about active client count and active client growth, and the use of and Company

21  spending on television advertising.

22      100.      As set forth above, Defendants violated §10(b) of the Exchange Act and Rule 10b-

23  5 by their acts and omissions.  By virtue of their positions as controlling persons, the Individual

24  Defendants are liable under §20(a) of the Exchange Act.  As a direct and proximate result of the

25  Individual Defendants' wrongful conduct, Plaintiff and other members of the Class (defined

26  below) suffered damages in connection with their purchases of the Company's publicly-traded

27  securities during the Class Period.

28

1

**XI.    APPLICABILITY OF THE FRAUD ON THE MARKET AND AFFILIATED UTE PRESUMPTION OF RELIANCE**

2

3       101.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-

the-market doctrine in that, among other things:

4

5               (a)     Defendants made public misrepresentations or failed to disclose material

facts during the Class Period;

6

7               (b)     The omissions and misrepresentations were material;

8               (c)     The Company's common stock traded in an efficient market;

9               (d)     The misrepresentations alleged would tend to induce a reasonable investor

to misjudge the value of the Company's common stock; and

10

11              (e)     Plaintiff and other members of the Class purchased Stitch Fix common

12      stock between the time Defendants misrepresented or failed to disclose material facts and the time

the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

13

14      102.    At all relevant times, the market for Stitch Fix common stock was efficient for the

following reasons, among others:

15

16              (a)     As a regulated issuer, Stitch Fix filed periodic public reports with the SEC;

and

17

18              (b)     Stitch Fix regularly communicated with public investors via established

19      market communication mechanisms, including through the regular dissemination of press releases

on major news wire services and through other wide-ranging public disclosures, such as

20      communications with the financial press, securities analysts, and other similar reporting services.

21

22      103.    Plaintiff will also rely upon the presumption of reliance under *Affiliated Ute

Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against

23      Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

24

**XII.    CLASS ACTION ALLEGATIONS AND THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE**

25

26      104.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

27      Rules of Civil Procedure on behalf of all persons who purchased Stitch Fix common stock on the

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:18-cv-06208-JD                                                    - 43 -
4843-2935-8031.v4

open market during the Class Period, and were damaged thereby (the "Class").  Excluded from the Class are Defendants, directors and officers of Stitch Fix and their families and affiliates.

105.   The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, there were more than 38.5 million outstanding shares almost certainly owned by thousands, if not tens of thousands, of persons.  Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

106.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members include:

(a)   Whether the federal securities laws were violated by Defendants;

(b)   Whether Defendants engaged in fraudulent conduct and omitted and/or misrepresented material facts;

(c)   Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether Defendants knew or recklessly disregarded that their statements were materially false and misleading;

(e)   Whether the prices of Stitch Fix common stock were artificially inflated;

(f)   Whether Defendants' fraudulent conduct, misrepresentations and omissions caused Class members to suffer economic losses, *i.e.*, damages; and

(g)   The extent of damage sustained by Class members and the appropriate measure of damages.

107.   Plaintiff's claims are typical of those of the Class because Plaintiff and the members of the Class purchased Stitch Fix securities during the Class Period and sustained damages from Defendants' wrongful conduct.  Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

108.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  A class action will achieve economies of time, effort and

1  expense and provide uniformity of decision to the similarly situated members of the Class without

2  sacrificing procedural fairness or bringing about other undesirable results.  Class members have

3  not indicated an interest in prosecuting separate actions; none have been filed.  The number of

4  Class members and the relatively small amounts at stake for individual Class members make

5  separate suits impracticable.  No difficulties are likely to be encountered in the management of

6  this action as a class action.

7        109.   In addition, a class action is superior to other methods of fairly and efficiently

8  adjudicating this controversy because the questions of law and fact common to the Class

9  predominate over any questions affecting only individual Class members.  Although individual

10  Class members have suffered disparate damages, the fraudulent scheme and the

11  misrepresentations and omissions causing damages are common to all Class members.  And, as

12  discussed below, there are no individual issues of reliance that could make this action unsuited

13  for treatment as a class action because all Class members relied on the integrity of the market and

14  are entitled to the fraud-on-the-market presumption of reliance.

15        110.   The market for Stitch Fix's securities was open, well-developed and efficient at

16  all relevant times.  Stitch Fix's stock met the requirements for listing, and was listed and actively

17  traded on the NASDAQ, a highly efficient and automated market.  As a regulated issuer, Stitch

18  Fix filed periodic public reports with the SEC and the NASDAQ.  Stitch Fix regularly

19  communicated with public investors via established market communication mechanisms,

20  including through regular disseminations of press releases on the national circuits of major

21  newswire services and through other wide-ranging public disclosures, such as communications

22  with the financial press and other similar reporting services.

23        111.   As alleged herein, the change in the price of Stitch Fix's stock – compared to the

24  changes in the peer group and NASDAQ – in response to the release of unexpected material

25  positive and negative information about the Company shows there was a cause-and-effect

26  relationship between the public release of the unexpected information about Stitch Fix and the

27  price movement in the Company's stock.  Numerous analysts followed Stitch Fix, attended the

28  Company's conference calls and issued reports throughout the Class Period.  Numerous National

Association of Securities Dealers member firms were active market makers in Stitch Fix stock throughout the Class Period.  According to the Company, it was eligible to register securities on Form S-3 during the Class Period.

112.    As a result of the foregoing, the market for Stitch Fix common stock promptly digested current information regarding Stitch Fix from all publicly available sources and reflected such information in the Company's stock price.  Under these circumstances, all purchasers of Stitch Fix securities during the Class Period suffered similar injury through their purchases of Stitch Fix stock at artificially inflated prices and the subsequent revelations concerning declines in price, and a presumption of reliance applies.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

113.    Plaintiff incorporates ¶¶1-112 by reference.

114.    During the Class Period, Stitch Fix and the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.    Stitch Fix and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Stitch Fix common stock during the Class Period.

116.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially-inflated prices for Stitch Fix common stock.  Plaintiff and the Class would not have purchased Stitch Fix common stock at the prices they paid, or at all, if they

had been aware that the market price had been artificially and falsely inflated by Stitch Fix's and the Individual Defendants' misleading statements.

**COUNT II**

**For Violation of Section 20(a) of the Exchange Act**
**Against Defendants Lake and Yee**

117.    Plaintiff incorporates ¶¶1-116 by reference.

118.    Defendants Lake and Yee acted as controlling persons of Stitch Fix within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by Stitch Fix and disseminated to the investing public, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of these Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

119.    Each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and therefore had the power to control or influence the statements regarding active client growth and the running of Stitch Fix's television campaign that give rise to the securities violations as alleged herein and exercised the same.  Furthermore, throughout the Class Period, these Defendants had access to the data and other internal reports regarding active client count and growth and television advertising.

120.    As set forth above, Stitch Fix and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this AC.  By virtue of their positions as controlling persons, Defendants Lake and Yee are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff

1 | and other members of the Class suffered damages in connection with their purchases of the

2 | Company's publicly-traded securities during the Class Period.

3 | **PRAYER FOR RELIEF**

4 | WHEREFORE, Plaintiff prays for judgment as follows:

5 | A.    Declaring this action to be a proper class action pursuant to Federal Rule of Civil

6 | Procedure 23;

7 | B.    Awarding Plaintiff and the members of the Class damages, including interest;

8 | C.    Awarding Plaintiff reasonable costs and attorneys' fees; and

9 | D.    Awarding such equitable or injunctive, or other relief, as the Court may deem just

10 | and proper.

11 | DATED:  November 6, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP

s/ Shawn A. Williams
SHAWN A. WILLIAMS

SHAWN A. WILLIAMS
MATTHEW S. MELAMED
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
CAROLINE M. ROBERT
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
ASHLEY R. RIFKIN
5040 Shoreham Place
San Diego, CA  92122
Telephone:  619/525-3990
619/525-3991 (fax)

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:18-cv-06208-JD
4843-2935-8031.v4

- 48 -

1

Additional Counsel for Plaintiff

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify under penalty of perjury that on November 6, 2020, I authorized the

3

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

4

send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

5

and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service

6

to the non-CM/ECF participants indicated on the attached Manual Notice List.

7

           s/ Shawn A. Williams

8

SHAWN A. WILLIAMS
ROBBINS GELLER RUDMAN
     & DOWD LLP

9

Post Montgomery Center

10

One Montgomery Street, Suite 1800
San Francisco, CA  94104

11

Telephone:  415/288-4545
415/288-4534 (fax)

12

E-mail:  shawnw@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4843-2935-8031.v4

## Mailing Information for a Case 3:18-cv-06208-JD Sawicki v. Stitch Fix, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter Arthur Binkow**
  info@glancylaw.com,pbinkow@glancylaw.com,peter-binkow-7144@ecf.pacerpro.com

- **Jenny L. Dixon**
  jdixon@robbinsllp.com,notice@robbinsllp.com

- **Donald J. Enright**
  denright@zlk.com

- **Patrick Edward Gibbs**
  pgibbs@cooley.com,bgiovannoni@cooley.com

- **Richard W. Gonnello**
  rgonnello@faruqilaw.com,ecf@faruqilaw.com,dbehnke@faruqilaw.com

- **Dillon Joseph Hagius**
  dhagius@faruqilaw.com,smarton@faruqilaw.com,ecf@faruqilaw.com

- **Benjamin Heikali**
  Bheikali@faruqilaw.com,ealdo@faruqilaw.com,rglezakos@faruqilaw.com,ecf@faruqilaw.com,tpeter@faruqilaw.com

- **Shannon L Hopkins**
  shopkins@zlk.com,shalliday@zlk.com

- **Katherine M. Lenahan**
  klenahan@faruqilaw.com

- **Rosanne L. Mah**
  rmah@zlk.com,arocco@zlk.com,rlm@classlitigation.com,shopkins@zlk.com,jgrohsgal@zlk.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew Seth Melamed**
  mmelamed@rgrdlaw.com,mburch@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Sherief Morsy**
  smorsy@faruqilaw.com,ecf@faruqilaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@poml

- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,clinehan@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com,charles-linehan-8383@ecf.pacerpro.com

- **Caroline Maryse Robert**
  crobert@rgrdlaw.com

- **Jessica Valenzuela Santamaria**
  jsantamaria@cooley.com,galancr@cooley.com

- **Jessie A. R. Simpson Lagoy**
  jlagoy@cooley.com,galancr@cooley.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,kmccarty@rgrdlaw.com,e_file_sd@rgrdlaw.com,sbloyd@ecf.courtdrive.com,sbloyd@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)